UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

```
                              )
UNITED STATES OF AMERICA,      )  CR20-032-JCC
                              )
              Plaintiff,       )  SEATTLE, WASHINGTON
                              )
v.                             )  January 11, 2022
                              )
KALEB COLE,                    )  9:00 a.m.
                              )
              Defendant.       )  Sentencing
```

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE JOHN C. COUGHENOUR
UNITED STATES DISTRICT JUDGE

_____


APPEARANCES:




```
For the Plaintiff:      Thomas Woods
                        Seth Wilkinson
                        Assistant United States Attorneys
                        700 Stewart Street
                        Suite 5220
                        Seattle, WA  98101


For the Defendant:      Christopher Black
                        Teymur Askerov
                        Black & Askerov PLLC
                        705 2nd Avenue
                        No. 1111
                        Seattle, WA 98104,
```

THE CLERK:  We are here on CR20-32-2JCC, the United States of America versus Kaleb Cole.  Counsel, please make your appearances for the record.

MR. WOODS:  Good morning, Your Honor.  Tom Woods, Nicholas Brown and Seth Wilkinson on behalf of the United States.  With me at counsel table as well is FBI Special Agent Kibbler (phonetic).

MR. BLACK:  Good morning, Your Honor.  Christopher Black and Tim Askerov appearing on behalf of the defendant, Kaleb Cole.

THE COURT:  Has he had an opportunity to read and comment on the presentence report?

MR. BLACK:  He has.

THE COURT:  All right.  Do you wish to speak?

MR. BLACK:  Thank you.

Your Honor, Mr. Cole is a young man.  He was even younger when he first got pulled into the kind of thinking associated with the group involved in this case.  Mr. Cole, when he was growing up, was isolated, lived in a rural area, didn't have a lot of friends.  He was bullied.  And he turned to a place for community, where he probably shouldn't have, and ended up associating with people who had ideas that most of society, and I'm sure the court, finds pretty abhorrent.

Mr. Cole was brought into this at a young age, and that has led him to where he is today.  And that's not an excuse

for his actions that he has been convicted of in this case, but it is something that we ask the court to consider in imposing sentence here.

Mr. Cole clearly made some serious errors of judgment in this case, and these decisions impacted people in a significant manner.  We acknowledge that.  And we have never contested that, the defense has never contested that in any proceeding, trial, or anywhere else.

We acknowledge also that there are consequences for the actions that Mr. Cole has been convicted of.  However, we'd submit that the sentences recommended by the probation office and the government are far greater than necessary, to accomplish the goals of the sentencing statute, when considering all the factors that the court must consider in imposing sentence.

First, is Mr. Cole's background.  Again, he is a young man.  At the time of the offense he was just 24 years old. He has no criminal history.  He's always been employed.  The government has attempted to portray Mr. Cole as a violent, dangerous person.  But this, we'd submit, is a false narrative.

It's true that at a time when he was legally permitted to do so, Mr. Cole possessed firearms.  It's also true that he was a member of Atomwaffen.  But it is not true that he ever engaged in any violent actions, or planned any violent

actions.  And we know this because the government had an informant embedded in Atomwaffen, during the entire period of Mr. Cole's involvement with that group.  That informant testified during trial that during that period the group did not engage or plan any violent actions.  Instead what they did is hold conferences, discuss ideologies, create messaging videos that are clearly protected by the First Amendment.

Sometimes they got together and shot guns out in the woods.  But it was people who were legally permitted to own firearms.  And they did that in a way that was completely legal.

They were fundamentally not planning any sort of actual violence.  And to suggest otherwise, we submit, is unfair and prejudicial to Mr. Cole.  The same is true of the discussion of actions committed by members of Atomwaffen in the past.  There's not even a suggestion that Mr. Cole had any involvement in any violent actions, committed by anybody who was a current or former member of Atomwaffen, or had anything to do with those people.  What's being suggested here is guilt by association, and we'd ask the court not to heed that kind of argument.

Instead, we'd ask the court to submit to -- excuse me, we'd ask the court to impose sentence on Mr. Cole for what he was convicted of in this case, which is sending threatening messages.  Although there's no indication of any plan to

carry out those threats, which there would have been, again, because the government had an informant involved in the group and knew what was going on, and there was also evidence suggesting that Mr. Cole, in particular, didn't want the messages to go too far.

Mr. Cole, nonetheless, was convicted, and the jury found that those messages did, in fact, go too far. And that conviction, or those convictions, warrant a sanction, and even a significant sanction. But we'd ask the court to keep in mind the actual conduct that Mr. Cole was convicted of, and not view it as part of some bigger violent plan which did not exist.

We'd also ask the court to consider the context in which the posters involved in this case were sent. Again, Mr. Cole is a young man, and he clearly showed some poor judgment in this case. One of those errors was miscomprehending the situation he was in. He was viewing what was going on, and what he was involved in, as some sort of conflict between his group and journalists, and the actions in this case were a way to push back against what he viewed as unfair treatment of him and his group.

And what he did not fully consider, as part of the actions here, was the impact that they would have on individual people. And given the procedural posture of the case, Mr. Cole is not currently in a position to make a statement

about his actions or his intent.  But just because he is remaining silent here doesn't mean that he is necessarily insensitive to the human impact of his actions.

I will note that at Mr. Cole's trial the defense presented a case that I'd submit was not inconsistent with acknowledgment of this impact, and we certainly acknowledge that here today.

I just want to touch on a couple more points.  One is the -- in the guideline analysis, the leadership role, as gone into detail in our brief, we believe that the evidence does not establish that Mr. Cole was a leader under the guidelines.  Mr. Shea was the leader.  While it's possible to have more than one leader, as the government has noted, we submit the facts don't bear that out here.  Mr. Shea was the person who conceived of the plan here.  He started the chat group.  He invited others to it, including Mr. Cole.  There's no indication Mr. Cole had knowledge or involvement before that.  Mr. Shea took the lead role in planning.  He picked the dates, and disbanded the chat group, and engaged in sending a number of the posters.

While Mr. Cole was a participant and he made some suggestions about ways that things could be done, literally everybody in the chat group did the same thing.  And the co-defendants, who the court has already sentenced, did the same things as Mr. Cole.  The only thing that Mr. Cole did

that was different is create the posters.  But on the other hand, he was not involved in actually sending or posting them.  And the creation of posters does not qualify as an act of leadership, under the guidelines, which require some sort of influence or control over others.

And the discussion about Mr. Shea leads me to my last point, which is that we'd submit there's no proper basis to sentence Mr. Cole to something appreciably longer than Mr. Shea, based on their relative culpability.  We have submitted that Mr. Shea is more culpable.  But even if the court doesn't accept that, it has to be pretty close.

Mr. Cole -- excuse me, Mr. Shea was named first in the indictment.  While that doesn't technically mean anything, we know that that is a spot reserved for, at least who the government views as the most culpable person in the case.

Also Mr. Cole doesn't have any appreciably different social history than Mr. Shea.  And we'd submit that they are, therefore, in pretty much the same position in front of the court.  The only difference, of course, being that Mr. Cole took the case to trial, while Mr. Shea entered a guilty plea. We'd submit that that is not a proper basis for a longer sentence, and we'd ask the court to not sentence Mr. Cole on that basis.

Instead, we ask the court to sentence Mr. Cole to the same sentence as Mr. Shea, a sentence of 36 months, which is a

serious sentence, it's a long sentence, it reflects the seriousness of the convicted conduct. It acknowledges that Mr. Cole is a young man, and has no criminal history. He's been incarcerated for now almost two years, during this COVID pandemic, which has included very harsh conditions of confinement. And that is likely to extend for the, at least foreseeable future. And so we'd submit that that is a fair sentence, and we ask the court to impose it.

And that's all I have, unless the court has any questions.

THE COURT: Regarding the objections to the presentence report, do you wish to have any additional evidence in the record?

MR. BLACK: No, Your Honor.

THE COURT: Does your client wish to speak?

MR. BLACK: No, Your Honor. But I would like to have Mr. Cole's grandmother speak, briefly, if the court will permit that. I don't know if this is the time for that.

THE COURT: That's fine. Go ahead.

MR. BLACK: Mr. Cole's grandmother is JoAnne Powell.

MS. POWELL: Thank you for letting me speak. I'm Kaleb's grandmother, and I'm representing Kaleb's mother, and father, and grandfather. We all love you, Kaleb. And we respectfully request the court's leniency for Kaleb, for several reasons:

I guess I never expected to be doing this sort of thing

for Kaleb.  This is just beyond belief for me.  We were here for the court case.  And, even so, Kaleb is not the person he was presented to the court to be.  He's served almost 22 months in detention so far, waited trial for 18 months.  And because of the COVID, much of that time was spent in lockup.  It was a year before anyone could see him.  And then it was only immediate family.  And his mother is living in another country, and because of COVID, couldn't be here.  So, fortunately, thank you to the prison system for letting us, as his grandparents, to see him.  Because we've been very close to Kaleb.

Kaleb has always had a strong work ethic and always been a good young man.  His -- I know I have a -- I'm sorry -- he's always had a strong work ethic.  He supported himself when he moved out on his own, when he turned 18.  And he's never been -- he had never been in any trouble before.  And I've known Kaleb his whole life.

Kaleb wants to resume a normal life and he wants to put this episode behind him.  He never dreamed that anything like this would be happening to him.

Kaleb's father, and his mother, and ourselves, my husband Ken and I, have maintained a good relationship with Kaleb through this whole thing.  And while he's been incarcerated, we've been in touch with him.  We've talked to him, and are thankful because we finally got to see him, after a year.  We

were able to talk to him about this whole situation and what's been going on.

And I just want to say that his mother and father and ourselves -- when he is allowed to return to society, we'll support him, both mentally, and financially, and physically, in any way we can to help him start on his way to a normal life.

Kaleb has a girlfriend he's had for a long time.  And he would like to resume this normal life and get married and have children and move ahead.  He never intended to do anything to hurt anyone.  Kaleb has never been a violent person.  We know this.  I've been around Kaleb since he was -- well, since he was born.  All of us.  And he's never been violent.

He would spend summers with us.  He developed friendships with the local children that were there, and nice kids.  And he had a very good summertime with us.  I've never seen him get violent or angry.  And you can say whatever you want about him, but I know he's not a violent person.  You don't know him.  We know him.

Did he make some mistakes?  Yes, he did, and he realizes that.  But there is no purpose in keeping him incarcerated. He's not going to hurt anybody.  He's not interested in hurting anybody.  He's never wanted to be part of protests, or anything like that.  We've talked -- we talked about that

in the past.  And he says he didn't want to do that, because people get out of control.  And he's always been good and helpful to us.  He's always been good and helpful to his parents.  And he would never have left the state in the first place, if he had not been concerned for the safety of his father and stepmother.

And I just beg that you would not look at him through hatred for whatever his political beliefs had been.  And I say "had been," because Kaleb is not a violent, mean person. I love Kaleb.  He's been so good to all of our family.  He cares about his family.  And he just wants to be a productive member of society.  And isn't that what he's supposed to be learning from this, is not -- not to do the things that got him in trouble?

But Kaleb had never been in trouble before this time.  So he certainly does not want to do that again.  This is already going to affect his life forever, because things that are on the Internet, the news media, the things that they've said; they'll always be there.  So he has paid.  He has paid big time.  And he's paid big time for what is happening in his life.

Anyway, imprisoning him will just be a burden on the prison system, that is just not necessary.  He can be out there.  He can be paying his own way, instead of you all paying for him.  So I just ask that you would just consider

that.

And I don't know if it makes any difference, but I would ask that, if possible, if he has to stay and spend some additional time, that perhaps he could consider requesting that he might be incarcerated in a facility in Arizona, or near there, which is where my husband and I live.  That we could be a support and encouragement to him, and certainly when he would be released, we could be there for him and help him get started in his new life.

He's not a person that you need to be worried about. Kaleb is a good man, who was a young man who made some poor decisions.  But he's not someone that you need to be afraid of.  And I just thank you for letting me speak.

And love you, Kaleb.

THE COURT:  All right.  Let me hear from the government.

MR. WOODS:  Your Honor, one of the great harms to emerge from this pandemic is the perpetual state of unease that so many people feel throughout their day.  All of the decisions that are intertwined with the question of:  Is it safe?  Is it safe to go back to commuting on the bus?  Is it safe to send my kids to school?  Is it safe for me to be at work?

What's important to remember is that perpetual state of unease is something that countless Americans have felt before

the pandemic, and through today, because of the color of their skin, because of their religion, because of their national origin, because of some other protected class.  It is the great tragedy of this country that some 250 years in, so many Americans have that feeling of unease.

And if that is the great tragedy of this country, the greatest sin is the people who exploit that, the people who target that, the people who seek to transform that unease into fear and into terror.  And that is what Kaleb Cole did in this case.  That is who he is.  That was his identity, his life's work to this point.  Hate.  Targeting people to instill terror.

And, Your Honor, it worked.  That is the tragic thing about this case.  It worked.  The court heard from the victims in this case, and those stories were hard to hear. Mala Blomquist discovering that poster taped to her daughter's bedroom window.  Hilary Bernstein, coming back late at night after visiting her grandchild, the widower who lived alone, finding that message with the swastika and the message, "You are being watched in your home."

Chris Ingalls, the steps he took to protect his family. Veronica Cintron, leaving the profession of a journalist, in part because of what happened in this case.  Dave Rosenbaum, clutching his daughter -- his daughter -- while making pancakes on that weekend morning, because he saw someone at

the front door, who turned out to be a deliveryman.  Those wounds are not easy to heal.  They are deep.  They are a harm that is very hard to quantify.  And it is a harm that will extend well past today in this case.

You know, the jury heard a sanitized version of this case, but the court has the bigger picture.  So when Miri Cypers discovers that poster, and she sees the man in the skull mask holding that Molotov cocktail outside a home, and when she sees her name, her address at the bottom of that poster, and she sees that radiation shield, she knows what that means.  She knows, because she's the director of the ADL.  Her work, her mission, has been, in part, this group.  She knows that group has committed murder.  She knows that group embraces, promotes, advocates violence against Jews and people of color.  She knows that.  And that is what he intended.

Your Honor, in fashioning the sentence in this case, I ask you to keep in mind three different things.  First, Kaleb Cole is different.  He is head and shoulders apart.  He is apples and oranges from the other defendants who have appeared before this court.  The court saw Cameron Shea.  He stood right where I was standing.  He was trembling.  He was scared.  And he looked back into that gallery and he apologized.  He accepted responsibility for what he did. Kaleb Cole --

THE COURT:  I might add that he got a different

sentence because of that, than he would have gotten otherwise.

MR. WOODS:  And Kaleb Cole has not done that.  His words -- this case, this trial, having heard those victims on the stand, in tears -- his words:  This is a persecution of him.

And the second thing that sets him apart from Cameron Shea, that sets him apart from the other defendants, is the specter of violence.  Now, Your Honor, I can't tell you with assurance, I can't tell you with assurance that at some point Kaleb Cole was going to hurt somebody physically.  But I can tell you this:  Number one, he had an arsenal of weapons.  And when they were seized from him, he fled.  He talked about getting more weapons.  Another weapon was found in his house during the search; an assault rifle.  And he talked about hiding them from law enforcement.

And more importantly, he embraced, as the person partly responsible, largely responsible for the promotional videos, for the brand of Atomwaffen, he embraced the violent messages of this group.  The race war now.  The images of men in combat training, shooting weapons, screaming racial epithets.  That was him.  And he embraced that.  And he promoted that.  And he deserves to be punished for that.  Because when Miri Cypers, Hilary Bernstein, Chris Ingalls, when they open those posters, they know, they feel what that group had been

responsible for.  And that was the intent in this case.

The second thing this court should consider is the pernicious harm in targeting people to make them feel unsafe.  Your Honor, we stand before you as prosecutors with all sorts of cases, drug cases, fraud cases, where this court gives out sentences greater than the one we are recommending today.  And in those cases, although the harms are serious, there is not the intent to make people feel unsafe.  The drug dealer doesn't want his customers to die.  They might, but that's not what he wants.  The fraud defendant doesn't want his victims to go broke, he just wants their money.  Kaleb Cole wanted people to feel unsafe, to feel terror.  And that is a harm that is, again, difficult to quantify, and should be punished.

And the third thing I'd ask this court to consider is the assault on the press.  Your Honor, we live in a time where our institutions are under attack, whether it be the criminal justice system, the court, but most importantly the press.  And those institutions are not perfect.  There is reform to be done.  The people in those institutions are not perfect.  But when there is an assault on journalists, on advocates who seek to expose the truth, to seek to expose the hate in our society, and when there's an assault on that, that is an assault on the very fabric of our democracy.

Your Honor, the last thing I want to say is this:  We are

here today in this sentencing because of the courage of the victims in this case.  It was not easy for them to walk into this courtroom and stand up to this man.  It was not easy, and they did it.  And their courage, their fortitude and their strength was a reminder to me of why I became a prosecutor.

Our recommendation is 87 months.

THE COURT:  All right.  Mr. Wilkinson, what's your role in these proceedings?

MR. WILKINSON:  Simply to admire Mr. Woods, sir.

THE COURT:  Well, I want to hear what you have to say.

MR. WILKINSON:  Your Honor, coming up with a sentencing recommendation is very much a team effort, and I wholeheartedly embrace what Mr. Woods has said.  I do believe that this is a case about violence, and it is a case about deliberately terrifying other human beings.  And that was this person's stock and trade.  That was why Atomwaffen selected him to be their leader.  It was because he was good at identifying symbols, whether it's a swastika, whether it's death topics, he knew what buttons to push.  That was why he ascended to the top of Atomwaffen, and why he was selected for this mission.  And that is what makes him different from every other defendant in this case.  And that's the quality that I think requires a sentence consistent with the

government's recommendation.

THE COURT:  All right.

Anything else?

MR. WOODS:  No, Your Honor.  Thank you.

Actually, Your Honor, I'm sorry, some of the victims would like to address the court.

THE COURT:  That's fine.

MR. ROSENBAUM:  Do you mind if I leave my mask on?

THE COURT:  That's fine.

MR. ROSENBAUM:  Your Honor, thank you for the opportunity to address the court today.  This is now the third time you've heard from me as to how these heinous crimes have impacted my life, and will continue to impact my family long into the future.

I will be respectful of the court's time and not go into that all, again.  But I want to share a recent example that's illustrative of the impact.  The other day I was up early, and one of external security lights, motion detectors was triggered by some motion in the backward.  When I took a look, I was relieved to see there was only a family of raccoons tearing up the yard, and not someone sticking a knife through a doll's head and sticking it to a tree.  As you remember, Mr. Cole was talking about that act of terror and intimidation with great adoration, not to mention someone standing with a Molotov cocktail ready to throw it into one

of my children's bedrooms.

Your Honor, when I first appeared before the court for Mr. Shea's sentencing, I believe everyone in the room had some apprehension about the proceedings.  It was apparent Mr. Shea recognized what he did was wrong.  He felt bad, and clearly regretted his actions.  And despite heartfelt empathy for the consequences of his actions, and his plot, which as we know was orchestrated by Mr. Cole, still, actions have consequences, and his sentence was appropriate and necessary.

I don't feel any of those mixed emotions today. Throughout these proceedings, and even in the filings before the court today regarding sentencing, the defendant has displayed no regret or empathy, no concern for his victims, no resolve to change his hateful view of the world.

Even if the defense's claim that Mr. Cole did not intend to terrorize is true -- sorry, intend to terrorize my family is true, they could have, at minimum, offered some sort of apology, or expressed some sort of remorse, because his actions had unintended consequences.  Instead, despite hearing the impact this crime had on his victims, we continue to hear the refrain of:  This isn't that big of a deal.  At best, it's tone deaf and offensive.  At worst, it shows the defendant is proud of his role.

Nowhere in any of the filings before you today will you find any indication that Mr. Cole is remotely sorry for the

outcome of his actions.  But you will see multiple times he has a desire to move on, or put this behind him.  I don't believe a lenient sentence is appropriate to his victims who simply won't be able to move on.  Our society cannot allow these people to commit these heinous crimes and show no remorse.

Fortunately, in our justice system, regardless of the perpetrator's ability to empathize or desire to apologize, actions do have consequences.  I respectfully ask that you sentence Mr. Cole to the longest term that you feel is appropriate.

THE COURT:  All right.  Thank you.

MS. CYPERS:  Good morning.  Thank you for the opportunity to address the court today.  As you know, my name is Miri Cypers, and I serve as the regional director for the Anti-Defamation League's Pacific Northwest office.  I'm here today to share, again, my experience of being targeted by the defendant and his associates, in January 2020.

I was with my family and received a call from the FBI asking me to set up a meeting, when I returned to Seattle from vacation.  When we met, the FBI informed me that a member of Atomwaffen planned to visit my home to drop off threatening propaganda.  As a professional staff member of the ADL, I work to track and expose domestic extremism, and I know that spreading hateful propaganda is a tactic used to

target communities vulnerable to hate.

I also had heard of the group Atomwaffen before, when colleagues described this group as a violent neo-Nazi organization.  I was immediately worried for my safety, and the safety of my family.  Without hesitation, my husband and I decided to leave our home the night of the intended visit. And I'll never forget that long Saturday morning, looking out my front window, worried they would arrive, moving my daughter's strollers and toys from our front yard, so they wouldn't know that we had a child.  We spent that night at the hotel, and were worried to tell even our closest family members what was taking place, because we didn't want to cause them fear.

Although no visit occurred that night, the experience had consequences for me and my family, constantly looking over our shoulders.  We also installed a comprehensive home security system.

Weeks later, we opened our mail and saw a terrifying image of a skeleton throwing a Molotov cocktail inside my home, with the intent to burn it to the ground.  The letter said my first and last name, and said that the sender's patience had had its limits, and I had been visited by my local neo-Nazis.

This threatening letter felt deeply personal.  As a Jewish leader with family members who survived the Holocaust, I know what it means to be visited by your local Nazis.  As a mom

with two now young children, I saw this as a death threat.

Although this threat instilled fear within me, it will not silence me, and that's why I'm here today, to continue shining a bright light on hate and speaking out against the normalization of threats and violence. Just as Mr. Cole said in his letter to his victims, that actions have consequences, I believe firmly that attempts to threaten and harm individuals in our community must have consequences as well. Thank you so much for your time.

THE COURT: Yes.

MR. INGALLS: Thank you, Your Honor. Chris Ingalls.

You know, Kaleb Cole would tell you that he is a political prisoner. But you're not, Kaleb. You've experienced, in your young life, the full force of American journalism and American criminal justice, and you've done it before a judge that sat on that bench for decades, with the most highest level of prosecution team that we have in the United States of America, and with the A-team of law enforcement, the people who are the best and brightest, and with defense attorneys who have done an extremely capable job in your defense; and this is the verdict that we have today.

Your Honor, journalists before me came and reported on Kaleb Cole and Atomwaffen, because they were doing their job of telling readers and viewers what was happening in American society and the alarming rise of hate in this country,

outward hate in this country, including through Atomwaffen. And that's what we do.

And I would remind the court that I was targeted, because I performed the most basic function of journalism.  I went to Kaleb's house, the only place I knew where I could try to reach him, to get his side of the story.  He would call his response to that -- harassment is what he would call it.  What happened next, which actually stepped into the world of a criminal act, which is what we're here for today.  It's journalism, Your Honor.  And I ask the court to sentence Kaleb Cole for his attack on journalism.

The other thing I want to admit to, Your Honor, is that I was fairly clueless about the extent of the harm that Kaleb Cole did, until we had a trial in this courtroom, and I met some of the victims, and I better understood the depth of what he did to them, which people before me have told you very eloquently.

But one thing stands in my mind, Your Honor, that when we sat over there on the last day of trial, and I sat next to a victim who testified, and then came in to hear the jury's verdict, and I fully understood what this crime meant to the Jewish people, and the black and brown people who were victims.  She couldn't turn around to this side of the court to face that guy.  She didn't want to look this way.  And, you know, that's exactly what he wants.  He wants us all to

fear him.  And when he demanded a trial, as was his right, that's exactly what he got all over again.

So what I'm asking, Your Honor, is the court sentence Kaleb Cole to the prosecutor's recommendation.  Thank you.

THE COURT:  All right.

MS. BERNSTEIN:  Your Honor, I'm speaking today as a victim of Kaleb Cole's clear intent and unambiguous actions. I received the ugly and fear-inducing poster, which indicated that the perpetrators, self-identified on the poster as neo-Nazis, are watching you and know where you live.  I am Jewish.  I am a widow, and I live alone.

I am still negatively impacted by the fact that Mr. Cole and his followers know my name and my address.  And that cannot be undone.  That cannot be undone.

But what can be done by the court today is to impose the maximum sentence Mr. Cole can receive, before he returns to society.  The maximum length of time before Mr. Cole will again be free to act on hate-filled ideology, and to negatively influence other impressionable people to act as well.

Although the defense claims Mr. Cole had no intention of harming anyone, he absolutely knew that he could inflict harm, utilizing the threat of violence, threats which do harm victims.  I can attest to that.  My sense of safety in my own home has been eroded, as a result of Mr. Cole's intentions

and actions.  I had to install an expensive security system in order to sleep at night, and to assure my adult children that I am safe in my own home.

Mr. Cole claims he is not the leader of Atomwaffen.  The facts and his history of behavior as the leader of Atomwaffen over many years indicate otherwise.  He has recruited and influenced many others, who followed him both in person and online.  He hides behind claims of being young.  His age has not prevented him from encouraging violence.

Unlike the other co-conspirators who each pled guilty to one count, Mr. Cole was defiant and insisted upon going to trial.  The jury unanimously found him guilty of all five counts against him.  That was the strongest statement they could make as a jury.  Today the court needs to make the strongest case that it can make as well, the strongest statement that it can make as well.

Mr. Cole has taken no responsibility for his actions, for his leadership, or for his participation, but instead blames another defendant for this whole situation.  The court must demonstrate Mr. Cole's responsibility to him, with a maximum sentence.  There is no other way to indicate to him and to others the seriousness of his actions.  I ask that you make that statement to him.

Thank you.

THE COURT:  All right.

MR. WOODS:  Nothing further, Your Honor.

THE COURT:  One thing that is left unaddressed is restitution.  Is there a claim for restitution?

MR. WOODS:  Although you've heard, Your Honor, that the victims did suffer out-of-pocket losses, we are not seeking restitution.  We did confer with them.

THE COURT:  All right.  Okay.

Regarding the objections to the presentence report, having presided over the trial and considering the evidence at trial, I find, by a preponderance of the evidence, that the objections must be overruled.

I find the total offense level is 27, criminal history category is 1, which gives a guideline range of 70 to 87 months.

The sentence I'm imposing is based upon the following factors:  The defendant's role in the offense, as a co-leader of the conspiracy; the nature and extent of the weapons seized; the defendant's lack of remorse, especially when compared to the remorse shown by Mr. Shea, and the defendant Dipeppe, which is a major factor explaining the difference in the sentences I imposed upon those defendants; the defendant's role in the preparation of the offending posters; the defendant's lack of criminal history, and his relative youth; the defendant's glorification of Nazi Germany; and the remaining factors of 18 U.S.C., Section 3553.

Mr. Cole's crime is one based on hate, a generalized hate for others, and a particular hate for any who threaten his world view, a view driven by entitlement and the failed notion, or the discredited notion of a superior race.

Mr. Cole, who operated free from social consequence, under the cloak of digital anonymity, was indignant that journalists and members of the Jewish community had the audacity to publicly reveal his terroristic activism; so he took great pains to silence them, through threats and intimidation.  This is something, as a society, we cannot tolerate, particularly today.

Journalists, who shed light on the evils that some would prefer to keep hidden, are the true heros of our nation and our world.  Now, more than ever, for us to function as a democratic society, we need reliable, truthful journalism. And we must do everything in our power to ensure that journalists, and others seeking the truth, can do this work, free from intimidation by hate-filled individuals, and hate-filled organizations, and the false claim of fake news.

I find Mr. Cole's clear and unequivocal hate for members of the Jewish community particularly odious.  This hatred is incontestably wrong on so many levels.

Just picture a world of Mr. Cole's preference, where Nazi Germany did, in fact, attempt to wipe out the Jewish people from this planet.  Besides the obvious human toll, imagine

the immeasurable devastation to the collective good.  This would be a world without contributions of Albert Einstein, Carl Sagan, Ruth Bader Ginsburg, Milton Friedman, Carl Bernstein; and without the works of Steven Spielberg, Paul Newman -- yes, Paul Newman -- Bob Dylan, Barbara Streisand, Stanley Kubrick, Annie Lebowitz and Arthur Miller, to just name a few.  We are richer, in the world, because of the contributions from these and many other Jewish Americans.

For reasons I truly do not understand, Mr. Cole and other like-minded individuals are threatened by the Jewish community.  So in an effort to push back, they attempt to threaten and terrorize prominent Jews, with no concern for the consequences of their actions.

Today's hearing establishes just what the consequences are for this type of social behavior.

I'm imposing a period of confinement of 84 months, three years of supervised release, subject to standard conditions, together with those additional conditions set forth in the presentence report.  I'm waiving a fine, due to the defendant's financial condition.  He'll be required to pay the mandatory assessment of $500.

Mr. Cole, you have a right to appeal this sentence.  If you wish to file a notice of appeal, it must be filed within 14 days of today.  If you wish the assistance of an attorney in filing a notice of appeal and cannot afford one, one will

be appointed to assist you, if you so request.  If you wish the assistance of the clerk in filing a notice of appeal, he will assist you, if you so request.

And, counsel, include a recommendation of confinement in Arizona.

MR. BLACK:  Your Honor, we'd specifically request FCI Phoenix.

THE COURT:  That's fine.

MR. WOODS:  Your Honor, may I approach Mr. Black with the judgment?

THE COURT:  Yes.

MR. WOODS:  Thank you.

MR. BLACK:  Your Honor, I've reviewed the proposed judgment and have no objection to the form.

MR. WOODS:  May I approach?

THE COURT:  Yes.

Thank you, counsel.  We'll be in recess.

(Adjourned.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Debbie Zurn*

DEBBIE ZURN
COURT REPORTER