UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

                                   )
UNITED STATES OF AMERICA,          ) CR20-032-JCC
                                   )
                    Plaintiff,     ) SEATTLE, WASHINGTON
                                   )
v.                                 ) September 27, 2021
                                   )
KALEB COLE,                        ) 10:00 a.m.
                                   )
                    Defendant.     ) Trial - Day 1
_____

                VERBATIM REPORT OF PROCEEDINGS
         BEFORE THE HONORABLE JOHN C. COUGHENOUR
              UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

 For the Plaintiff:      Thomas Woods
                         Seth Wilkinson
                         Assistant United States Attorneys
                         700 Stewart Street
                         Suite 5220
                         Seattle, WA  98101

 For the Defendant:      Christopher Black
                         Teymur Askerov
                         Black & Askerov PLLC
                         705 2nd Avenue
                         No. 1111
                         Seattle, WA 98104

EXAMINATION INDEX

EXAMINATION OF:                                              PAGE

 MIRI CYPERS          DIRECT EXAMINATION                      103
                      BY MR. WOODS
                      CROSS EXAMINATION                       113
                      BY MR. ASKEROV

 DAVID ROSENBAUM      DIRECT EXAMINATION                      120
                      BY MR. WOODS
                      CROSS EXAMINATION                       124
                      BY MR. ASKEROV

 CHRIS INGALLS        DIRECT EXAMINATION                      126
                      BY MR. WOODS
                      CROSS EXAMINATION                       137
                      BY MR. ASKEROV
                      REDIRECT EXAMINATION                    143
                      BY MR. WOODS

 CHRIS LECKINGER      DIRECT EXAMINATION                      144
                      BY MR. WOODS

EXHIBIT INDEX

EXHIBITS ADMITTED                                            PAGE

 Exhibit 2                                                    152
 Exhibits 200, 202, 203 and 204                              155
 Exhibit 207                                                 156
 Exhibit 208                                                 129
 Exhibits 500 and 501                                        133
 Exhibits 502 and 503                                        109
 Exhibit 604                                                 131
 Exhibits 606 and 607                                        150

THE COURT:  It will take us a few minutes to get all the jurors up here, so you have some more time to look at the responses.

While we're waiting, let me put on the record my rulings on the motions in limine.  The government has indicated no objection to the first two of the defendant's motions in limine.

On the Government's Motion in Limine No. 1, regarding the identity of the undercover agent, is denied, except that the witness should not be cross examined on other investigations, unless the government opens the door.

The Defendant's 1 and 2 are denied.  I'm sorry -- yes. Yeah.  On the objection to the exhibit that was lodged last night, the objection is overruled.











September 27, 2021 - 16



September 27, 2021 - 54

AFTERNOON SESSION

THE COURT:  Are you ready for the jury?

MR. WOODS:  Yes, Your Honor.

MR. WILKINSON:  Yes, Your Honor.

THE COURT:  All right.  Bring them in.

(The following occurred in the presence of the jury.)

THE COURT:  Please be seated, folks.  Ladies and gentlemen, you now are the jury in this case, and I want to take a few minutes to tell you something about your duties as jurors.

It will be your duty to decide from the evidence what the facts are.  You will then hear the evidence and decide what the facts are, and then apply those facts to the law, which I will give to you.  In doing so, you must follow the law as I give it to you, whether you agree with it or not.

The evidence will consist of the testimony of witnesses, documents, and other things received into evidence as exhibits, and any facts on which the lawyers agree or which I may instruct you to accept.  You should not take anything I may say or do during the trial as indicating what I think of the evidence or what your verdict should be.

This is a criminal case brought by the United States Government.  The charges against the defendant are contained in the indictment.  The indictment is simply the description of the charges made by the government against the defendant,

and is not evidence of anything.  The following things are also not evidence, and you must not consider them as evidence in deciding the facts of this case:

Statements and arguments of the attorneys, objections and questions of the attorneys, testimony that I instruct you to disregard, and anything you may have seen or heard when the court is not in session, even if what you see or hear is done or said by one of the parties or by one of the witnesses.

Some evidence may be admitted for a limited purpose only. When I instruct you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and for no other.

Evidence may be direct or circumstantial.  Direct evidence is testimony by a witness about what that witness personally saw, or heard, or did.  Circumstantial evidence is indirect evidence.  That is, it is proof of one or more facts from which one can find another fact.  You are to consider both direct and circumstantial evidence.  The law permits you to give equal weight to both.  But it is for you to decide how much weight to give to any evidence.

There are rules of evidence which control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence, and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.  If I overrule the

objection, the question may be answered, or the exhibit received.  If I sustain the objection, the question cannot be answered or the exhibit cannot be received.  Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer would have been.  Sometimes I may order that evidence be stricken from the record and that you disregard or ignore that evidence.  That means that when you are deciding the case, you must not consider the evidence which I told you to disregard.

In deciding the facts of this case, you may have to decide which witnesses to believe and which witnesses not to believe, or how much of any witness's testimony to believe.

You may believe everything a witness says, or only part of it or none of it.  In deciding what to believe, you may consider a number of factors, including the following:  The witness's ability to see, or hear, or know the things the witness testified to; the quality of the witness's memory; the witness's manner while testifying; whether the witness had an interest in the outcome of the case, or any motive, bias, or prejudice; whether the witness was contradicted by anything the witness said or wrote before trial, or by other evidence, and how reasonable was the witness's testimony, when considered in the light of other evidence which you believe.

I'll now say a few words about your conduct as jurors.

First, do not talk to each other about this case or about anyone who has anything to do with it, until the end of the case when you go to the jury room to decide on your verdict. Second, do not talk with anyone else about this case or about anyone who has anything to do with it until the trial has ended and you have been discharged as jurors.  Anyone else includes members of your family and your friends.  You may tell them that you are a juror, but do not tell them anything about the case until after you have been discharged by me.

Third, do not let anyone talk to you about the case, or about anyone who has anything to do with it.  If anyone should attempt to talk to you about the case, immediately identify yourself as a juror and tell them to stop.  If they do not stop, bring it to my attention promptly, and I will see to it that they do.

Fourth, do not read any news stories or articles, or listen to any radio or television reports about the case, or about anyone who has anything to do with it.

Fifth, do not do any research, such as consulting dictionaries or other reference materials, or online searches.  And do not make any investigation about the case on your own.

Sixth, if you need to communicate with you me, simply give a signed note to the clerk to give to me.  And, lastly, do not make up your mind about what your verdict should be,

until after you have gone to the jury room to decide the case, and you and your fellow jurors have discussed the evidence.  Keep an open mind until then.

At the end of the trial, you will have to make your decision based upon what you recall of the evidence.  You will not have a written transcript to consult.  And it is difficult and unlikely that I will ask the reporter to read back lengthy testimony.  I urge you, therefore, to pay close attention to the testimony as it is given.  If you wish, you may take notes to help you remember what witnesses said.  If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room.  If you do not take notes, you should rely upon your own memory of what was said and not be overly influenced by the notes of other jurors.

The trial will begin in just a minute.  First, each side may make an opening statement.  An opening statement is not evidence, it is simply an outline to help you understand what that party expects the evidence will show.  A party is not required to make an opening statement.  The government will then present its evidence, and counsel for the defendant may cross examine.

Following the government's case, the defendant may present evidence, and the government counsel may cross examine.  After all the evidence has been presented, the attorneys will make their closing arguments to summarize and interpret the

evidence for you, and I will instruct you on the law.  After that, you will go to the jury room to deliberate on your verdict.

All right.  Opening statement.

MR. WILKINSON:  Thank you, Your Honor.

On January 29th of 2020, a woman named Miri Cypers received a message in the mail.  Ms. Cypers is a Jewish woman who lives in the Seattle area.  Her family members are Holocaust survivors.  And Ms. Cypers is also the regional director of the Anti-Defamation League, or the ADL.  The ADL is an organization that works to expose the anti-Semitism, the hatred against Jewish people.  And when Ms. Cypers opened her mail that day, this is the message she received.

"Your actions have consequences.  Our patience has its limits."  A man in what is known as a skull mask, preparing to throw a Molotov cocktail to burn down a house. Ms. Cypers' name written at the bottom of the poster, along with her address.  And you have been visited by your local Nazis.  The message Ms. Cypers received was clear:  We know who you are.  We know where you live.  And if you don't stop doing what you're doing, we will get you in your home. Ms. Cypers was not alone.

In Phoenix, Arizona, a woman named Mala Blomquist is the editor of a Jewish newspaper.  Ms. Blomquist found this exact same poster glued to her daughter's bedroom window.

In Tampa, Florida, a woman named Veronica Cintron, is a news anchor, and her network reported on acts of anti-Semitism. She, too, was a target of a different poster. This was the message she received. "We are watching. We are everyone. We know where you live. Do not fuck with us." Her name and an address at the bottom of the poster. And, again, "You have been visited by your local Nazis."

Back here in Seattle, another woman Hilary Bernstein, the former director of the Anti-Defamation League, received this same poster in the mail. And a local TV reporter, Chris Ingalls, who himself had reported on neo-Nazi activities, received a different poster.

This is the message Mr. Ingalls received. "Two can play at this game." A picture of a blindfolded journalist, with skeletons holding assault rifles behind his head. "Death to pigs. These people have names and addresses." Mr. Ingalls's name, address, phone numbers, at the bottom of the page. And, again, "You have been visited by your local Nazis."

There is a reason why people all around the country received these hateful messages, all at the same time. It's because there was a plot, a plot to intimidate and threaten journalists, people from the ADL, other people who worked to expose hate. And the organizer of that plot is sitting in the courtroom today, the defendant, Kaleb Cole.

The defendant personally designed those hateful posters.

He personally added the victims' names and addresses so there would be no question that we know who you are and we know where you live.  And he sent them out to his followers, like-minded neo-Nazis around the country, with instructions to post them on people's houses.

Kaleb Cole's intent was, in his own words, to create a frenzy.  He wanted to terrify people.  He wanted to scare them so bad that they wouldn't report on his activities.  And so the defendant is charged in this case with three offenses. With mailing threatening communications, with interfering with federally protected activity, and with conspiracy.

So I'm going to spend the next 25 minutes or so going over the evidence that you will see in this trial that will prove these charges.  But let me start by telling you a few basic things about the defendant.  He's from Arlington, Washington, and he is also a leader of a neo-Nazi group.

You may have noticed when we looked at these posters a minute ago, they all have the same symbol down in the lower left-hand corner.  That's what's called a radiation shield. And the radiation shield is the symbol of a neo-Nazi organization called the Atomwaffen Division.  Atomwaffen meaning atomic weapon, in German.  And this is the Atomwaffen flag.  And, in fact, this is the defendant's Atomwaffen flag. This is a picture that was taken from his bedroom.  Here are some of the defendant's clothes, military jackets with the

radiation shield on the shoulder.  These are the defendant's masks.  These are what are known as skull masks, and they're what Atomwaffen members wear when they want to scare someone, without being recognized.  And you'll see that the design of these masks is the exact design that we saw in the posters that some of the victims received.

This is Kaleb Cole's desk.  This is where he did his work.  And the evidence will show that the defendant's work was producing propaganda for Atomwaffen.  He gave speeches.  He produced posters.  He strategized about how to spread hate and fear.  That's what he did.

But the defendant wanted to do these things from the shadows.  He wanted to hide behind that computer.  He wanted to hide behind those masks.  He didn't want to be publicly identified as a member of Atomwaffen.  Part of that was he used this nickname, Khimaere.  And you're going to hear this nickname used to refer to him, in the course of this trial.  But since secrecy was so important to Kaleb Cole, he hated journalists, journalists who reported on neo-Nazis.

I'm going to show you an example.  One of the things the defendant did as propaganda for Atomwaffen was publish speeches online, recordings of himself speaking.  And here is one of them:

(Audio played as follows:)

"Another thing that I must address is the matter of

these nosy reporters coming into our daily lives, where we work, where we live, where we go in our spare time. We must simply approach them with nothing but pure aggression."

MR. WILKINSON: Pure aggression. So the defendant hated the press.

Then in September of 2009, he became the subject of some news articles. The Seattle Police Department obtained what's called an "Extreme Risk Protection Order" that said that Mr. Cole couldn't have weapons anymore, couldn't have guns, his guns were taken away.

And the press learned about the ERPO, this order, and reported on it. And in particular, a local TV journalist, Chris Ingalls, ran a story about the defendant. Chris Ingalls revealed Kaleb Cole's name. He put his face, pictures of him on the news. He revealed that he was a leader of Atomwaffen. And he even went to the defendant's house, where he was living, to try to interview him. And the defendant was furious.

The first thing he did was he left the Seattle area and moved down to Texas to live with another Atomwaffen member. But he did not forget Chris Ingalls. He wanted to retaliate against Chris Ingalls. He wanted to scare him away from ever covering Atomwaffen or the defendant again. And that was the beginning of the defendant's plot to threaten journalists and others.

In this trial, you are going to hear about this plot from the defendant himself.  And that's because on January 9th of 2020, an undercover FBI agent met with Cole and others.  He pretended like he was another neo-Nazi interested in working with him.  But the undercover agent recorded the meeting.  Some of it is on video, some is just on audio.  So you are going to hear the defendant talking about this plot, in his own words.  And here is one small part of that recording.

(Audio played as follows:)

"Oh, yeah, like, you know, actual anchors and shit.  And, you know, just admittedly kind of pulling -- pulling a little bit of the Antifa thing in that where, you know, it's just like, hey, we know where you live, don't fuck with us.  Just a reminder.  Yeah.  Just a little friendly reminder right on their doorstep."

MR. WILKINSON:  We know where you live, don't fuck with us.

And then three weeks later a poster appeared, multiple posters using those exact same phrases.  "We know where you live.  Don't fuck with us."

You're also going to hear the defendant talk about the selection of his specific victims.

(Audio recording played.)

MR. WILKINSON:  The TV anchor, Chris Ingalls, and the ADL director, Miri Cypers.  And, again, just three weeks

later, each of them received a poster from Mr. Cole.

The other thing that's going to be clear from these recordings is the defendant's intent, how much he wanted to terrify the people who got these posters.  It's clear from the posters themselves, but you're going to hear it in his own words.

(Audio recording played.)

MR. WILKINSON:  So there he is talking about another operation that he admired, by another neo-Nazi member.  And what did he want to create?  That feeling you get when you see a rag doll with a knife stuck through its head.

Now, you're also going to hear Cole, again in his own words, talk about the fact that he knew he could make more of an impression, scare people even more, if they could do this all over the country at the same time, to multiple people in different places.

So the plan was that Atomwaffen cells in different states would gather names of victims, and then they would deliver the posters in different areas, simultaneously.

But to make all of that happen, this operation had to be coordinated.  They had to communicate about where they were going to do it, when they were going to do it, how they were going to do it.  And to do that, they used an online chat platform called "Wire."  You're going to see a lot of those chats in this case.  And this is one of the pages.

Now, the chat group that they created just for this purpose was called "Operation Erste Saule, or "First Pillar." And these are some of the members of the group that was planning the operation and that were included on this chat. They used nicknames instead of their real names.

So, for example, Krokodil is one of the other leaders of Atomwaffen.  Lazarus was the leader of the Florida cell.  And the group chose Wire to communicate over, because they thought it gave them security.  Wire is a Swiss service that is encrypted, and that means law enforcement in the United States usually cannot get access to the chats themselves.  So the group talked openly about their plans, using this service that they thought was secret.

But what the group did not know was that one member of the chat group was an FBI informant; the FBI informant received those texts, took pictures of those texts, and turned them over to the FBI.  And that is why we're looking at them now. And that is why you're going to see those texts or chats throughout this case.

Now, there's one member of the group I didn't mention yet, it's the one at the bottom of the screen here that uses this string of foreign characters as a nickname.  Here it is blown up.  We're going to be referring to it as "The Moniker" in this case.  That's just the nickname of one of the people sending the chats.

And The Moniker used an avatar -- and if you don't use social media, an avatar is just a little picture that goes next to each message that you send.  So, The Moniker's avatar was this picture of a person wearing night-vision goggles, military gear, holding a machine gun.  Now, the evidence in this case is going to make clear that Kaleb Cole was the person sending the message using this avatar.

It will be clear, first, from the chats themselves. Here's an example:  This is The Moniker sending out a news article from the Seattle Times.  You're going to hear that this Seattle Times news article was actually an article about Kaleb Cole.  It was saying that Kaleb Cole had had an arrest warrant issued for him in Washington State.  And at this point, Kaleb Cole had moved down to Texas.  And so the user of The Moniker sends out this article and says, "Well that settles it, I'm not returning."  So you'll see that chat and other ones that make clear that the person speaking is Kaleb Cole.

Or there's this one.  Remember the rag dolls that he wanted to re-create?  Here is The Moniker saying, "If I had to make suggestions for some here, if some of these reporters have a house, some should get Dollar store rag dolls and knife them to a tree outside of their houses.  Knife through the head of the doll."  Suggesting exactly what the defendant wanted to re-create.

And then there's this. This document here on the left side of your screen is a page that was found under Kaleb Cole's bed when he -- after he was arrested, and he was in jail. And this page contains each of the foreign characters used to create that moniker. We'll go through them during the trial, but just as an example, on the left side there is the first character in the moniker. And then there is this: Remember the avatar, the person with the night-vision goggles, the military jacket? Well, the FBI got ahold of Kaleb Cole's computer, and they searched his computer. And guess what they found on that computer? The exact same photograph of the person with the night-vision goggles and the military garb. So it will be abundantly clear that the defendant is the person sending messages using the avatar.

So let me talk about the chats themselves. You will see many of them in this case. You will watch the defendant and the rest of the group plan this operation. You'll see it with your own eyes. You'll see them agree that Cole is going to design the posters, that the cell leaders from around the country are going to send the names and addresses of the target so that Cole can enter them into the bottom of the posters. They agree that they're going to exchange those names and e-mails, and the posters themselves, using a special encrypted e-mail service to provide added security. You're going to see them discussing ways of disguising

themselves, so they won't be recognized when they go up to people's houses and glue neo-Nazi posters on them. And you'll see them discuss what to do if they get arrested.

So here are a few examples. Here is the defendant saying, "Now, we are still working on some more people getting addresses, and we're working on some more posters and such."

Here he is again. "So I have three designs ready for doorsteps. I may make another one as well." Sure enough, three different designs of posters ended up at people's houses.

Here he is saying: Don't worry, we're working on the posters. Here is a sample. And he sends out one of the posters that ended up being sent to Veronica Cintron and Hilary Bernstein in Seattle.

Here is one of the members of his group telling him he sent a list of victims. "List sent. Three Jews." And Kaleb Cole says, "Hold up, I'll check the e-mail." And the member of his group says, "Including the lead director of several local stations, and a member of the Jewish Community Center, who is a writer for the Jewish Journal." And Kaleb Cole says, "Nice work."

Here is the defendant saying, "I just wanted to let you all know that I sent out the posters to all the e-mails. And I used guerrillamail," the encrypted e-mail service I mentioned a minute ago.

And, finally, Krokodil, one of the other leaders of Atomwaffen saying, "Please take the necessary precautions to avoid leaving evidence, both forensic" -- that's computer evidence -- "and physical.  If you are caught, remember, say nothing at all.  Plead the 5th Amendment.  Don't talk to the police about anything.  Let your lawyers do the talking."

Now, I mentioned that the reason that we have all of this evidence is because there was an informant.  And I want to talk about that informant for a minute.  To investigate crime and disrupt crime, law enforcement sometimes needs to rely on informants, people who are connected to the groups that are under investigation.  So in drug investigations, sometimes law enforcement needs to work with drug dealers to get information about those organizations.  And this case is no different.  The informant in this case has a history of participating in white supremacist activities.  That's why the defendant invited him into the group.

But since about 2005, he has been providing information to the FBI.  And he's been paid a considerable amount of money for doing that.

Now, the benefit to that was the government was able to obtain this evidence we've just been looking at.  He took screenshots of those pictures.  And they were able to learn who some of the victims were, ahead of time, and they were able to warn them.  That's the benefit.  The cost to that was

that the FBI had to work with and pay money to someone who has a white supremacist history.

So you may not like the informant in this case. But let me be clear about one thing. The case against Kaleb Cole will not depend on whether you like the informant. It won't depend on whether you trust the informant. Because as you have already started to see, you are going to see the evidence of the defendant committing these crimes, with your own eyes. You're going to hear him talk about it in his own voice.

Another source of evidence you're going to be seeing is a search that the FBI conducted of the residence where Kaleb Cole was living, down in Texas. You've already seen some of that evidence, the Atomwaffen flag, the skull masks. But here is another piece. The defendant's computer. A computer that was turned on in his bedroom at the time of the search warrant.

Now, we saw a minute ago that warning from Krokodil to make sure you get rid of all the computer evidence, the forensic evidence. And, in fact, the defendant did delete the actual posters themselves. So the FBI didn't find those. But he was not careful enough. And you are going to see that the defendant left digital traces of his work on his computer. You're going to hear about slack space. And slack space is the part of a computer where investigators can find

fragments of old files, that may have been deleted or partially written over.

And remaining in the defendant's slack space were three names:  Veronica Cintron, Mala Blomquist, Chris Ingalls. Three of the people who received posters in this case. Veronica Cintron received hers in Tampa, Florida.  Mala Blomquist received hers in Phoenix, Arizona.  And Chris Ingalls received his here in Edmonds, Washington.  And, by the way, his name and his phone numbers were sitting on Kaleb Cole's computer.

The reason that the names of people from Florida, Arizona, and Washington were sitting on his computer in Houston, Texas, was that he had entered those exact same names into these posters.

The last part of the evidence I want to talk about right now will be the evidence of the effects of the defendant's crimes, his hateful plot, the effect on his victims.  Because unfortunately, he was successful.

You're going to hear from these people.  You're going to hear from Miri Cypers, from Veronica Cintron, from Chris Ingalls, from Hilary Bernstein.  You're going to hear what it feels like to find a poster glued to your daughter's window saying that you have been visited by local Nazis.  What it feels like to receive a letter in the mail with your name and address on it saying, "You have been visited by your local

Nazis," knowing that your family members were survivors of the Holocaust.

You're going to hear what it feels like to be told that, "We know who you are.  We know where you live.  And there will be consequences for your actions."

Members of the jury, that is what we call a threat.  And let me be clear about one thing, this is not about free speech.  You'll receive instructions from the judge on the law at the end of this case.  And they will make very clear to you that free speech does not include the right to terrorize other people.  If you intentionally threaten another person, you have committed a crime.

Kaleb Cole crossed that line when he put people's names on those posters, posters that said, "Your actions have consequences.  Don't fuck with us.  Death to pigs."  And the evidence is going to show that the defendant's purpose in this operation was to terrorize people.

That is why the defendant is charged with these three offenses.  He's charged with mailing threatening communications, for the mailings that he sent to some of his victims.  He's charged with interfering with federally protected activity, for trying to intimidate the director of the ADL, because she is Jewish, for just doing her job.  And he is charged with conspiracy, which simply means entering into an agreement with other people to commit these crimes.

Members of the jury, the evidence will show that the defendant committed all of these crimes. And at the end of this trial, we will ask you to hold him responsible for them by finding him guilty on all counts. Thank you for your attention.

THE COURT: All right. For the defendant.

MR. ASKEROV: The First Amendment to the United States Constitution guarantees the freedom of speech and expression. And its protections extend to speech that may be proscribed in other societies. And this includes hate speech.

The United States Government has charged our client, Kaleb Cole, with various federal offenses for the alleged distribution of posters that are composed of words and images. Because of this, the government must overcome the heavy burden, must carry the heavy burden of establishing, beyond a reasonable doubt, that these posters fall within the type of speech that can be criminalized under our constitutional system.

During this trial you will be exposed to images and statements that you will find shocking. Some ideas allegedly espoused by Mr. Cole, and some other individuals who will be featured in this trial, are far outside the mainstream. And some of you will find these ideas detestable. But we ask you to keep in mind that your role as jurors is not to judge

Mr. Cole for his actual or perceived beliefs, or for conduct that is not at issue in this trial; your job as jurors is to evaluate the evidence in this case and to hold the government to its burden of proving every element of the crimes charged, beyond a reasonable doubt.

The government has painted a picture of Mr. Cole and the Atomwaffen Division -- or, AWD as I'll refer to it -- as a group of violent extremists.  The government alleges that the posters in question were intended to convey threats of violence to their recipients.  The government claims that this conduct amounted to stalking.  And in one instance, it interfered with one of the alleged victim's constitutional rights.

But we submit that the government's view of this case is inconsistent with what the evidence will show.  The evidence in this case will show that AWD was a loosely affiliated group of misfit youths, who shared a set of perceived grievances against the government, and the media, and used extremist memes, pictures, and slogans, to rebel against what they believed to be a broken system, to stand up against what they perceived as these grievances against that system.

In essence, the group was, for the most part, a number of young Internet trolls, who dwelled in secret Internet chat rooms, knew each other by their screen names, and dealt in extremist images, pictures, and conspiracy theories.

Despite the group's alleged use of white supremacist symbols, violent slogans, and post-apocalyptic imagery that often contained explosives, and firearms, and their belief in an inevitable race war, at some point in the distant future, AWD did not pose a threat of imminent violence.

You will learn, during the course of this trial, that at the time these posters were distributed, that AWD did not actually have any plans of violence against any of these alleged victims.  AWD had never planned to confront any of the alleged victims, in person.  And you will learn that some of these alleged victims were, in fact, notified of these facts by the FBI, before receiving these posters.

How did the government know that there were no plans of violence?  Because, as the government just told you, there was a CI that had been embedded for years with AWD.  And during the course of those years, the CI did not report a single plot of a violent attack against a target.  The most serious offense that AWD has been accused of, as a group, was the distribution of the posters in this case.

You will also hear evidence in this case that alleged members of AWD were singled out by the media, including Mr. Cole.  They were singled out by certain nonprofit groups for their extremist views; they were singled out, despite the fact that many of them had not committed a single crime.

These organizations, as the government told you, revealed

these people's identities.  In the case of Mr. Cole, King 5 went as far as to put his father's house on the nightly news.  There was video footage of his father's house, and of his neighborhood.  For Mr. Cole, who was only 24 years old at the time, the pressure was so immense that he felt the need to pick up and leave the State of Washington immediately, and relocate to start a new life in Texas.

The AWD postering campaign at issue in this case, was a direct response to the perceived injustice felt by alleged members of AWD, after being exposed, or "doxed" as they'd call it, by the media and various other actors.

In a deluded effort to hit back against the individuals who exposed them, AWD members devised a plan to send propaganda posters to the media, and the others who exposed them.

The purpose of this campaign was not to communicate a threat of injury to another person.  The purpose of this campaign was to make clear to the media that AWD would not be bullied into abandoning its beliefs as a result of media publicity.  It was to send the message that AWD was prepared and could, just as easily as the media and the nonprofit organizations involved, could find the addresses of their employees, and they would not hesitate to dox them.  In other words, AWD wanted to send a message that they would reciprocate, in kind, to attacks on their members.

This was the purpose of the campaign, as stated by some of those involved. You will see intercepted chats. These are unfiltered intercepted chats that will be displayed to you during this trial. You will hear undercover recordings. And what these recordings will show is that, time and time again, the individuals involved in this group repeated the intent of making it known that they could expose members of the media, and that they could expose members of the nonprofits, who went after their alleged members.

The threat contained in these posters was not to do violence to the recipient. The threat was to expose their identity, to expose their personal information. That's what the threat was.

That is consistent with the messages that you will see in these posters. The poster that alleged victim Chris Ingalls received says, "Two can play at this game," meaning, we can put your information online just as you can publish our information. "These people have names and addresses," is another statement in one of these posters. "We are watching you. Your actions have consequences." The meaning of all this is that AWD was prepared to expose the personal information of individuals that they believed were involved in exposing alleged AWD members.

Ultimately, this case boils down to three posters; the three posters that the government showed at the beginning of

their opening statement.  The question before the court is whether the content of these posters amounted to a true threat, a type of speech that can be criminalized under the First Amendment.

The court will instruct you on the law of true threats. And you will learn that, when you determine whether this poster or these posters are true threats or not, both the context will be important, and the sender's or the speaker's intent, the speaker's subjective intent.  That means, what did the speaker mean to convey?

We ask you, during this trial, to pay very close attention to what the alleged members of the conspiracy themselves said about their intentions, and to closely scrutinize the images and words in these posters, in the context of the course of dealing between AWD and the organizations involved.

And when you look at these materials, you should consider: Are these posters intended to be received as threats of violence, or are they intended to be received as something else?  Are they intended to be received as extreme political hyperbole?  Are they simply a threat to expose the recipients' information?

In particular, pay close attention to any evidence regarding Mr. Cole's thoughts, his statements, and his own expressions about his intentions.  And whether you are convinced beyond a reasonable doubt, on the basis of that

evidence, that Mr. Cole intended to threaten the recipients of these posters with physical injury, or whether he intended to communicate something else, such as, "Two can play at this game."  We can do to you what you did to us.

Throughout the course of this, trial, the government will make much of the fact that the slogans, hate symbols, and images of weapons and explosives that appear in these posters, are intended as threats of violence to the recipients.  But before accepting that conclusion, we ask you to pay close attention to all the evidence that you will see during the course of this trial, and to consider posters, memes, and other propaganda that was allegedly produced by AWD, and circulated among its own members, among potential recruits, and in their own chat rooms, that contain many of these same slogans and images and statements, but are obviously not intended to be received by the reader as a threat.

We also ask you to keep in mind, during the course of this trial, the recent trend in our politics, as a nation, for sensationalism, divisiveness, extreme political hyperbole, and shocking and sometimes violent political slogans.  And we ask you to view this case in the context of our current political and social climate.

We also ask you to bear in mind that Mr. Cole was born in 1995, 50 years after World War II has ended.  For his

generation, the context and understanding of events such as the Holocaust is not the same as it is for earlier generations, that had a direct link to individuals who lived through those horrors.

You have given an oath as jurors in this case to put aside your prejudices. And your commitment to that oath is vital, because the defendant in this case is accused of holding views that are despised by almost every person across the globe. Again, many of the images, statements, and recordings that you will see, will be offensive in the extreme. But as jurors, you must remember, you are not here to judge the morality or immorality of Mr. Cole or AWD; rather, your job is to carefully evaluate the evidence in this case and make a determination as to whether Mr. Cole is guilty of any of the federal crimes charged in the indictment, and whether the government has proven each element of those crimes beyond a reasonable doubt.

Because the government will be unable to carry the heavy burden of proving that the speech at issue can be criminalized in our constitutional system, and specifically because the government will not be able to carry the burden of proving beyond a reasonable doubt that Mr. Cole intended to communicate a threat to injure another person, through the distribution of these posters, at the end of this trial, we will ask you to return a verdict of not guilty on all counts.

Thank you.

THE COURT:  All right.  Call your first witness.

MR. WOODS:  Your Honor, the government calls Miri Cypers.

(Court and counsel met at sidebar.)

MIRI CYPERS

Having been sworn under oath, testified as follows:

MR. WOODS:  Your Honor, can we move actually back there.  I think in terms of the view from the witness.  Thank you.

DIRECT EXAMINATION

BY MR. WOODS:

Q   Ma'am, please state your name.

A   My name is Miri Cypers.

Q   Who do you work for?

A   I work for the Anti-Defamation League.

Q   What is the Anti-Defamation League?

A   The Anti-Defamation League, or the ADL, is a national organization.  And our mission is to stop the defamation of the Jewish people, and secure fair and just treatment to all. So we're a national anti-hate organization that works to address anti-Semitism and all forms of bigotry, and ensure the civil rights of all people.

Q   What are some of the things that the ADL does to try to combat anti-Semitism and other forms of hate?

A    So we do a lot of educational programming in K through 12 schools.  We build community partnerships and advocate for civil rights policies.  And our fourth pillar is really speaking out and being a bulwark against hate and extremism. And we have a national center on extremism, and I work with my colleagues in that center very closely.  And we work to shine a very bright light onto domestic extremism in society today.

As the regional director of the ADL, I work closely with my colleagues who are actively tracking domestic extremists. I liaise with law enforcement, to offer them educational opportunities, and sometimes sensitive information and memos on the whereabouts of potential threats, of domestic extremists in the Pacific Northwest.

Q    Is the ADL a national organization?

A    We are a national organization spread out throughout the United States.  And we're a national 501(c)(3).  And I specifically work for the branch based in Seattle, where we cover five states and the Pacific Northwest.

Q    And I think you mentioned that you're the regional director; is that right?

A    That is, yes.

Q    How long have you held that title?

A    I've served as the regional director for the ADL in the Pacific Northwest for four years.

Q    What are some of the things that you specifically, as opposed to the ADL generally, but specifically as the regional director do?

A    Specifically, I oversee an advisory board of leaders throughout the Pacific Northwest.  I oversee a team of colleagues that operates our local and regional programs.  I'm tasked with really being the face or the representative of our region.  I speak out when acts of hate and extremism happen.  And I really liaise with the public and media to explain to them the trends we're seeing, the data in the reports that are coming out of, you know, our collective teams' work.  And I respond to hate-based incidents that happen in the community.

Q    In a public-facing fashion?

A    Yes.  You know, I frequently speak with journalists and members of the media about the different kind of trends and activities that we're seeing, both on camera and in print.

Q    What did you do prior to joining the ADL?

A    Prior to joining the ADL, I started off my career serving a member of Congress in the U.S. House of Representatives in D.C.  And then a few years after that, I shifted to doing a lot of work in various advocacy roles, at different nonprofit organizations.

Q    Did any of those also have either a Jewish or anti-Semitic focus?

A   I did work for one Jewish organization, a Jewish nonprofit in Washington, D.C. that focused more on issues around preventing violence against women.

Q   Let's talk about late January of 2020.  Did someone reach out to you from the FBI?

A   Yes.  A member of the FBI contacted me.  And I remember very vividly receiving a call while I was on vacation with my family, letting me know that they needed to speak to me when I was back in town.

Q   What did the FBI relate to you?

A   So when I actually met with a representative from the FBI in person, they told me that they believed, you know, based on their intelligence, that a member of a neo-Nazi organization called Atomwaffen, was going to visit my home on a specific day, on a Saturday -- probably a Saturday night -- to drop off some sort of threatening propaganda at my house.

Q   With this information, did you stay in the house?  What did you do?

A   I spoke with my husband, and after thinking about it, it was not a hard decision.  We decided, pretty immediately, that we absolutely would not stay in my house the day that this alleged person was supposed to be coming.  I know from my work with the ADL, the threat that extremism can have.  And in this particular case, with this particular group, I knew their reputation for violence, and even murder in some

cases.  And I would never want to -- I would never want to risk the safety of, not only my own life, but my family's life, and my small child, who was then two years old.

MR. ASKEROV:  Objection, Your Honor.

THE COURT:  Overruled.

MR. ASKEROV:  Nonresponsive.

Q   And so these concerns about violence, and I think you said potential murder, what did you know about Atomwaffen prior to being contacted by the FBI?

A   Well, you know, I've participated and listened in on a number of law enforcement trainings that my colleagues have provided, over the years that I've been with ADL.  And, you know, I understand pretty well, from speaking with the media, that there's a spectrum of different types of extremists. But I knew certainly, the first thing that I recalled was just how violent they tend to be, and that's --

MR. ASKEROV:  Objection, Your Honor.

THE COURT:  Sustained.  Let's ask another question.

Q   When you got that information from the FBI, I think you said you stayed somewhere else.  Where did you stay?

A   So we ended up going to a nearby hotel.  I don't know if I should say -- a nearby hotel, near my house.  And --

Q   Who -- go ahead.

A   No, that's okay.

Q   Who did you stay with that day?  Your family?

A   So during the day I was by myself with my daughter, and I remember it being a very, very frightening day, where I just was constantly looking over my shoulder.  And there was just a pit in my stomach that someone was going to come to my house.  So I was worried about telling family about what was going to happen.  So we decided to stay at a hotel and not tell them, because we didn't want to create more fear for them, in addition to the fear that we were experiencing.

Q   How old was your daughter at this time?

A   She was about two years old.

Q   Let's turn to about four days later, on January 29th. Did, in fact, as far as you know, anyone visit your home that night?

A   So we had stayed up really late into the night just being worried about what would happen.  And we learned, I think in the early hours of the morning, that nothing had occurred and no one had come to our home.  So we came back.

     And then I remember a couple of days later opening up the mail -- my husband opened up an envelope, and I was there near our kitchen table.  And it was addressed to me.  And I opened it up, and did receive an extremely threatening letter in the mail from the individual, I think, who was going to come to my home that night, but didn't.

Q   And that was about January 29th?

A   Um-hum, yes.

Q    You have a binder in front of you.  Can you take a look at Exhibits 502 and 503?  And after you've taken a look at those, if you could just let me know.

A    Okay.  Yes.

Q    Are those copies of the envelope and what was inside the envelope that you received on that day?

A    They are.

MR. WOODS:  Offer 502 and 503.

MR. ASKEROV:  No objection.

THE COURT:  They'll be admitted.

(Exhibits 502 and 503 were admitted.)

MR. WOODS:  May I publish, Your Honor?  Thank you. Let's start with 502, please.

Q    Let's start with the envelope.  What caught your attention, first, about the envelope?

A    Well, it was addressed to me.  And the sender was my name and my address as well.  So that definitely caught my attention.

Q    Let's talk about that address for a minute.  Have we -- did the original actually have the original address, and this is just a redacted copy for court purposes?

A    The original address was actually the address of my parents -- so my husband's parents.  My in-laws.  When we first moved to the Seattle area, we ended up living with them.  So they shared our mail, not knowing what it was.  So

thus creating another complication in this entire issue, because not only did I feel like I was being threatened, but the actual alleged perpetrator of the crime was targeting their home.

So it did create some additional complications for us.

Q   Who was living, then -- you said your husband's parents; is that right?

A   Um-hum.

Q   Let's back up just a minute.  Are you Jewish?

A   I am.

Q   Is your husband Jewish?

A   He is.

Q   What about your husband's family who was living at this address?

A   Yes.  My husband's -- both of his parents are Jewish as well.  My husband's father is a longtime rabbi and leader in the Jewish community.  And my mother-in-law is a leader in the Jewish community, as well, and also the daughter of Holocaust victims.

Q   Let's look at the poster itself.

So when you received this poster, what was your reaction?

A   I was terrified.  I saw my name written out very clearly. I saw where I was purported to live.  I saw the name of my organization.  You know, I saw a symbol that I recognized to

be this organization, Atomwaffen.  I think most strikingly, what I saw is an image of a hooded person, whose face looks like a skeleton, throwing a Molotov cocktail into, what I interpreted to be my house, which I interpreted to be someone not only threatening me, but potentially wanting to kill me and my family.

Q   You mentioned a symbol, earlier.  If you look in the lower left-hand corner, is that the symbol that you were familiar with when you opened this poster?

A   It is.

Q   And what did you know it to be associated with?

A   From my work at the ADL, you know, we know a lot about the importance of symbols and language, and all of those things. And I recognized it to be the symbol for Atomwaffen.

Q   When you received this poster, did you take any concrete steps in response?

A   Well, I did.  I took many steps.  I notified the FBI that I had received this in the mail.  I notified my employer, because I knew immediately that I would have to really beef up security at my home.  I knew that, you know, after trying to tread really carefully with family members, because we really didn't want to scare them, that because there was a direct threat made, we needed to tell them as well.

I mean, I think this -- you know, this has had a lot of complications for my life, in many ways.  So we ended up

creating a really robust security system at our home. We had to have, I guess, security that we've hired outside of my "in-laws" house, for at least, I think, one night, you know, when kind of pressures were high and this was first unraveling.

So there have definitely been many, you know, personal and professional consequences for this.

Q  Was there anything about children's equipment, like a stroller, that you did, or did anything different in terms of what was outside the house?

MR. ASKEROV:  Objection.

THE COURT:  You're leading, counsel.

Q  Okay.  Let me ask:  Was there any other changes you made to your daily routine, or to your house, in response to this incident?

A  Well --

MR. ASKEROV:  Objection.

THE COURT:  Overruled.

A  Well, on the date that this did happen, as I mentioned, I was at home with my daughter, by myself, because my husband had a retreat for -- a commitment that he had through an elected office that he holds.  And I remember very distinctly how, you know, I felt like I was being personally targeted, because of my job, and what I do.  But I really was worried about, you know, domestic extremists also being familiar with

the fact that I did have a family, and I do have kids.  So I hid my daughter's stroller, and any remnants of a child living in my house.  And I took all of her things and put them away.  Because I would never want to put her in jeopardy, or just have further knowledge of my family and my kids out there.

Q   Did you talk to her about what was happening?

A   No.  She was only two at the time.  So when we went to the hotel, we just said we were making a trip to a hotel.  And it was like a vacation.  And we just kind of made light of it. And it was just a really horrible night.  I think sometimes, as parents, we have to put on a brave face for our kids, to show them a sense of safety and security in the world.  But it was obviously a really -- it was a hard and stressful night for us.

        MR. WOODS:  No further questions.

        THE COURT:  Cross.

                    CROSS EXAMINATION

BY MR. ASKEROV:

Q   Good afternoon, Ms. Cypers.

A   Good afternoon.

Q   You just testified that you were contacted by the FBI before you actually received the poster in this case?

A   I was.

Q   And at the time you were contacted, didn't the FBI tell

you that there was not actually a plan of violence against you or your family, and that there were no plans for in-person confrontation?

A    They did tell me that, you know, they knew that someone was going to come to my house, but they didn't believe that I was in direct fear of violence.

But knowing what I know about the world today and how empowered and emboldened domestic extremists are, I made certain decisions, based on my own knowledge as well, and my own concerns for my family.

Q    And did the FBI specifically tell you that somebody was going to physically deliver the poster to your house, or were you told that they may mail it, or they may deliver it in person?

A    I think at the time, originally they believed that someone was going to physically come to my house.

Q    Were you also told at that time, that the FBI would be monitoring and was monitoring the situation?

A    They did try to assure me that they were monitoring the situation and keeping a close tab on what was going on.

Q    Was there an FBI detail on the -- I guess on the night that the delivery was supposed to happen, was there an FBI detail assigned to your house?

A    There was.

Q    Now, you didn't actually receive anything in the mail at

your residence, correct?

A   Right.  It was -- the letter was physically mailed to my in-laws, which was then given to us as part of our mail.

Q   And so your in-laws didn't know the contents of the envelope?

A   They didn't.

Q   And so you actually received the mailing, not on January 25th, but on January 29th; does that sound accurate?

A   I believe so.

Q   And, again, it came to your in-laws' residence?

A   Yes.

        THE COURT:  Counsel, you can generally assume that if you begin a question with, "And again," that it's repetitive.

        MR. ASKEROV:  Understood, Your Honor.

Q   You e-mailed SA Salts on January 29th when you received the envelope, correct?

A   I don't remember the exact action I took.  But I remember contacting the FBI shortly after.

Q   Do you remember whether they offered to speak with you the same day?

A   I don't remember.

Q   If could you pull up Government's Exhibit 502.  I'm sorry, the next one, 503.  The poster itself.

        This is the poster that you received in the mail, correct?

A    Yes.

Q    And on top it says, "Your actions have consequences." Correct?

A    Yes.

Q    The statement, "Your actions have consequences," suggests that it's referring to something you did?

A    I would assume so.

Q    You testified that you're employed by the Anti-Defamation League?

A    I am.

Q    And it's part of your organization's mission to report on and expose individuals or organizations you believe to be supremacists?

A    Yes.

Q    Prior to receiving the poster in question, did ADL publish anything on their website or in any other media about Atomwaffen, or AWD?

A    This is -- yes, this is a group that we have been tracking carefully over the years.

Q    So you had published something before receiving -- ADL had published something before receiving -- before you received the poster?

A    At some point in time, yes.

Q    And are you aware whether people's -- whether ADL published the names of individuals associated with AWD?

A   I'm not exactly sure if that was public on our website or not.

Q   Is it possible that it was?

A   It is.  There are times where we name specific individuals that we're concerned about, or who historically are associated with certain white supremacist movements.  But there are also times where we use our discretion, where there might be an active case or investigation, where we're connecting directly with law enforcement, and using tactics that are more discreet when we're tracking a hate group or a hateful individual more closely.

Q   The poster that you received contains your address, or what the sender perceived to be your address, correct?

A   Yes.

Q   After seeing your address in the poster, were you concerned that your address may be exposed to the public on the Internet, to various Internet trolls, to other people, just made publicly available?

A   I was most concerned that -- because a potentially violent individual, with white-supremacist ideology, had decided to send this to me with my address, I was personally most concerned that other people with that kind of proclivity towards violence or beliefs would be interested in targeting me.

Q   So you're saying not necessarily AWD, but you believed

that if your information was published on various websites, you may be targeted by other individuals; is that correct?

A   I guess what I'm saying is all of the above.  I was concerned about the direct threat that was very clear in this particular mailing that I received.  And I was also concerned that perhaps other people would be interested in causing harm.

Q   So one of the messages you took from this is that you could be doxed, or your identity could be exposed, your personal information could be exposed on the Internet?

A   I guess I was concerned about that.  But my chief concern was for the physical safety of me and my family.  And I think while the address was very -- both the address and the personal nature of this was very threatening, and the image itself as well, that suggested that someone was potentially going to -- someone wanted to throw a Molotov cocktail into my house.

Q   Before receiving this poster, had you personally seen any posters or propaganda materials that had been attributed to AWD?

A   I had not seen posters or propaganda, but I was familiar with the group.  I was, I think, familiar with that little symbol there.  And also, I mean, I was familiar with the defendant, and a lot of his activities, because they were quite notable; I would think both within the law enforcement

community and to those who tracked domestic extremists.

Q    So your testimony is you had not seen any AWD posters, memes, flyers, before you saw this one in question?

A    I personally had not.  You know, my colleagues at our center on extremism are familiar with the ins-and-outs of, you know, every piece of propaganda, and all of the kind of literature that comes out.  You know, I work closely with them.  And when I do see things in the community, I speak out about them.  So I'm a bit more of a generalist when it comes to these issues.

Q    Are you still employed by the ADL?

A    I am.

Q    And you've been able to continue your employment with the ADL, without issue?

A    I mean, there's been no issue in the sense that the organization I work for is supportive of me, and, you know, cares about me and my safety, and wants to support me in working there and feeling comfortable.  But I've obviously, you know, had to take considerable -- make considerable changes in my life, to just be able to ensure that I'm safe, and my family is safe, and my colleagues are safe, just in terms of the security of our office, and my home.  And just even the daily decisions I make about when to appear on camera, and whatnot, and when to speak out, and just being more sensitive about all aspects of security in my life.

So I continue to work there, and work there proudly, but this incident has had profound professional implications.

MR. ASKEROV:  Nothing further.  Thank you.

MR. WOODS:  No further questions, Your Honor.

THE COURT:  You may step down.  Put your mask back on, please.  Thank you.

MR. WOODS:  Your Honor, would you like us to call our next witness?

The defendant calls David Rosenbaum.

DAVID ROSENBAUM

Having been sworn under oath, testified as follows:

DIRECT EXAMINATION

BY MR. WOODS:

Q   Sir, please state your name.

A   David Rosenbaum.

Q   Are you married?

A   Yes.

Q   Who is your wife?

A   Miri Cypers.

Q   Where do you live?

A   Mercer Island, Washington.

Q   And what do you do?  What's your job?

A   Sure.  I work in public relations for a local technology company.  And I serve on the Mercer Island City Council.

THE COURT:  Would you consider joining the Seattle

City Council?

THE WITNESS:  I think they have residence requirements that would bar me from doing so.

THE COURT:  A shame.

Q   In the house that you are living now, have you always lived there, or did you live somewhere else, in the immediate area?

A   No.  We previously, when we moved to the Seattle area, we moved with family, close to our current residence.

Q   You say "family."  What type of family?

A   My parents.

Q   Let's turn to January 29th of 2020.  Did you and your wife receive something in the mail that day?

A   We did.  We received a letter that I immediately thought was very unusual.  The return address and the mailing address were the same.  Which was obviously unusual.  I initially thought it might have been some spam, but when I opened it, I had a very different perspective.

Q   Let's put on the screen 504.  What was -- I misspoke, 503. Is this what you received in the mail that day?

A   Yes.

Q   What was your reaction when you received this?

A   You know, initially I was very shocked and I was very terrified.  You know, we had received indication prior to this that a neo-Nazi group that was associated with a

tremendous amount of violence, may be visiting our home, by the FBI. And earlier that week we had --

MR. ASKEROV: Objection.

THE COURT: Ask another question.

Q   Okay. Mr. Rosenbaum, was there something in particular in terms of the image of the poster that caught your attention?

A   Yeah. Well, the poster, from top to bottom, caught my attention. Obviously it's addressed to my wife, very personally identifies her place of work, and our -- one of our residences. You know, at the top, "Your actions have consequences." I'm very proud of the work that my wife does, but "consequences" is really terrifying. The image in the middle of a skull face and someone holding a Molotov cocktail, that appears to be lit, and standing in front of homes, you know, not very different from ours, it appears to be someone who is looking to do damage, in some capacity. "Our patience has its limits." My first thought was: What are those limits? Have they reached those limits? The insignia on the bottom I knew to be associated with a hate group.

But the line on the bottom was honestly one of the more terrifying pieces of this, where it says, "You have been visited by your local Nazis." I'm Jewish. My wife is Jewish. Our family is Jewish. My family is from Eastern Europe. And we -- my paternal grandparents were some of the

only survivors of the Holocaust.  My grandmother in Auschwitz, and my grandfather was in the French resistance. But they were mostly the only people in their family that survived.  A lot of my family in the past has been visited by Nazis.  So I found this to be particularly terrifying.

Q   After receiving this poster, did you take any concrete steps to change your daily routine?

A   Certainly.  Even before receiving this poster, we immediately had a sophisticated alarm system put in our house.  We had contracted armed security in various places. We had immediately just tried to keep a closer lookout.  We also contacted our local police, and they had been by our house a number of times, and just were really on the lookout for anything that seemed suspicious or out of the ordinary.

Q   You said, even before you received the poster.  Was that after the FBI had contacted you?

A   Yes.

Q   Has there been anything, in terms of people who have come to the house, that sort of has caught your attention?

A   Yeah.  You know, we have a daughter who is pretty young, and we often will bake with her.  There was one morning I was baking with her, and had her up on -- we have a stool, a stepstool, so she could reach the counter.  And there was a gentleman --

          MR. ASKEROV:  Objection.

THE COURT:  Overruled.

A   There was a gentleman who pulled up in our driveway.  We don't get a lot of people that come into our driveway.  The window was rolled down.  He was a white man with very short hair.  And he kind of reached into the side, into the passenger seat.  And I found myself reaching to pull my daughter off of the stool and away from the windows.  He reached over and pulled out a newspaper and threw it towards our door.

And I was shocked at my own behavior.  And I realized just how terrified I had been, that there might be someone of this nature who would be visiting our house to cause damage.

Q   Have you avoided doing anything to the front of your house, specifically your door, in response to this incident?

A   Yeah.  You know, we -- like I said, we're Jewish, and normally we'd put up a mezuzah on the side of our door.  But we've been so terrified of people identifying us, and identifying where we live, that it's been unfortunate, but a decision we made not to do that.

MR. WOODS:  No further questions.

THE COURT:  Cross examination.

CROSS EXAMINATION

BY MR. ASKEROV:

Q   Good afternoon, Mr. Rosenbaum.

A   Good afternoon.

Q   You became aware, before receiving the poster, that your spouse had been targeted to receive one of these mailings, correct?

A   We'd been aware that she -- we were potentially going to be visited by a group, a violent group.

Q   Did your wife tell you that the FBI had informed her that there was actually no threat of violence or no information about a threat of violence at that time?

A   No.  We knew it was a violent group.

Q   So the poster that we're looking at now, that's the poster that you received in the mail?

A   Yes.

Q   And your address is featured at the bottom of the poster?

A   That address where we had previously lived.

Q   After receiving this poster, were you concerned about your previous address, or your current address being published on the Internet, or in other media?

A   Of course.

Q   So you had concerns, after seeing this poster, that somebody had intent to expose your personal information to the public?

A   Not only that, but potentially subject us to damage, to violence.

Q   But that -- one of the concerns was also having this information exposed to the public, correct?

A    Of course.

MR. ASKEROV:  We have no further questions.  Thank you.

THE COURT:  Any redirect?

MR. WOODS:  No.  Thank you.

THE COURT:  Thank you very much.

THE WITNESS:  Thank you.

MR. WOODS:  The government calls Chris Ingalls to the stand.

CHRIS INGALLS

Having been sworn under oath, testified as follows:

DIRECT EXAMINATION

BY MR. WOODS:

Q    Please introduce yourself to the jury.

A    Yes.  My name is Chris Ingalls.  It's I-N-G-A-L-L-S.

Q    Mr. Ingalls, who do you work for?

A    King TV in Seattle.

Q    How long have you been with King TV in Seattle?

A    It will be 27 years in December.

Q    This is King 5 News?

A    That's right.

Q    What do you do for King 5 News?

A    I'm a news reporter.

Q    Do you appear both on camera and off camera?

A    They actually put this face on TV.  And, yes, I write and

I research, write and report stories on TV.

Q   What are the types of stories that you report on?

A   It can be anything.  But I now work for the King 5 Investigators, the investigative unit.  So usually those are stories that involve a little more research, and detail, and length, as opposed to the daily news reporters, who might go into work at 9 o'clock in the morning, and put a story on TV at 4 o'clock or 5 o'clock that afternoon.

Q   Do you also do stories for the King 5 website?

A   I do.

Q   Have you received any awards for your work?

A   I have.  Yes.  Some regional Emmy awards, and what are called Murrow awards, radio television news production, director awards.  I've won a national Emmy, a Peabody award, a Sigma Delta Chi award.

Q   What did you do prior to working for King 5?

A   I drove a forklift.  I worked in a store.  I worked my way through college and got a job as a radio reporter in Dayton, Ohio.  And that's really where I started in broadcast journalism.  I have a mass communications degree from Wright State University in Dayton.

Q   At your time at King 5, have you done any news stories about the group Atomwaffen?

A   I have.

Q   Roughly, how many stories have you done?

A   I would say maybe in the neighborhood of ten separate stories.

Q   What's the general time period of these stories about Atomwaffen?

A   Yeah.  It started in the fall of 2019, the original -- the first Atomwaffen story, with some court records that I was able to get my hands on.  And the stories were based on that.

Q   When you were reporting on Atomwaffen, was there one particular person that was the focus of your stories?

A   Yeah.  I would say Kaleb Cole was the initial focus of our story.  Although anybody that was connected to Atomwaffen was fair game for a story, in my opinion.

Q   Let me turn your attention to October 18th of 2019.  Did you do a television story about Mr. Cole on that day?

A   Yeah.  That might have been the second story in the series that I was talking about, because we did a number of stories on Atomwaffen.  So that may have been the story where I actually went to a home in Arlington that police had responded to, and court documents had been generated.  So it was the address that I knew of that could have a connection to Atomwaffen.

Q   Was the topic of the story on October 18th, was it a type of protection order that had been issued that seized -- that authorized the seizure of Mr. Cole's guns?

A   That's correct.

Q   Okay.  And I think you said that -- as part of your story, did you visit a particular residence?

A   Yeah.  I had done a story that had named Kaleb Cole, the initial story, and I had tried to get ahold of Mr. Cole or anybody that could speak on his behalf.  I was not able to reach anybody for the initial story, but I realized that the court documents that I had obtained that were the basis of the story included an address in Arlington.  And not knowing what that address was, I decided the following day that I should go and visit that Arlington home, Arlington in Snohomish County, and see if there was somebody there that -- either Mr. Cole, or somebody that could comment on his behalf.

Q   Prior to coming to court today, did you review Exhibit 208, a news story that you produced on October 18th?

A   Correct, I have.

          MR. WOODS:  Offer 208.

          MR. ASKEROV:  Maintain our prior objection.

          THE COURT:  Overruled.  It may be admitted.

          MR. WOODS:  Thank you.  And may I publish?

                    (Exhibit 208 was admitted.)

          THE COURT:  Counsel, before you play it, would there be any objection to my instructing the jury that it's not being admitted for the truth of the contents?

          MR. WOODS:  Correct, Your Honor.

THE COURT:  Ladies and gentlemen, the video you're about to see is not being admitted for the truth of its contents, but only as information regarding the background of the events in this case.

MR. WOODS:  Thank you, Your Honor.

(Exhibit 208 played.)

Q   Is that just a portion of the news story that you did?

A   Yes.

Q   In the remaining portion, was there a reference that you made to Atomwaffen and Charles Manson?

A   I'm trying to remember if that was part of this story, and I believe it was.

Q   Do you remember doing reporting in which you talked about Charles Manson and the connection to Atomwaffen?

A   Yes.  That was a significant part of our stories.

Q   The stories that appeared on the news?

A   Yes.

Q   Okay.  Did you also do a print version of the story, the day before, that focused on Mr. Cole?

A   Yes.

Q   And prior to coming to court today, did you review Exhibit 604, this print version of the story?

A   Yes.

MR. WOODS:  Offer 604.

MR. ASKEROV:  Maintain prior objection.

THE COURT:  Overruled.  And, again, ladies and gentlemen, this exhibit is not being admitted for the truth of the contents, but only as the background of the events.

MR. WOODS:  May I publish?  Thank you.

(Exhibit 604 was admitted.)

Q   And is this the story that you published in the print version of King 5's website?  Is that right?

A   This is the print version of the original story that we aired on Atomwaffen.

Q   And who was the focus of this story, the person?

A   I would say the focus was Atomwaffen, but the individual who we were zeroing in on, because of court documents that we had, was Kaleb Cole.

Q   And is it fair to say, if you look at the subtitle of this story, was Kaleb Cole the focus?

A   Yes.  That's fair to say.

Q   All right.

    Let's turn to January of 2020.  Did someone from the FBI speak to you?

A   Yes.  I was called in to speak to FBI agents.

Q   What did the agents tell you?

A   They told me that they had information that I was being targeted by the Atomwaffen Division, and further they told me that they believed that people from Atomwaffen could be coming to my home, possibly in the coming weekend.

Q    Who lives in your home?

A    I do.  My wife and my three kids.

Q    How old are your three kids?

A    Now 19 years old, 17 years old and my 14-year-old
daughter.

Q    And this was about two years ago; is that right?

A    This was about two years ago, correct.

Q    For that weekend that the FBI talked about, did part of
your family stay somewhere else?

A    My wife and I talked it over, and it didn't take us very
long to decide we needed to get out of the house.  I mean,
the FBI couldn't -- said they didn't believe there would be
any violence at our house.  But, you know, who really knows
for sure what's going to happen with a group like this.

     So it didn't take my wife and I very long to decide we
wanted to get out of the house and go stay in a motel until
we could figure out what our next step would be, to protect
ourselves.

Q    Is that what your family members did?

A    That's what we did.  We left the house and went and stayed
in a nearby motel.

Q    Okay.  Let's turn to later in the month, January 29th of
2020.  Did you receive something in the mail?

A    Yes.  So that would have been a Wednesday night.  I walked
out to check the mail.  It was dark.  It was evening time.

And I saw a letter in the mailbox, in the middle of a pile of mail, that looked very suspicious and very peculiar to me.

Q   There's a binder in front of you.  If you could take a look at Exhibits 500 and 501.  After you've done that, if you could let me know.

A   I see a letter here, yes.

Q   Okay.  Is that the letter and the contents that you received on that day?

A   Yeah.  That's the letter that was in my mailbox.

MR. WOODS:  Offer 500 and 501.

MR. ASKEROV:  No objection, Your Honor.

THE COURT:  Admitted.

(Exhibits 500 and 501 were admitted.)

Q   Let's start with Exhibit 500.  Is this the envelope that you received?

A   Yes.

Q   Was there anything that struck you as unusual about the envelope?

A   Yeah.  Everything about the envelope struck me as unusual. The block lettering, the way it was -- the paper was cut out and taped on there.  The Santa Claus stamp struck me as a little strange, for some reason, even though it was fairly close to Christmas.  So, yeah, it stood out to me.

Q   And the version we're seeing here, for court purposes, contains some redactions.  But so we're clear, what appeared

in the redaction box right underneath your name?

A   Yeah.  That was my home address.  And it had been delivered to my home.

Q   Let's look at Exhibit 501.  Is this what was inside the envelope?

A   It was.

Q   What was your reaction in opening this envelope and seeing this?

A   You know, I knew exactly what this was.  This was a threat to me and to my family, that they were going to come to my home.

Q   Was there anything in particular about the images in this poster that caught your concern?

A   It was all extremely concerning to me.  Everything in here is a message sent to me, at my home.  Starting with the swastika at the top, which we all know that that's a Nazi representation.  "Death to pigs."

        MR. ASKEROV:  Objection, foundation.

        THE COURT:  Overruled.

A   "Death to pigs" is a Charles Manson reference.  I knew that from studying Atomwaffen, and from prior reading that I had done.  The guy in the picture is a news reporter with a press badge on, with a dollar sign, corporate media.  I assume that says, "He's a phony."  I knew that that was supposed to be me.  I'm surrounded by -- this is the

Atomwaffen garb, and the Atomwaffen mask.  And you can see those are armed individuals behind me, surrounding me, presumably at my home.  And they're telling me that these people have names and addresses.  And that's me, I assume. There's my name, my address.  My cell phone number, which I don't give out to anybody, except in very special circumstances.

"You've been visited by your local Nazis," is the tag line at the bottom.  And that's an Atomwaffen symbol, which I knew from my reporting, in the lower left of that letter.  So every part of this letter, from top to bottom, is a threat.

Q   You talked a little bit about, "Death to pigs."  And I think you said there was a Charles Manson reference.  What did you know or understand about that statement at the time you got this poster?

A   As part of my research into Atomwaffen, I read sort of some of the information on what you might say was the founder or the godfather of sort of this clan following.

MR. ASKEROV:  Objection, hearsay.

THE COURT:  Overruled.  It's not being accepted for truth of the contents, but only as part of the background of these events.  Go ahead.

A   Atomwaffen believed that Charles Manson, who was a mass murderer, who was convicted of encouraging his followers to go into people's homes and kill innocent victims in the Los

Angeles area, Atomwaffen believed Charles Manson was right. They believed they could go into the homes of white people, kill them, scrawl "Death to pigs" on the wall of the victims' homes, and make people believe that African-Americans had killed white people, to spark a race war, claiming:  We're going to kill the cops, basically.

And so this was what Atomwaffen believed in, along with the Nazi principles.  So to me, "Death to pigs," was basically you can be slaughtered in your own home, just as Charles Manson's followers did.

Q    After receiving this poster, did you take any steps to protect yourself?

A    There's a long list of steps that I can go through, if you want me to.

Q    Tell us what you did.

A    I got my family out of the house.  I got -- told the neighbors.  The neighbor got his family out of the house for a few days, too.  He was worried that one number wrong and they could come to his house.

My company gave me about a week off to install a pretty sophisticated security system around my house, which I did myself.  I dug an underground -- dug underground wires to put lighting up in the back of my house, so my house would look like Vegas at night.  I wanted it all lit up.  I went out and bought a handgun, against my wife's wishes.  She was very

upset by that.  I took my pistol-training class.  I got my concealed-carry permit, so I could be armed if I needed to be.

And I told the kids:  We're kind of in a new phase here, kids, this is a different level than we've been at before. And I need you to pay attention to what's around you.

MR. WOODS:  No further questions.

THE COURT:  Cross.

CROSS EXAMINATION

BY MR. ASKEROV:

Q   Good afternoon, Mr. Ingalls.

A   I'm sorry, you are?

Q   I'm Tim Askerov.  I represent Mr. Cole.

A   Thank you.

Q   Good to meet you.

A   Good to meet you.

Q   You testified that prior to receiving the poster in question, you had talked to the FBI?

A   That's correct.

Q   And you also testified that the FBI told you that there was no evidence of an actual threat of violence at your house?

A   I'm not sure it was said that way.  The FBI told me that they didn't believe that there was going to be violence at the house.  But they weren't answering any questions about

why they believed that, or why they didn't, and couldn't guarantee that. You know, they just said they didn't think there was going to be violence at my house.

Q   You were advised also that the FBI was monitoring the situation as it was progressing?

A   Well, "monitoring" is not a word I recall. I knew that the FBI was continuing to investigate.

Q   Do you recall if there was an FBI detail posted to your home around January 25th, the date of the expected delivery?

A   There was an officer from the joint terrorism task force who was posted at my house for one night.

Q   And ultimately there was no poster that was physically delivered to your house, correct?

A   The poster that I have, that we see in evidence here, came through the mail.

Q   It came through the mail?

A   Yes.

Q   It was not brought to your house, in person?

A   Um, so I'm assuming it was delivered by the mail, by the mail carrier.

Q   You didn't actually open the envelope when you received it, correct?

A   I did not.

Q   You took it in to the FBI?

A   That's correct.

Q   Then you opened it at their office?

A   It was actually the agents that opened it.

Q   And so we're looking now at a copy of the same poster that was delivered to you, correct?

A   That's right.

Q   And at the top it reads, "Two can play at this game."

A   It does, yes.

Q   And generally when someone says, "Two can play at this game," the suggestion is, "I can do this, too."  Is that accurate?  I can do the same thing?

A   Perhaps.

Q   The poster also says, "These people have names and addresses."

A   It does, yes.

Q   And the poster contains your name, your address, and your office and cellular phone numbers at the bottom, correct?

A   Yes, it does.

Q   You previously testified that you reported on Mr. Cole, personally, and on Atomwaffen generally, correct?

A   Well, I thought they were both the focus of the reporting. Now, that initial story had quite a bit of information about Mr. Cole in it, yes.

Q   And one of your stories -- we just saw a clip from it -- it featured Mr. Cole's neighborhood, and I believe it was his father's home; is that correct?

A    I now think that that is correct.  But, yeah, I think that was his parents' house that I visited that day.  And, yes, that's correct, there was some footage of the neighborhood.

Q    Were you afraid when you went to the house?

A    I was actually very fearful of going to that house.  The only reason I went there, because it's reporting 101, to try to get the other side of the story.  And sometimes that means taking some risks.  I was worried this could be -- could it be a Nazi hideout?  Could Mr. Cole be there?  Could friends of Mr. Cole be there?  I did not want to go to that house. In fact, if you look at that video, you will see the camera was set a long way away, and I was on a telephoto lens.  And I told the photographer, "If we have any problems at that house, you go get help.  I will go to the door, you get help."  So, yes, I went there not knowing exactly what I would find.

Q    After receiving this poster and talking to the FBI, when you were talking to the FBI, do you recall telling them that you had concerns about your private information being made publicly available?

A    I did.

Q    So -- and I think it was specifically you were worried about your cell phone being leaked to the public, because you had taken steps to keep that private?

A    That's correct.

Q   And so one of the messages that you took from this poster was that AWD, or people who may be affiliated with it, had the intent of publishing your information or disseminating your information to the public; is that correct?

A   Not the public so much, but other members -- other like-minded members.

Q   Or maybe other like-minded people, generally?

A   Possibly, yes.

Q   Are you familiar with the term "doxing"?

A   I am.

Q   And do you understand that to mean the publication of somebody's private, personal information?

A   I do.

Q   And that was one of your concerns here?

A   Yes.

Q   You have not received any mailings from AWD since this incident?

A   No, I have not.

Q   You have not received any mailings from AWD before this incident?

A   No.

Q   You testified that you had done some research on AWD, generally, in your reporting, or for the purpose of reporting?

A   That's right.

Q   During the course of that research, did you see any other propaganda posters, any other movie clips, any other type of media that was allegedly produced by AWD?

A   Yes.  Before the publication of the first story, I had seen some videos online that purported to have been produced by the Atomwaffen Division, and I viewed those and collected those as part of the research.

There was also other public-sourced news articles on the Atomwaffen Division.  So I studied some of that as well.

Q   Isn't it true that many of the materials produced, many of the media materials produced by AWD contain images of weapons?

A   I would say that's true.

Q   Isn't it true that many of the materials produced by AWD contain images of explosives?

A   I'm not so sure about that.  I did see a lot of firearms. I don't remember that many explosions.  There was some special effects that had ominous sounds, and perhaps explosions, if that's what you're referring to.

Q   Isn't it true that many of these materials have violent slogans or have hate symbols in them?

A   They do.

MR. ASKEROV:  Nothing further.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Redirect?

REDIRECT EXAMINATION

BY MR. WOODS:

Q   Mr. Ingalls, you were asked about these videos.  Do you remember any slogans that accompanied the videos that counsel asked you about?

A   Yeah.  I'm embarrassed to say one of them, but I'll say it.  The one that stands out to me, the guy is giving the Nazi salute and saying, "Gas the kikes."

Q   When counsel asked you about visiting the Cole residence, did you leave anything at the residence?

A   I did.  I left my business card.

Q   What was printed on that business card?

A   The information that you see on the poster here.

          MR. WOODS:  No further questions.

          MR. ASKEROV:  Nothing further, Your Honor.

          THE COURT:  You may step down.

     You folks can stand up and stretch, if you'd like.  We'll be stopping at 4 o'clock today.  So the end is in sight.

          MR. WOODS:  Your Honor, the government calls Chris Leckinger to the stand.

     Your Honor, may I address something briefly at sidebar?

          THE COURT:  Yes.  Do you need a reporter?

          MR. WOODS:  I don't think so.

                         (Sidebar.)

          THE COURT:  Ladies and gentlemen, let me admonish

people in the audience, you are not to record any of the
testimony, take any pictures or video of any of the
testimony.  If you do, you'll be in violation, direct
violation of a court order, which could result in your
incarceration.

                      CHRIS LECKINGER

    Having been sworn under oath, testified as follows:

                    DIRECT EXAMINATION

BY MR. WOODS:

Q   Sir --

        MR. WOODS:  May I inquire, Your Honor?

        THE COURT:  Yes.

Q   Sir, who do you work for?

A   The FBI.

Q   What's your job title?

A   I'm a special agent.

Q   How many years have you been an FBI special agent?

A   Twelve years.

Q   What was your role in this case?

A   My primary role in this case was as undercover to
infiltrate the Atomwaffen Division.

Q   Did you receive any specialized training in being an
undercover officer, from the FBI?

A   I did.

Q   Tell us about the training you received.

A    It's a fairly intense selection process, where they groom special agents who are predisposed to doing this type of work.  Then there's training involved, and a selection process.

Q    What are the types of training you have received from the FBI?

A    My primary background is cyber.  So most of my training centered around cyber activity, cyber investigations.  I've had explosives training, as well as just investigative-type training.

Q    I want to turn to the summer of 2019.  Did you infiltrate the group Atomwaffen in an undercover role?

A    I did.

Q    Prior to infiltrating the group, did you do some research on this group?

A    I did some research, and I received a case brief.

Q    Okay.  And what was your familiarity with Atomwaffen, as you set about to infiltrate the group?

A    The background that I was provided was that they were a violent group of individuals who had their own set of ideology that promoted racial tension, anti-Semitic behavior, things along those lines.

Q    What was your goal in infiltrating the group?

A    Primarily it was to collect evidence, as well as to identify members of the group.

Q   Were you hoping to identify anything in particular, in terms of conduct?

A   Mostly to differentiate between the violent individuals and the individuals who were solely there for ideological purposes.

Q   Tell us how you went about infiltrating this group.

A   I worked with an informant.  And between myself and the informant, we made some headway in terms of meetings that we set up with them.

My primary role was to -- because I work many different cities and different states with Atomwaffen members, so I would go visit them personally to understand where they were, where they wanted this group to go, and kind of what they were planning.

Q   So what -- how did the informant help in that regard?

A   At the time, a member of the group had reached out to the informant, recruiting him into the group.  And he then recruited me into the group.

Q   What persona did you adopt when you were infiltrating the group?

A   Are you referring to my moniker?

Q   No.  I mean, in terms of what was your cover?  What was the cover story?

A   So, I was significantly older than the majority of the group.  And my persona was, I was a part of the movement,

with the informant for some time now.  Again, my background is in cyber.  I have a master's degree in computer science. And I was using that as my angle, because this particular group of individuals was very much interested in technology, encryption, obfuscating themselves, communications platforms.

Q   I want to turn your attention to August of 2019.  Was there an Atomwaffen meeting scheduled somewhere?

A   There was.

Q   Where was that scheduled for?

A   Las Vegas, Nevada.

Q   What was the meeting called?

A   It was called the Nuclear Congress.

Q   Did you attend?

A   I did attend.

Q   Roughly how many people attended?

A   There was approximately ten to 12 individuals there.

Q   Was the informant there?

A   He was.

Q   Was Kaleb Cole there?

A   He was.

Q   So we're clear, is the person you know as Kaleb Cole, is he here in the courtroom?

A   Yes.

Q   When Kaleb Cole was at this meeting, did he go by a nickname?

A    I was introduced to him, and the name I was provided was Khimaere.

Q    Was there also a person at this meeting named Cameron Denton?

A    There was.

Q    Was there somebody who also went by the name Krokodil, or Krokodil?

A    Krokodil, yes.

Q    What was the general format of the -- this meeting in Las Vegas?

A    This group had met before. And primarily they do mostly training, firearms, self-defense. This meeting was primarily just to understand where they wanted to take this group. So it was very presentation based. Members of the group would present to the rest of the other members. It was in a hotel suite. There was no training that was involved in it. And it was just mostly sharing ideas.

Q    During the meeting, did this person, Cameron Denton, pull you aside to talk to you about something?

A    He did.

Q    When that conversation occurred between you and Cameron Denton, was anyone else present?

A    Initially, no. But then eventually Kaleb Cole came and sat in on the conversation.

Q    What was the nature of the conversation?

A    It was mostly about technology.  Cameron was very much interested in technology, Linux platforms, communication platforms.  The website that he was putting together, he was doing some things on the dark web with Tor.  So most of the conversation was around that.

Q    Using this word "technology," was there also a discussion of any security?

A    Encryption security.  It was mostly to obfuscate who they were, so they could hide.

Q    During the meeting, did Cole talk at all about any propaganda for the group?

A    Yes.

Q    While this meeting was occurring, did there come a point where Kaleb Cole addressed the group?

A    He did.  He described some of his activities prior to coming to the meeting.

Q    And during that discussion with the Atomwaffen members, were -- was the FBI able to record what Kaleb Cole was saying?

A    We did, yes.

Q    And prior to coming to court today, did you listen to snippets of those recordings in Exhibits 606 and 607?

A    I did.

Q    Are Exhibits 606 and 607 accompanied by a transcript?

A    There was.

Q   And did you review that transcript as well?

A   I did review the transcript, yes.

Q   So two sets of questions.  One, are the recordings true and accurate recordings of what Cole was telling the group?

A   The recordings were true and accurate of what he was, yes, explaining to the group.  Yes.

Q   Was the transcript true and accurate of what was being said on the recordings?

A   There was one area where some of the information was flip-flopped between myself and Cameron Denton.

Q   Let me ask you that.  Was that in this meeting where Cole was --

A   No, it was not.

Q   Or was that later?

A   No, it was a different recording.

Q   For this recording, was it true and accurate?

A   It was, yes.

          MR. WOODS:  Offer Exhibits 606 and 607.

          MR. BLACK:  We maintain our prior objections.

          THE COURT:  Overruled.  It will be admitted.

          (Exhibits 606 and 607 were admitted.)

Ladies and gentlemen, you're about to hear an audio recording of a conversation.  And also to assist you in following the recording, there will be a transcript of what purports to be on the recording.  It's the recording itself that is the

evidence, not the transcript.  The transcript is just to aid you in following the recording.  To the extent you discern a difference between what's on the recording and what's in the transcript, it's the recording that's the evidence.

Okay.

MR. WOODS:  Thank you, Your Honor.

Q   And, special agent, we're going to listen to that recording a little bit later in the trial, but let me ask you a question up front, since you were present at the meeting.  Was Exhibits 606 and 607 part of the same presentation, just different snippets of it?

A   It was, yes.  Yeah.

Q   I want to fast-forward in time.  So we talked about this Las Vegas conference in the summer of 2019.  Now I want to jump ahead to January 9, 2020.

A   Okay.

Q   Did you meet Kaleb Cole for a second time on that day?

A   I did.

Q   Where did that meeting occur?

A   It was in the area of Montgomery, Texas.

Q   Is Montgomery, sort of near the Houston area?

A   It is, yes.

Q   And you said it was in this Montgomery or Houston area.  Where was the actual meeting, at a house, a business?  Where was it at?

A    It was at a residence of Cole and some of the other members.

Q    In particular, what other member?

A    Cameron Denton.

Q    Let's look at Exhibit 2.  In fact, there's a binder in front of you, if you don't mind looking at Exhibit 2.

A    I'm sorry, which exhibit?

Q    Two, the number 2.  So it should be all the way in front of the binder.

A    Okay.

Q    Does that -- what does that depict?

A    That is a layout of the residence that I visited them at.

Q    Are you sure you're looking at Exhibit 2, as opposed to Exhibit 1?

A    I apologize.  Okay.

     The house that's in this photograph is the house that I met with Cameron Denton and Kaleb Cole.

          MR. WOODS:  Offer Exhibit 2.

          MR. BLACK:  No objection.

          THE COURT:  It will be admitted.

                    (Exhibit 2 was admitted.)

          MR. WOODS:  And may I publish?

          THE COURT:  Yes.

Q    This is the residence where Cole and Denton were staying?

A    It is.

Q   Prior to -- let me ask it this way:  What had happened that prompted you to want to visit Kaleb Cole in January of 2020?

MR. BLACK:  Objection, leading.

THE COURT:  Overruled.

A   At the time, we had information that they were planning action towards some of the individuals that were focusing on them.  So ideally, we wanted to find out who some of these subjects or these targets were, as well as what they were planning.  So we visited the residence, myself and the informant, to meet with them to see if we could elicit that information.

Q   Specifically what was your understanding as to what potentially was going to happen in terms of what you were trying to accomplish?

A   Can you rephrase the question?

Q   Sure.  It's a bad question.

A   Yeah.

Q   Did you have any information about a potential plot?

A   It was my understanding at the time that some of the members of Atomwaffen were planning a flyering campaign, specifically targeting those individuals that either reported on them, or who they just didn't have good opinions about.  So that was the information we had, going down to the meeting.

Q   Did you visit the residence by yourself, or were you with somebody?

A   I was with the informant.

Q   Were you wearing a recording device during the meeting?

A   I was wearing a recording device, and carrying one as well.

Q   Were you able to videotape portions of the meeting as well?

A   I did.

Q   Prior to coming to court today, did you review Exhibits 200, 202, 203 and 204?

A   Yes.

Q   Were those recordings accompanied by transcripts?

A   They were, yes.

Q   And I think now you're going to say this, other than one instance -- other than one instance, are the transcripts true and accurate in terms of what was said in the meeting?

A   They were, yes.

Q   And in that one instance, was there a point where the name "Mr. Denton" should have said somebody else in the meeting?

A   Yes.

Q   And are you prepared, if we listen to this, to point out where that is?

A   Yes, I can.

        MR. WOODS:  Offer Exhibits 200, 202, 203, 204.

MR. BLACK:  We just maintain our prior objections, again.

THE COURT:  Overruled.  They'll be admitted.

(Exhibits 200, 202, 203 and 204 were admitted.)

Q   Let's start with Exhibit 200.

THE COURT:  Ladies and gentlemen, remember the court's instruction regarding the difference between the transcript and the recording itself.

A   Would you like me to pause you when we get to that point?

Q   Sure.  Let's get to that.

Let's start with Exhibit 200.

(Exhibit 200 was played.)

Q   Where are we in the meeting?  Is this in the beginning, the middle, the end?  Where are we?

A   This is right when we arrived at the home.

Q   You heard this statement, "FBI, get on the ground."  What was happening there?

A   It was more or less a joke.

Q   Did it really have two meanings, in fact?

A   Well, obviously we were the FBI showing up at the door. But it wasn't intended other than just a joke.

Q   Was Cameron Denton wearing anything when you arrived at the residence?

A   When I arrived there, he was wearing what I perceived to be a Ku Klux Klan robe.

Q   Did Kaleb Cole subsequently change into anything?

A   Eventually he put on a different colored robe, yes.

Q   If you look at Exhibit 207, which would be before you, do you recognize that photo?

A   Yes, I took that photo.

Q   Who is depicted in the photo?

A   Kaleb Cole.

MR. WOODS:  Offer 207.

MR. BLACK:  Maintain prior objection.

THE COURT:  Overruled.  It will be admitted.

(Exhibit 207 was admitted.)

Q   So is that Kaleb Cole that we're looking at in this photo?

A   It is.

Q   Where is that in the residence?

A   As you first walked in the front door, that's just to the right, which is what I became aware was his area of the home that he was staying.

Q   All right.  Let's look at Exhibit 203, which was previously admitted.  And let's play that.

(Exhibit 203 played.)

Q   So we've got an image now of these two.  Tell us who is who in this.

A   As I'm looking at the screen, the individual on the left is the defendant, Kaleb Cole; on the right is Cameron Denton.

(Audio continued.)

Q    Are you familiar with who Nate Thayer is?

A    I am.

Q    Who is he?

A    He is a journalist with ProPublica, and he had done articles on Atomwaffen Division.

                    (Audio continued.)

Q    You see that reference to the Base; are you familiar with that?

A    I am.

Q    What is with the Base?

A    It is a similar group to the Atomwaffen Division.

          THE COURT:  All right.  Let's stop there for the day. Ladies and gentlemen, we'll resume tomorrow morning at 9:30. Please remember the court's admonitions not to discuss the case with anyone, not even among yourselves.  Don't permit anybody to talk to you about the case, don't read, listen or watch anything about the case.  I'll see you tomorrow morning at 9:30.  We'll be in recess.

                    (Adjourned.)