UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

UNITED STATES OF AMERICA,   ) CR20-032-JCC
                            )
              Plaintiff,    ) SEATTLE, WASHINGTON
                            )
v.                          ) September 28, 2021
                            )
KALEB COLE,                 ) 9:30 a.m.
                            )
              Defendant.    ) Trial - Day 2
_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE JOHN C. COUGHENOUR
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the Plaintiff:      Thomas Woods
                        Seth Wilkinson
                        Assistant United States Attorneys
                        700 Stewart Street
                        Suite 5220
                        Seattle, WA  98101

For the Defendant:      Christopher Black
                        Teymur Askerov
                        Black & Askerov PLLC
                        705 2nd Avenue
                        No. 1111
                        Seattle, WA 98104

EXAMINATION INDEX

EXAMINATION OF:                                                PAGE

 CHRIS LECKINGER        DIRECT EXAMINATION (Cont.)          161
                        BY MR. WOODS
                        CROSS EXAMINATION                   164
                        BY MR. BLACK
                        REDIRECT EXAMINATION               171
                        BY MR. WOODS

 JERROLD DeROCHE        DIRECT EXAMINATION                 172
                        BY MR. WILKINSON
                        CROSS EXAMINATION                  177
                        BY MR. BLACK

 STEVE HAUGHTON         DIRECT EXAMINATION                 178
                        BY MR. WOODS
                        CROSS EXAMINATION                  227
                        BY MR. BLACK
                        REDIRECT EXAMINATION               241
                        BY MR. WOODS
                        JOSHUA SUTTER                      242
                        DIRECT EXAMINATION                 243
                        BY MR. WILKINSON
                        CROSS EXAMINATION                  256
                        BY MR. BLACK

 JAYME POTEET           DIRECT EXAMINATION                 264
                        BY MR. WILKINSON
                        CROSS EXAMINATION                  275
                        BY MR. BLACK

 MALA BLOMQUIST         DIRECT EXAMINATION                 277
                        BY MR. WILKINSON
                        CROSS EXAMINATION                  284
                        BY MR. ASKEROV
                        REDIRECT EXAMINATION               287
                        BY MR. WILKINSON

 VERONICA RUDIE         DIRECT EXAMINATION                 288
                        BY MR. WILKINSON
                        CROSS EXAMINATION                  295
                        BY MR. ASKEROV

 JOHN POWERS            DIRECT EXAMINATION                 300
                        BY MR. WILKINSON
                        CROSS EXAMINATION                  317
                        BY MR. ASKEROV

HILARY BERNSTEIN    DIRECT EXAMINATION                         318
                    BY MR. WILKINSON
                    CROSS EXAMINATION                          324
                    BY MR. ASKEROV


                         EXHIBIT INDEX


EXHIBITS ADMITTED                                            PAGE

Exhibit 1                                                    267
 Exhibits 2 - 23                                             269
 Exhibit 24                                                  274
 Exhibit 25                                                  274
 Exhibit 26                                                  275
 Exhibits 100 - 111                                          181
 Exhibit 300                                                 278
 Exhibit 305                                                 281
 Exhibit 307                                                 280
 Exhibit 402                                                 292
 Exhibit 504                                                 321
 Exhibit 505                                                 322
 Exhibit 600                                                 176
 Exhibit 601                                                 175
 Exhibits 602, 603, and 605                                  184
 Exhibit 802                                                 307
 Exhibit 803                                                 307
 Exhibit 804                                                 308
 Exhibit 805                                                 315
 Exhibit 807                                                 311

THE COURT:  Are you ready for the jury?

MR. WOODS:  We are.

THE COURT:  All right, bring them in.

(The following occurred in the presence of the jury.)

THE COURT:  Ladies and gentlemen, today is a very important day.  Forty years ago today, a very young lawyer was sworn in as a United States district judge on September 28th.  The commission was signed by the then President of the United States.  And that's when I started my judicial career.  It's 40 years today.  All right. Mr. Woods.

CHRIS LECKINGER

Having previously been sworn, testified further as follows:

DIRECT EXAMINATION (Cont.)

BY MR. WOODS:

Q   Sir, let's go back to Exhibit 203.  And let's just, very briefly, reset the stage.  Okay?

Who were the four people at this meeting?

A   Myself, who was recording this video.  If you look at the screen, the person closest to me is Cameron Denton.  The one next to him is Kaleb Cole, and the informant.

Q   In terms of the voices, that Male 1, the deep, gravelly voice, is that the informant?

A   That is the informant, yes.

Q   Are you Male No. 2?

A   I believe so, yes, I'd have to --

Q   We'll play it, and then we'll stop it.

A   Okay.

                    (Exhibit 203 played)

Q   That Male 2, that's you?

A   Yes.

                    (Video continued.)

Q   You were asked yesterday if there was one spot in the transcript where there was a mistake.  Is Mr. Denton in the frame at this point, or is he inside the house?

A   At this point Mr. Denton left the porch.  And that would be me speaking.

Q   Who says, "You have access to that."

A   That's correct.

Q   Are you familiar with an onion?  What is an onion?

A   The onion is a derivative from Tor, which is the onion router, which is essentially a network of computers scattered around the world, so that when you browse the Internet, you can do it anonymously.  So you go from hot point to hot point.  Not to get too technical, but your signature, as you go, gets obfuscated by the last signature.  So it's just a way to browse the Internet anonymously.

Q   Is it a way to access the dark web?

A   It is.

                    (Video continued.)

MR. WOODS:  Your Honor, may I confer with Mr. Black just very briefly?

Q  Let's turn to a different part of the conversation, Exhibit 202, which was previously admitted.

Did the name Chris Ingalls come up during your meeting with Mr. Cole?

A  Yes.

Q  Was it in the context of a protection order that had been served upon him and which his guns had been seized?

A  That's correct.

MR. WOODS:  Let's play Exhibit 202.

(Exhibit 202 played.)

MR. BLACK:  Your Honor, objection.

MR. WOODS:  Your Honor, may I have a minute?

Your Honor, may I have one minute?

MR. BLACK:  Objection withdrawn.

THE COURT:  All right.

MR. BLACK:  Sorry, Tom.

MR. WOODS:  No.  I understand.

Q  So we'll resume Exhibit 202.

(Video continued.)

Q  All right.  And let's turn to Exhibit 204, which was previously admitted, part of the same meeting.

(Exhibit 204 played)

Q  What was the cover story for the informant when you were

meeting about his role in this plot?

A   So, the informant and myself had our own cell, and he was following along in the sense that he was also going to participate, even though we weren't going to.

Q   You don't actually have a cell, right?

A   No.  No.  It was all notional.

(Video continued.)

MR. WOODS:  Nothing else, Your Honor.

THE COURT:  All right.  Cross?

CROSS EXAMINATION

BY MR. BLACK:

Q   Good morning.  My name is Chris Black, and I am one of the attorneys representing Mr. Cole in this case.

I'm going to first ask you a few questions about the 2019 meeting in Las Vegas that you testified about.

A   Yes.

Q   You were there for the conference?

A   I was, yes.

Q   That lasted a couple of days, I believe?

A   It did.

Q   And you indicated that the conference was about sharing ideas; is that correct?

A   Yes.

Q   There was a discussion about cyber security?

A   Offline, as well as some sort of OPSEC-type presentation,

yes.

Q   The topic of the conference was not planning violent attacks, correct?

A   No.

Q   Wasn't discussed there?

A   No.

Q   Thank you.

You indicated that you traveled to Texas in January of 2020 for the meeting that we just saw excerpts of; is that correct?

A   That is correct, yes.

Q   And you were with the confidential source when you went to that meeting?

A   I was, yes.

Q   You met with Mr. Cole and Cameron Denton, correct?

A   Correct.

Q   And who else was there?

A   At that meeting it was the four of us.  I don't believe there was anyone else at that meeting, if I remember right.

Q   There was nobody else in the house during the entire time you were there?

A   I had visited Cameron Denton's home and Kaleb's residence on two different occasions.  At one point Kaleb was not residing there.  At another point he was.  The first time that I went to Cameron's house, there were other individuals

there.  The second time, there might have been a roommate that went to work that day, but there wasn't somebody for the duration of the meeting.

Q    Could that have been Sean Fernandez?

A    That sounds right, sir.

Q    So you believe he was there for --

A    A portion, anyway.

Q    Do you know if he was living there?

A    I believe he was living at that residence, yes.

Q    Do you know if anybody else was living there?

A    My understanding, it was just the three of them.  But I do know there were others going in and out.

Q    At this meeting, you were obviously undercover?

A    That's correct, yes.

Q    And the confidential source was, likewise -- you kept it secret that he was working with the FBI.

A    Right.  He wasn't working under an undercover umbrella, but he was working as a confidential human source, yes.

Q    Thank you.

     Mr. Cole, at the time of that meeting, was living in the living room of the house; is that correct?

A    That was my understanding, yes.

Q    And that was based on the fact that his belongings were in the living room?

A    Yes.  There was a couch there with a desk.  Or, excuse me,

like a portable table.  And he was showing me some of his

items that were in that vicinity, a computer, et cetera.  So

it was believed to be that was his portion of the home.

Q    And there were a few computers there; is that correct?

A    That is correct, yes, sir.

Q    A couple of laptops as well as a desktop computer?

A    I believe that's the case.  I can't say definitively, but

there were a few different types of computers there, yes.

Q    Thank you.  And that was in the living room, that was in

the kind of central area of the house that everybody had

access to?

A    Yes.  So when you first walked in the door, you are in the

living room.  And just to the right is sort of that area in

which I believe Cole was residing, yes.

Q    Thank you.

     During your visit that day, did you actually use one of

the computers that was in the living room?

A    I didn't personally touch any of the computers.  But Cole

did show us some media on one of the computers, yes.

Q    Okay.  And did you learn, either during that meeting or at

any other time, what Cameron Denton's screen name or nickname

was?

A    He went by a variety of different names.  "Rape" was the

most common one that he used.

Q    Sorry.  Do you know of any others?

A    I would know them if I heard them.  But a lot of times, for operational security purposes, I noticed that the group, in general, would switch monikers, to obfuscate who they were.

Q    So his was "Rape" and other ones.  But you don't remember the specific ones?

A    Not offhand.  No, sir.

Q    Thank you.  When you visited the house on January 9th, you were utilizing recording equipment, correct?

A    Yes.

Q    That was both video and audio?

A    Normally we use a couple different devices.  At this meeting here, I did have a key fob that also recorded video, with a short record time.  So portions of that were recorded. But it wouldn't have lasted the entire meeting, which is why we had an audio recording of the entire meeting.

Q    Okay.  So the audio recording was running for the entire time that you were there?

A    Yes.

Q    And was the undercover -- excuse me, the confidential informant also wearing a recording device?

A    I don't believe so.  I think I had both the recordings on me.

Q    Were you with the confidential informant the whole time you were there?

A   Short of a quick bathroom break, yes.

Q   How long were you there that day?

A   I would say it was at least a couple hours.

Q   And you had extensive discussions with Mr. Cole and others while you were there, correct?

A   We had discussions, yes.

Q   And during those discussions, Mr. Cole at various points discussed his intent behind the planned postering campaign; is that correct?

A   Unrelated to the evidence we just viewed?

Q   No, within that evidence.

A   Oh, yes.  Yes, sir.

Q   Okay.  Thank you.

    He was talking about things like:  Pulling an Antifa thing, and doing to AWD what they were doing to Mr. Cole's group; is that correct?

A   He was, correct.

Q   He said that the message is, "Don't fuck with us."

A   Right.

Q   He was talking about media coverage and that enhancing their reputation; is that correct?

A   That is correct.

Q   He said it was a symbolic gesture?

A   Um-hum.  He did say that, yes.

Q   He said that the point overall was that they would not be

dissuaded by their bullshit?

A   Yes.

Q   At one point he was talking about not wanting to overshoot things; is that correct?

A   He did say that, correct.

Q   He said:  You don't want to go up to somebody's door and say you're going to kill them, right?

A   Right.

Q   So he was talking during that meeting about not wanting to take things too far; is that correct?

A   That's correct, yes.

Q   And there was no point when Mr. Cole said that his true intent here was to actually make people think that they were coming for them; is that correct?

A   Not in the course of those conversations, no.

Q   And, again --

        MR. BLACK:  I'll strike that, Your Honor.

Q   There was no indication, during any of the time that you were there, that Mr. Cole or Mr. Denton, or anybody else who was there, knew that you were an FBI agent; is that correct?

A   No.  The group, in general, was concerned.  They would call it -- the way they termed it was "feds," everyone was a fed.  But they had no reason to believe that anybody was a fed, other than the fact that there was a level of paranoia that they had.

Q   The same is true for the confidential informant.  They didn't have any reason to think he was actually working with the FBI; is that correct?

A   I'm not aware of that, no.

MR. BLACK:  Nothing further, Your Honor.

THE COURT:  Redirect?

MR. WOODS:  Briefly.

REDIRECT EXAMINATION

BY MR. WOODS:

Q   You said this meeting occurred on January 9th of 2020?

A   Yes.

Q   Do you know one way or the other whether a search warrant was conducted at this residence later?

A   Post that meeting there was, yes.

Q   Were you part of that?

A   I was not.  My only role was the undercover.

Q   So you didn't go into the residence during the search warrant?

A   No.

Q   You don't know where Kaleb Cole was living at the time the search warrant was executed?

A   Not during the search warrant, no, sir.

Q   You mentioned that people switched their nicknames.  And you said, am I correct, for operational reasons?

A   That's one of the reasons why, to obfuscate who they are.

Q   And they switched within themselves.  In other words, they didn't trade nicknames between themselves?

A   I'm not aware of any instance where that occurred, no.

MR. WOODS:  No further questions.

MR. BLACK:  Nothing further, Your Honor.

THE COURT:  All right.  You may step down.

MR. WILKINSON:  The United States calls Jerrold DeRoche.

JERROLD DeROCHE

Having been sworn under oath, testified as follows:

DIRECT EXAMINATION

BY MR. WILKINSON:

Q   Good morning.

A   Good morning.

Q   Could you please tell the jury your name and what you do for a living?

A   I'm Jerrold Anthony DeRoche.  And I'm a correctional officer over at Bureau of Prisons in Sea-Tac, Washington.

Q   How long have you worked with the Bureau of Prisons?

A   A year, as of September 13th.

Q   And can you describe what the facility is in Sea-Tac, Washington, where you work?

A   So it's a --

MR. BLACK:  Objection, relevance.

THE COURT:  Overruled.

A    It's an institution for inmates, housing them in and out. And we just provide security and welfare.

Q    Does it sometimes house people while they're awaiting trial?

A    Correct.

Q    Can you describe what your job responsibilities are at Sea-Tac?

A    So, as a senior correctional officer, I provide the safety and security for the inmates, and welfare for those around me as well.

Q    Okay.  Are you assigned a particular unit?

A    Depending on the shift and who is in charge that day, or shift, they'll assign me to a unit based on their specifications.

Q    And you said that you're responsible for safety and welfare.  Does that include conducting searches of inmates' cells from time to time?

A    That is correct.  A minimum of five cell searches per shift.

Q    And under what circumstances do you conduct searches?  Are they random?

A    Random, yes.

Q    Have you become familiar with Kaleb Cole?

A    As far as being in the unit, and -- yes.

Q    He is in one of the units that you have worked with?

A    That is correct.

Q    I want to turn to July 9th of 2021.  Do you recall performing a search that day?

A    Yes.

Q    And was one of the cells that you searched Mr. Cole's cell?

A    Yes.

Q    Did you find anything of note in that search?

A    Yes.  So what I found was a journal with symbols and unfamiliar written things in there, that I was unaware of, which was deciphering coding and symbols, that I was unaware of, and brought to my lieutenant's attention.

Q    Where did you find this journal?

A    On the top of his bunk, under the right side of the mattress.

Q    Are there rules that govern where inmates are supposed to keep their papers?

A    Usually they will have to store their papers in their wall locker, which is on their right-hand side, usually.

Q    Are papers like this permitted to be stored underneath the mattress?

A    They can store it.  But based on their discretion, but during a cell search, yes.

Q    Was the notebook visible to you, apart from conducting the search?

A    From moving up the mattress, yes, it was.

Q    I want to show you Exhibit 601.  Do you recognize that document?

A    Yes.

Q    And how do you recognize it?

A    That was one of the images -- or, excuse me, pages that was in his notebook.

Q    And is it actually a multipage exhibit that contains various pages from the notebook?

A    Yes.

         MR. WILKINSON:  United States offers 601.

         MR. BLACK:  Your Honor, we object to the relevance of this exhibit.

         THE COURT:  Overruled.  It will be admitted.

                    (Exhibit 601 was admitted.)

Q    And I think the jury should be able to see this now.  I'm circling some characters at the top of the first page.  You mentioned a minute ago that the document had various foreign characters.  That's an example of some of the characters you were talking about?

A    Yes.  So on looking on these images, I was unaware of the symbols or any of that nature.  So once I collected these images in the notebook, I called my higher-ups, my lieutenant, and notified them.  Then I confiscated the material and gave it to them.

Q   Now, I'm showing you Exhibit 602 -- 600, excuse me.  I'll find you Exhibit 600.  Do you recognize Exhibit 600?

A   Yes.

Q   And how do you recognize that?

A   When I first saw this, it looked to me as an unknown deciphering tool.  I was just unaware of the symbols from when I saw the journal.

Q   Is this another document that you found in Mr. Cole's cell?

A   Yes.

Q   Underneath his mattress?

A   Yes.

        MR. WILKINSON:  The United States offers 600.

        MR. BLACK:  No objection.

        THE COURT:  It will be admitted.

                (Exhibit 600 was admitted.)

Q   And, again, are these some of the foreign characters that you described earlier in your testimony?

A   That is correct.

        MR. WILKINSON:  No further questions for this witness.

        THE COURT:  Cross?

        MR. BLACK:  Thank you, Your Honor.  Very briefly.

CROSS EXAMINATION

BY MR. BLACK:

Q   Good morning.  I just have a few very brief follow-up questions.  I'm one of the attorneys representing Mr. Cole, Chris Black.

    You indicated that the searches at the facility are random?

A   That is correct.

Q   And you conduct a certain number of searches every shift?

A   That is correct.

Q   Okay.  You indicated that you talked to your superior about these items that you found in Mr. Cole's cell, because they looked unusual; is that accurate?

A   Yes.  So based on my random cell search and looking at these items that were located under his bed, instead of in his wall locker, I briefly looked at the items, called my lieutenant, my superiors, and they said:  We'll take a look at it.  And I gave it to them, and there was no further incident from there.

Q   Had you been instructed to look for anything like that in Mr. Cole's cell?

A   No, I was not.

Q   Okay.  Did anything in those materials seem particularly problematic, for a security reason at the facility, or anything like that?

A    When I was looking in the journal?

Q    Yes.

A    The symbols and the deciphering of -- deciphering, and all that, I at first thought he was deciphering something in the magazines for someone else.  And it was unaware, to my attention, and I brought it to my higher-ups.

Q    Thank you.

          MR. BLACK:  Nothing further, Your Honor.

          MR. WILKINSON:  No, Your Honor.

          THE COURT:  You may step down.

          MR. WOODS:  Your Honor, the government calls FBI Special Agent Steve Haughton to the stand.

                    STEVE HAUGHTON

     Having been sworn under oath, testified as follows:

                 DIRECT EXAMINATION

BY MR. WOODS:

Q    Sir, who do you work for?

A    I work for the FBI, as a Special Agent.

Q    How long have you been a Special Agent with the FBI?

A    For 13 years.

Q    Are you one of the agents who was assigned to this case?

A    Yes.

Q    Were there other agents assigned to this case as well?

A    Yes, there was.

Q    About how many offices in the FBI worked on this case?

A    At least five offices, probably more.

Q    Did the FBI capture a series of chats that related to the plot in this case?

A    Yes, they did.

Q    What app were members of the plot using to conduct these chats?

A    Members of the plot were using an encrypted application, an end-to-end encrypted application called Wire.

     And basically the way that Wire works is the users will download the software to their phone, or a digital device, and that will enable them to communicate over the Internet with other users of the application.  Since it's encrypted, it's a Swiss-based company, unlike --

          MR. BLACK:  Your Honor, I'm going to object.  This is turning into a narrative.

          THE COURT:  Ask another question.

          MR. WOODS:  Sure, Your Honor.

Q    Does the end-to-end encryption that you've described that Wire uses, does that pose any challenges for law enforcement investigating a case?

A    Yes, because the content is not available by a search warrant.

Q    Could you contrast the use of Wire, with, for example, the use of Gmail?  How would those two situations be different for the FBI investigating that case?

A    Yes.  In the situation with a Gmail account, that information is contained on a server that's controlled by Google.  Therefore, law enforcement with a search warrant can access the content of the communications.

Q    Unlike the case of Wire?

A    Unlike the case of Wire.

Q    So given that end-to-end encryption, how was law enforcement able to get copies of these chats in this case?

A    In this case, we had an informant who posed as a member of the group, and he was a party to the communications.  So he was able to collect the communications by screenshot or photograph, and then send that to the FBI.

Q    Did the informant provide these chats to the FBI, on a rolling basis?

A    That's correct.

Q    What time period did these chats span?

A    The chats in question are going to be from late November 2019 to late January 2020.

Q    Were you reviewing the chats as they were being provided to the FBI?

A    Yes.

Q    Are the chats that the informant provided marked as Exhibits 100 to 110?

A    Yes.

Q    Did the informant also provide an e-mail attachment that

was connected to these chats as well?

A   Yes.

Q   Is that in Exhibit 111?

A   Yes, it is.

MR. WOODS:  Offer 100 to 111.

MR. BLACK:  No objection.

THE COURT:  They'll be admitted.

(Exhibits 100 - 111 were admitted.)

Q   Let's talk about the informant for a minute.  Were you directly responsible for the informant in this case?

A   No, I was not.

Q   But are you generally aware of the informant's history?

A   Yes, I was.

Q   Does the informant have any criminal history?

A   Yes.  My understanding is the informant had a firearms violation arrest from the 2003 time period.

Q   About how much time did he serve on that?

A   Approximately 24 months.

Q   At the time of that conviction back in 2003, did the informant have any connection with the white-supremacist movement?

A   That's correct.  My understanding was that the informant had been a member of the Aryan Nations.

Q   When he was convicted, did the FBI attempt to recruit him as an informant?

A    Yes.

Q    What type of work was he asked to do?

A    He was asked to maintain the connections that he had made within the white-supremacy networks so that he would have access to potential subjects.

Q    Was the informant paid for his work?

A    Yes, he was.

Q    About how much was he paid, over what general time period?

A    Um, from the time period that he became a source, I think was close to 2004, until the present, it was between $100,000 and $150,000.

Q    Did -- and about how much, do you know, was he paid in connection with his work on Atomwaffen?

A    That was approximately $80,000.

Q    Did you learn recently that the informant had not been paying taxes on the amounts that he was paid by the FBI?

A    Yes.

Q    How did you learn that?

A    We learned that in discussions with the source in preparation for this trial.

Q    And you say "discussions."  Who volunteered that information?

A    The source provided that information, voluntarily.

Q    Does the informant have any involvement in a book-publishing business?

A    Yes.  My understanding, going back over the history of this case, was that the source was involved in a satanic bookstore, was my understanding of it.

Q    What were the general types of books that were published?

A    I've learned some of these books were, I guess, apocalyptic in nature.  So dealing with the apocalypse and satanic cults, and that type of thing, and that type of material.

Q    Are some of the writings something that most people would find distasteful?

A    Yes.

Q    Has he written some of the books himself?

A    Yes.

Q    Let's get back to the chats in this case.

     Did one of the users and participants in this chat, in these chats, use, like, a moniker, or, like, a handle, a user name that had a string of non-English characters?

A    Yes.

Q    Before coming today, did you review Exhibits 602, 603 and 605?

A    Yes, I did.

Q    Are those chats that were either captured by the informant and provided to the FBI, or the informant was part of the chat string?

A    Yes.

MR. WOODS:  Offer 602, 603 and 605.

MR. BLACK:  We just maintain our prior objection, Your Honor.

THE COURT:  It will be overruled.  It will be admitted.

(Exhibits 602, 603, and 605 were admitted.)

MR. WOODS:  And may I publish all these?

THE COURT:  (Nods head.)

MR. WOODS:  Thank you, Your Honor.

Q   Let's start with Exhibit 602.  Do you see that string of non-English characters that appears at the top of this chat string?

A   Yes.

Q   Did the FBI gather a series of -- and review -- a series of chats where the user of this moniker made statements, shedding light on who the person really was behind the computer screen?

A   That's correct.

Q   Let's look at Exhibit 603, and specifically Page 5.  This is going to be a two-page exhibit.  I want to take it slowly, so let's start with the first page.

A   Okay.  So the first page at the top there's a user using the name "Ryan," at the very top you can see, they're tagging this moniker that we're talking about in here.

Q   I'm going to stop you right there.  Are you familiar with

how Wire works, in terms of how the communications come up on the screen?

A    Yes.

Q    You just said that they "tagged a user."  Take a minute to explain how that works.

A    Right.  Within Wire, they can set up chat channels.  And so there could be multiple participants in that chat, and it can be restricted to just those few participants.

But the user has the capability to tag somebody in the group, for a specific message.  Similar to social media, you know, commonly available social media you might be aware of.

Q    So let's get back to that top message by Ryan.  Who is he tagging?

A    He's tagging the person that's using that moniker.

Q    And what is the content that Ryan is flagging for this moniker?

A    The content is a King 5 article.  And the subject of that article is Kaleb Cole.

Q    Let's stop there for a second.

A    Okay.

Q    Now, let's go to the bottom of this page.  Okay?  And this person, Greg, what is he offering?  What is he saying?

A    He's saying, "If you haven't already, you should consider finding a federal firearms lawyer."

Q    Let's now look at the very next page of this exhibit.  So

with the message from Ryan, in which he tags The Moniker, the article about Kaleb Cole and the question or point from Greg about the need to hire a lawyer, what does The Moniker say here?

A    The person using The Moniker is speaking in the first person saying, "I may not be able -- I may not be getting much.  I couldn't really pay them.  I am broke.  I wouldn't be paid money."  And, "I would have to get legal help," down there at the bottom.  So speaking in the first person, as the subject of the article.

Q    In that article that we just saw that Ryan had tagged the user, is that an article that we've already seen in this trial?

A    Yes.

Q    All right.  Let's look at Exhibit 604, which has been already admitted.

Who is this article about?

A    The article is about Kaleb Cole.

Q    Who wrote it?

A    Chris Ingalls.

Q    Let's turn now to Exhibit 605, which was just admitted. And let's look at The Moniker, the same string of non-English characters.  What is he posting to the group?

A    Right.  The Moniker is posting a link to a Seattle Times article that was dated December 2019, and in response -- who

the subject of that article is also Kaleb Cole.  And The Moniker is responding in the first person, "I'm not returning," in reference to a warrant -- this article about a warrant that had been issued in Washington State, that was non-extraditable.

Q   At this point, where was Kaleb Cole living?

A   In Conroe, Texas.

Q   After he left Washington State?

A   Yes.

Q   Let's go back to Exhibit 603, and go to the second page of that exhibit.  Let's look at the same moniker.  And let's start at the top.  What is The Moniker telling the group here?

A   The Moniker, again, is speaking in the first person about a proceeding that occurred in Canada, which I'm aware Kaleb Cole was a party -- had a proceeding in Canada.

    Also that, "I describe a blood eagle for every bureaucrat in detail."  Which was ascribed, again, to Mr. Cole.

Q   Okay.  Do you remember when the undercover officer was testifying and he talked about the audio clips that had been captured of Kaleb Cole addressing the group.  Do you remember that testimony?

A   Yes.

Q   Do you remember Exhibits 606 and 607, which were previously admitted but not played to the jury?  Do you

remember that?

A    Yes.

Q    And have you listened to those two exhibits?

A    That's correct, I have.

Q    Who is the primary person talking on those recordings?

A    It's Kaleb Cole.

Q    So let's play these.  These were previously admitted.

(Exhibits 606 and 607 were played.)

Q    Before we get to that, did Kaleb Cole attend that festival?

A    Yes, he did.

Q    Let's get to Exhibit 607.  And just so we are anchoring this discussion, these exhibits have all been admitted, I'm going to put on the screen Exhibit 603, and this blood eagle for every bureaucrat.

Now let's play 607.

(Exhibit 607 played.)

Q    All right.  Let's move on from the 603 and the blood eagle for bureaucrat poster, and let's talk about the document we just saw from the last witness.  Have you examined that?

A    Yes.

Q    And let's pull up Exhibit 600.  And have you undertaken to match the symbols found in that document, under Kaleb Cole's mattress, with the symbols that are in this moniker that was used in the chats?

A    Yes.

Q    And how -- let's start with the first symbol.  How do they match?

A    They match up with the symbols that are used in The Moniker.

Q    Is that the second?

A    Correct.  It matches.  That one matches.  That one matches.  That one matches.  That one matches.  That one matches.  That one matches.  That one matches.

Q    So in light of this cipher, the various articles, the blood eagle for bureaucrat, and the articles using the first person, what was your conclusion about who the person was who was using this moniker?

        MR. BLACK:  Objection, Your Honor.  Calls for an opinion.

        THE COURT:  Overruled.

A    Yeah, the conclusion I drew was that Kaleb Cole was using this moniker.

        MR. WOODS:  Your Honor, do you want me to proceed to a different topic?

        THE COURT:  Let's take the morning recess for 15 minutes.

                        (Recess.)

        THE COURT:  Are you ready for the jury?

        MR. WOODS:  Yes.

THE COURT:  Bring them in.

(The following occurred in the presence of the jury.)

Q   Special Agent Haughton, we ended with your conclusion about this moniker being Cole.  Let's move to the chats themselves.  And let's start with Exhibit 100, and the first page of that exhibit.

So let's start with this.  What is this person, Krokodil, telling -- first of all, who is he communicating with?

A   The person using the moniker Krokodil, is communicating with the informant.

Q   What is Krokodil telling the informant?

A   Krokodil is inviting the informant to participate in an operation that's called Erste Saule, where:  We will be postering journalists' houses and media buildings to send a clear message that we, too, have leverage over them, and that we aren't scared of their articles or public defamation.  The goal, of course, is to erode the media state's air of legitimacy by showing people they have names and addresses, and hopefully embolden others to act as well.  Do you have anyone in the East Coast alumni who would be willing to partake?

Q   On the next page, what does the informant write back?

A   The informant says to add him to the group.  He'll filter the information down to his guys, appropriately.

Q   And does the informant, in fact, have a cell?

A   No, he does not.

Q   That's his cover story?

A   It was fictitious.

Q   Let's turn to the fourth page of Exhibit 100.  Further along in the discussion, what does the informant write, Krokodil?

A   The informant is asking for an update, because the informant has not been in the Wire communication very long. And you can see with this dot over on the left, this gray dot, these particular chats were set up to auto delete after 24 hours.  So if they were not online for a period of time, participants would ask for updates that they missed, to get filled in on any chats that had potentially disappeared since the last time they were logged into the system.

Q   Let's look at Krokodil's response.  What does he tell the informant?

A   Krokodil's updating the informant that:  The Florida cell has acquired five targets, including home addresses. California has acquired four targets, including addresses. And Oregon has acquired three targets, including a cultural center, media building.

    Then at the bottom Krokodil says, "Khim is developing a number of posters that are threatening, but not explicitly. In 24 hours I'll follow-up with everyone regarding their

progress on finding their targets."

Q    Do you remember the undercover's testimony about the nickname that Kaleb Cole used in this Las Vegas Nuclear Congress?

A    Yes.  That nickname was Khimaere.

Q    Let's look at the next page.  How did the informant respond?

A    The informant responded, "Outstanding.  Thank you, comrade."

Q    Let's look now at Exhibit 101, on the first page.  And if you look at the bottom of the page, just so we're on the same page, what is The Moniker we're seeing at the bottom?

A    The Moniker down at the bottom is the one that we talked about before that's attributed to Kaleb Cole.

Q    Let's look at the next page of Exhibit 101.  What was the title of this chat group that had been started?

A    Right.  So the title of this chat group was Operation Erste Saule, which is reference to the operation that was propositioned to the informant.  You can see that "Krokodil added you," which is the informant, was added to this chat group.  And Krokodil is announcing, "Another ranking gentleman added to the mix."

Q    If we go to the next page of this Exhibit 101, what does the informant write to the group?

A    The informant is trying to find out what the timeline for

the operation is, and that he's filtering information down to some of his guys.  He'll be in the vicinity of some major news hub storefronts in short order, but wanted to make sure everything coincides.

Q   The next page of Exhibit 101, what does Krokodil tell the group?

A   Krokodil explains that, "The timeline is organic, we're breaking this down step-by-step, so everyone's on the same page.  Currently we're each to find out the names of local journalists and news stations, information gathering, and the deadline to have info gathered is in 24 hours.  Then after that, we will commission custom posters for the more prominent figures, and then we will prepare the materials, and then we will decide on a night to launch the operation."

Q   Next page, Page 5 of Exhibit 101.  What does Lazarus tell the group?

A   Lazarus tells the group, "All right.  We have four targets."

Q   Next page, Exhibit 101, Page 6.  So let's work through this section here.

Let's start with Krokodil, then the person you believe to be Cole.  What are they both saying here?

A   So Krokodil is saying, "We have some posters in the making we think you will like, rest assured."  And Cole is saying, "No, because they'll take a DNA sample."

Q    If you look at the top, does it look like that's -- the informant has just started using?

A    Right.  So this was one of these scenarios that I talked about before, where they would get back into the system, and the informant apparently doesn't have the message that precedes this one from Cole responding about the DNA.

Q    All right.  But let's look at the bottom right, after the DNA sample, what does the person you believe to be Cole say here?

A    He's again tagging Lazarus.  So this is in reference to a communication with Lazarus.  "Don't worry, we're working on the posters.  Here's a sample."

Q    Let's look, then, at the very next page.  Do you recognize this image?

A    Yes, I do.

Q    Was this one of the posters used in the operation?

A    Yes, it was.

Q    If we look at the very bottom right, below the poster, what does Cole write here?

A    "There will be more."

Q    Let's go to Page 10 of this exhibit.  What does Krokodil say?

A    Krokodil says, "Good morning, gentlemen.  I hope you all had a good Thanksgiving.  What are all your status on the data collection?"  Which was -- and that's in reference to

the targets, the information they were collecting about the targets.

Q    Let's look further down the page.

MR. BLACK:  Objection to the commentary.

THE COURT:  The last portion of the answer will be stricken.

Q    Let's look at the bottom portion of this page.  What does Lazarus say?

A    "I have three people written down.  I'll figure out the addresses, if possible."

Q    What about Azazel -- I'm sorry, let's start with Lazarus.

A    Okay.  So Lazarus starts with, "Two to three journalists with addresses found.  The other two we just have names, but I'm sure we can find addresses soon for them."

Q    Let's look at the next page, Page 11 of this exhibit. What are the two people here reporting?

A    This moniker is reporting, "I'm complete."  And the informant is reporting, "Same."

Q    The next page, Page 12, what does Krokodil say?  Then what's the response?

A    Krokodil is tagging these other monikers, and he's asking for status on your info collection.  One of them responds to Krokodil, "Things are well.  I'm taking a more unorthodox approach, but all the locations are in order.  There are lots of unsurveilled mailboxes in my area, which I'm going to

incorporate into this.  Much wider breadth."

Q   Let's look at the next page, Page 13.  What does this member say in response?

A   This member in response says, "Got three targets here lined up, working on the plan to hit them now.  Shouldn't be too difficult.  Main thing is distance, but that can be worked around."

Q   Page 15.  What does Krokodil now tell the group?

A   He tells the group, "Good morning, ladies.  We are now going to begin the second step of our operation, which is the commissioning of custom posters for our targets.  Please e-mail all the information you collected to your" -- collected of your targets, to this secmail.pro e-mail address.  Please have the subject of the e-mail be 'mailing list.'  Please do this within the next 24 hours, so we can begin making these posters as soon as possible.  Thank you."

Q   Are you familiar with this secpro e-mail service?

A   Yes.  I understand that to be a dark web e-mail service.

Q   Let's look further down the page, Page 15.  What does Krokodil say, then, the responses?

A   Krokodil says, "Please do this within the next 24 hours, so we can begin making these posters as soon as possible. Thank you."

     Azazel responds, "Yes, sir."  This other moniker, "Will do."

Q   Let's go to Page 20 of this exhibit, and walk us through what's happening here.

A   You have the person using the moniker "Old Scratch" says, "Sent."  Cole responds, "Okay."  Old Scratch responds, "Sadly, I couldn't get the address on the fourth guy, who was a Jew."  Cole responds, "Tis all good."

Q   Let's look at that next page, so just continuing this string here.  "Tis all good."  What does Old Scratch write and what does Cole respond?

A   Old Scratch, in his own words, "Those white cucks should be enough, so LMAO.  Plenty of articles on fag rights and whatnot."  Cole responds, "Oh, indeed."

Q   Further down this same page in the string.  "And so we're clear, who is writing?"  What does Cole recommend?

A   "If I had to make a suggestion for the Ohio boys, and there's a Twitter.com Egavactip."

Q   Have you visited that Twitter page?

A   You know, I don't remember visiting that one.

Q   Do you know who the person is?

A   Oh, no.  No, I did.  I do remember this.  That was an ADL official.  A Twitter page for an ADL official, I'm sorry.

Q   Let's go to the next page.  Tell us what's happening here with this person, Roman.

A   Okay.  Krokodil, "Another guy on deck.  And, no, this isn't the Base Roman LOL."  And, again, that's a reference to

another neo-Nazi group called the Base.

Q   What does Cole say?

A   "Yup he's a new initiate."

Q   Let's look at the next page, Page 23 of this exhibit.
What does Roman tell the group?

A   Roman tells the group.  "Thanks Krokodil.  Krokodil, happy
to be a part.  Hope I can help.  Has anyone already devised
an easy way to find these journalists?  I'm literally going
to a local news outlet, scouring for any names tacked on to
political or opinion pieces, that are directly attacking what
we represent."

Q   If we look further on Page 24.  What's the exchange with
Lazarus and then Cole?

A   The exchange with Cole, and it looks like he's responding
to Roman, "Often addresses will be listed on websites, such
as White Pages, or other websites like White Pages."

Q   Let's look at the next page, Page 25.  And this
continuation of this discussion.  What does Cole say to
Roman?

A   "This is still in somewhat earlier stages at this time.
So far we are manifesting this op organically."

Q   Page 26.  What's the exchange between Roman and Cole?

A   Roman says, "All right.  I've gotcha."  And Cole responds,
"At this time, it's mostly newer initiates that will be doing
this."

Q    What does Krokodil say?

A    Krokodil says, "And me, because I'm not doxed yet."

Q    Let's look at Page 31 of Exhibit 101.  Walk us through this exchange.

A    Okay.  So this moniker at the top is responding to Krokodil.  "List sent.  Three Jews."

Q    What does Cole say?

A    Cole says, "Hold up, I'll check the e-mail."  14ALG88 says, "Including the lead director of several local stations, and a member of the Jewish Community Center, who is a writer for the Jewish Journal."

Q    What does Cole say?

A    Cole says, "Nice work."

Q    Let's look at the next page, Page 32 of Exhibit 101. Following this exchange, what does that other user, ALG, offer?

A    ALG offers, "Thank you.  You can use Trustoria to get a complete list of literally every journalist in your area, and then you just put their name into White Pages."

Q    What is Trustoria?

A    Trustoria is a publicly available online database of professionals, to include journalists.

Q    If we look at the next page, how did Cole respond?

A    "Really?"

Q    And if we continue down the same page, this is Page 33.

What's the exchange here?

A    14ALG88 then cross-referenced the White Pages information for accuracy.  "Yes."  Cole says, "Interesting."

Q    Let's go to Page 36.  What does Roman tell the group?

A    Roman tells the group, "Very nice.  I found a leader of the Association of Black Journalists here in my state."  Krokodil responds, "Excellent work."

Q    And let's look at Page 41, later in the chat.  What does Lazarus say and how does Cole respond?

A    Lazarus says, "Sounds like you've been a bit busy.  I have my boys looking for local journalists in their area.  Do we need to learn any personal information about the journalists we are targeting?"  Cole responds, "If possible, home addresses."  Lazarus responded, "Got it."

Q    And the next page, Page 42.  What is the exchange here between Krokodil and Lazarus?

A    Krokodil and Lazarus.  "If there are local journalists who are up our ass, prioritize them.  If none of your local journalists are up our ass, hit them anyway."  Lazarus says, "Got it.  We've got three guys, and one of them is a Jewish journalist."  Krokodil responded, "Outstanding, Laz.  Make note, and tomorrow we can move on to the next step."

Q    Let's go to Exhibit 102, and the first page of that exhibit.  What does Cole tell the group?

A    Cole tells the group, "Okay.  So far I have addresses and

such from guys in Oregon, Florida, California and Ohio." Somebody responds, "Beautiful." Lazarus, "Oh, we are ready to get shit done here soon."

Q   Let's look at Page 2 of this string. What does Cole say here?

A   Cole says, "It seems we have some more work to do on the fronts of other cells in this chat. There are still a few more addresses some of us need to get. For instance, our Washington guys need a bit more time." Lazarus responded, "Ah, all right. We'll wait then."

Q   Let's skip to Page 7 of this string. What does Krokodil write and how does Cole respond?

A   Krokodil writes, "Wire has been down for me for the last 72 hours. If anyone has messaged me in that timeframe, please resend. This app is fucked. So have I missed anything related to the operations?" And Cole responded, "Not at this time."

Q   Page 8 of Exhibit 102. What does Cole write to the group?

A   "So when you guys film clips for this project, be sure to film your clips horizontally, landscape, not vertically, portrait."

Q   Okay. If we go to Page 10 of Exhibit 102, what does Krokodil say here?

A   "I also want to add, I think we should do this project on the same night. All of us. For two important reasons. If

some journos get hit before others, they will perhaps see it coming and prepare.  It would be a good show of force demonstrating we are capable of massive coordination." Lazarus says, "Sounds fun."

Q    Look at the next page, Page 11 of Exhibit 102.  What does, in particular, Roman say here?

A    Roman says, "I believe that as well.  Knowing what day, beforehand, would help to us.  They wake up on a certain day and find themselves terrorized all at once, with targeted propaganda."

Q    Let's go to Page 14 of this exhibit.  What does Cole write to this person?

A    Cole, to this person, "Once we compile the information, we will figure that out soon.  If I had to make suggestions for some here, if some of these reporters have houses, some should get Dollar store rag dolls and knife them to a tree outside their houses, knife through the head of the doll."

Q    Do you remember Exhibit 203, the video that was taken by the undercover officer of Cole?

A    Yes.

Q    Let's just play a very brief snippet of that.

                    (Exhibit 203 played.)

Q    All right.  Let's go to Exhibit 103.  What does Cole write to the group?

A    "Just to check in, how is everyone doing?"  Azazel says,

"Pretty good, brother."  Cole goes on to say, "Now we are still working on some more people getting addresses, and we're working on some more posters, and such.  We want this to be a real good campaign.  In the meantime, those that have their targets already, feel free to do recon, even over Google Maps, with the proper electronic opsec measures of the addresses.  If you" --

Q   We'll get to that part in a second.

In your training and experience, are you familiar with what that word "opsec" refers to?

A   Right.  The word "opsec" refers to taking measures so that you don't create information about what you're doing on the Internet.

Q   If you look at the continuation of this, so we can fill out the page here.  Then what does Azazel say?

A   "Yes, sir."

Q   Let's go to the next page, Page 3.  What does Cole say here?

A   Cole says, "We have addresses from Washington, Oregon, California and Ohio.  Did you guys send yours yet, @Azazel?"

Q   And what is the exchange in particular?  What does Cole say at the bottom?

A   In particular, Lazarus says, "I think we did."  Azazel responded, "Yes."  And Cole says, "Let me check that e-mail real quick."

Q    Page 4 of this exhibit.  Let's finish this continuation here.  What does Cole say?

A    Cole asks, "Which e-mail you have on file?  Sorry, I lose track of these things occasionally."  Lazarus responded, "If we sent them, it would have been from Azazel, @Azazel."  Cole responded, "Never mind, I found it.  I do not have an e-mail from you guys."  And he provides the secmail.pro e-mail account.

Q    The dark web e-mail account?

A    Yes.

Q    Let's look at Exhibit 104.  What does Cole write here?

A    "All right.  We have addresses from Washington, Oregon, California, Ohio, and Florida, and one from Arizona."  And then he's asking if Napalmson has any addresses.

Q    If you look at the next page of this exhibit.  What's the exchange here between the user of 14AL, and then Cole?

A    Okay.  So 14ALG88 is saying, "Everything I print at the library shows up on the clerk's monitor.  I tested it with printing out a resume.  I'm not sure how I'm gonna get prop. I might just have to improvise.  The messages will get across."  Cole responds, "You can also go on Craigslist. People sell printers on there for cheap.  I definitely wouldn't use the library.  You could also go to a spot like Kinkos, or something, depending on the surveillance around the place."

Q   Look at the next page, continuation of this string. What's some of the advice that Roman and this other ALG person offer?

A   Roman offered, "To distract the clerk with a rock."  ALG, "I could have my GF walk up and talk to her."

Q   GF, is that an expression you're commonly familiar with?

A   I'm familiar with that as "girlfriend."

Q   What does Cole say in response to those suggestions?

A   Cole says, "I wouldn't even do that."

Q   What does ALG then say?

A   ALG says, "It's probably archived."

Q   And if we look at the next page, how does Cole pick up on that comment, that it could be archived?

A   Cole picks up on it, "Exactly.  It may be archived.  Not the best idea.  As I said, oftentimes there will be printers on Craigslist for like 20 bucks that people don't use anymore."

Q   Let's go to Page 6 of this exhibit.  What does he tell the group?

A   There is also the printer/copier places that you can go for -- avoid Office Depot, because of their cameras and such. And be sure to only print in black and white.

Q   Page 7, does he explain why you should only print in black and white?

A   "A printer/copier spot that's a little more low key is not

a bad bet.  Just make sure everything is printed in black and white, so no metadata won't show up, the tiny yellow dots that indicate information about the printer."

Q    Are you familiar with what metadata is?

A    Yes.  Metadata is, again, talking back to operational security, is information that would be inadvertently left behind that could attribute the activity to you.

Q    Page 9 of Exhibit 104, what does Krokodil say?  Then what's the response from ALG?

A    Krokodil says, "Canon Pixma MG3620 is $39.99.  Canon Pixma TS3122 is $19.  And if you don't have $20 steal some baby formula and sell it on eBay to make that quick buck.  Joking of course."  ALG says, "Oh, I'd never do anything illegal."  Krokodil says, "I know you wouldn't, brother.  None of us would."

Q    Next page, Page 10.  What does Cole write Old Scratch?

A    He writes, "Hey, man, what website did you recommend previously in regards to getting journalists' home addresses?  Just so I can forward it to another crew getting in on this."

Q    Next page, Page 11.  How does Old Scratch respond?

A    He responded with this URL.

Q    And what is he -- again, his words?

A    "You can filter by state and specialties.  I chose targets who write about government and ethnic issues.  You can also view examples of their work and see the kind of" -- in his

words -- "faggotry they write about.  Some have addresses and some don't.  But useful either way."

Q   Let's look further down that page.  How does Cole respond?

A    "Aye, indeed."

Q   Let's go to Page 15 of this exhibit.  What does Krokodil tell the group?

A    Krokodil tells the group, "Once we decide on a unanimous night for the boots-on-the-ground operation, you gentlemen utilizing mail should mail a day or two earlier than the boots-on-the-ground operation, depending on how fast domestic in-state mail rates are."  Old Scratch says, "True.  True." And Krokodil says, "And, remember, buy your stamps in another town, with cash, while wearing a disguise.  Laughing out loud.  And utilize a mailbox with no cameras nearby.  Post office equals big no-no."

Q   Next page, Page 16.

A    Old Scratch says, "Definitely."  Krokodil says, "And wear medical gloves when handling all materials.  Make sure both the destination and return addresses, if you're dumb enough to add one, are printed on the paper and cut out and taped onto the envelope.  No handwriting allowed.  When sealing the envelope, use a Q-tip dipped in water, instead of your tongue, unless you want the FBI to have your DNA.  Little things, man.  Little things.  Study how others were caught, and improve on their techniques."

Q   Page 18.  What does Cole tell the group?

A   Cole tells the group, "So I have three designs ready for the doorsteps.  I may make another one as well.  If you're doing spots that are news stations or anything else, our standard selection of posters will work for those."

Q   Page 19.  What's the exchange here between Krokodil, Cole and the informant?

A   Right.  Krokodil is reaching out to the informant asking, "Got anything on your end, East Coast alumni?"  Cole likewise is reaching out to the informant.  "Will you have your guys participating in the fun?  You beat me to it, Swiss."

Q   Page 21.  What does Cole tell the group?

A   Cole tells the group, "I've held off on some of the specific posters, as I wanted to do them all in bulk."

Q   What does Krokodil say?

A   "I understand 100 percent.  Do what you need to do.  The timeline is still organic."

Q   Further down that same page, Page 21.  How does the informant jump in here?

A   Right.  He says, "I'll be sending out some night stalkers. Isn't there one poster that's more general with a blank part for personalized messages?"

Q   Next page, Page 22.  How does Cole respond to the informant?

A   "Yes.  I left it blank mostly, for input of addresses.

But you can make it personalized messages, too, I suppose."

Q    Next page, Page 23.  What's the exchange here between Roman and Cole?

A    Roman says, "This is pretty legit.  I haven't seen decent coordination executed so well.  Glad to be a part, even if I have quite a bit to learn.  I feel like I could have done more, though, is there time to add another address."  Cole says, "Feel free."  Krokodil says, "48 hours, my friend."  And Cole reiterates, "And the schedule is organic."

Q    Exhibit 105.  What does Cole tell the group?

A    Cole tells the group, "I should finish up the posters here sometime tomorrow.  I have a lot of work I am doing.  And if anyone has another address, feel free to let me know."

Q    Next page of this exhibit.

How did Roman respond to what we just saw, then what does Cole say?

A    Roman says, "Just sent you an e-mail."  And Cole responded, "Roger Dodger."

Q    Next page, Page 3.  What does Cole say here?

A    Lazarus says, "Also just sent."  Cole is saying, "Okay, I have most of the e-mails, now I just need one from @14ALG88."  Then he asks, "Hey, @Lazarus do you have an e-mail for Rabbit?  And if so, can you tell them I'm about to send him posters.  I just need one of" -- "I just need one from him, then I will be sending all of them in one session."  Lazarus

says, "Let me text him off something other than Wire really quick.  Hold on."

Q   Next page, Page 4 of this exhibit.  What's the exchange? What does Cole respond?

A   Lazarus says, "Let me text him off something other than Wire real quick.  Hold on."  Cole responded, "I will send the e-mails tomorrow.  I have to reinstall my Linux distribution."  Lazarus responded, "All right."

Q   Next page, Page 5.  What did Cole tell the group?

A   Cole tells the group, "Hey, guys, sorry to get here so late.  So I just wanted you to all know that I sent the posters out to all of the e-mails.  Subject line should be 'prop-run,' and I've been using guerrillamail.  I have been having problems with my Linux machine, hence why I haven't been around for the last couple days."

Q   Are you familiar with guerrillamail?

A   Yes.

Q   What is it?

A   It's randomly generated e-mail addresses that are not password protected.  And anybody can visit that guerrillamail e-mail address, and have access to the contents of that account.

Q   Next page, Page 6.  What does Cole tell the group?

A   "Okay, guys, I've finished the bulk of address posters. If anyone has additional addresses for me, DM me.  Cell

leaders, be sure to DM some appropriate e-mails for me to send these to you as well."

Q   Go ahead.

A   Lazarus, "MI will need to make an encrypted e-mail, then."

Q   Page 8 of Exhibit 105.  What's the exchange here between the informant and Cole?

A   The informant asked Cole, "Be sure to send me untimed templates when you get a chance."  And Cole says, "Sure." And the informant thanks him.

Q   We previously admitted Exhibit 111.  Is that the e-mail that the informant sent to the FBI containing posters?

A   Yes.

Q   Let's look at that.  What was the title of the attachment of the posters?

A   It's "prop-stuff" and it's a zip file.

Q   To be clear, this is from the informant to the FBI?

A   Yes.

Q   Let's look at the posters, the attachments.  Have we seen this before?

A   Yes.

Q   What is it?  Is this one of the posters that some of the recipients got?

A   Right.  Yes.

Q   We'll go through these one by one.  Did someone testify in this trial about getting this poster?

A    Yes.

Q    Who was that?

A    It was Chris Ingalls.  This is the one he got.

Q    Did someone testify about this poster?

A    This one was sent to Miri Cypers.

Q    Let's look at the other posters that were part of this.
We'll go through these one by one.

     Okay.  Exhibit 106, Page 2.  What does Krokodil say
here?

A    Krokodil says, "So the next step is to come up with a
collective time.  Those mailing, send yours out a day ahead
of the night of the prop run."

Q    Is there a discussion of dates?

A    Yes, discussion of dates.  Krokodil goes on, down at the
bottom, "Plan for sometime in January between Sunday the 19th
and Saturday the 25th."

Q    Let's look at Page 4 of Exhibit 106.  What does Cole write
the group?

A    Asks if everyone got the e-mails.  Azazel responded,
"Nope, we're missing them."  Cole responded, "Wait, really?
God fucking dammit.  All right.  I am having issues with my
Linux machine, so I haven't been able" --

Q    We'll finish on the next page.  What is that, to finish
what he said here?

A    -- "to be on here as actively."

Q   Let's look at Page 6 of this exhibit.  What does Cole tell the group?

A   Cole tells the group, "But was it entitled 'prop run; and did you get the picture?  Guerrillamail will send it as a weird 'from;' e-mail."  Azazel, "He can't even get into it."  Cole, "That's fine.  I'll send to you."  Azazel, "Thank you."  Cole, "But you got yours, the posters and all?"

Q   Next page.  Let's finish this string here.

A   Azazel says, "Laz and I are the same cell.  I never got an e-mail because I didn't have one at the time."  Cole says, "Oh, right, sorry.  I keep forgetting.  I haven't slept much last night.  All right.  What is the e-mail you want sent to, the one above?"  Azazel says, "Yes, sir."  Cole provides this e-mail address.  "Okay, I'm going to do that right now."

Q   Page 10 of this exhibit, what does Cole say here?

     So is there a discussion about timeframes, about when this operation will occur?

A   Right.  They're talking about the timeframes.

Q   What does Cole say?

A   Cole says, "Of course when we decide on a time, it should be at least two weeks ahead of time."

Q   And let's look at Exhibit 107.  Is there more discussion about timing?

A   Krokodil says, "So in that week of Sunday the 19th and Saturday the 25th, does anyone have any days that would work?

Personally, Friday the 24th would work best for me.  Friday night, that is."

Q    Okay.  Look at Page 5 of this exhibit.  Is there further discussion about what date this is going to happen?

A    Right.  Further discussion of what date it would happen.  "If the majority prefers Saturday, I can do Saturday, too.  Saturday the 25th, that is."

Q    Next page.  What does Cole remind the group?

A    Cole reminds the group, "Don't forget, guys, take video clips, and filming horizontally, landscape not vertically, portrait."

Q    Next page, Page 7.  What does Roman tell the group?

A    Roman talks about how he is scoping his places on maps right now.  That it looks pretty easy for his two.  He says, "For anyone that has apartments, just be sure to scope for security gates, cameras, and ground lights.  Depending on the apartment, it can be tricky.  Suburban or neighborhood houses look really easy, but single household owners can have cameras and other security that average apartments will not.  As well as neighbors.  Find a way to look unsuspecting, walk down the street with headphones, if you have to walk a distance, without looking."

Q    We'll continue the next slide here.  What does Roman say?

A    "Even if there are cameras around the gates, they don't have them everywhere.  The apartment I have looks pretty

accessible, even with the security car motion gate, all I got to do is hop a short adjacent wall with nothing facing it. Two funny ideas my cell had was in the daytime, dressing in construction gear, orange shirt, whatever makes you believable.  And the other was driving right up with an empty Amazon box, look like a mail deliverer.  But clearly it's safer and more practical to move in in the dead of night and drop the props."

Q   Page 11.  What's the exchange here?

A   Old Scratch, "Hell, yeah.  That's a piece of cake, then. And, yo, I'll probably go at night, just in case."

Q   You said, "Yo."  It's, "yeah."

A   Right.  "Yeah, I'll probably go at night, just in case."

Q   What does Roman say?

A   "Whatever the case, I wish everyone the best of luck in execution, whenever that day comes.  But I believe that if we smash this, we can reap the reward of a nationwide scare. And it's all just step one."

Q   All right.  Next page, Page 12.  What does Krokodil say?

A   Krokodil says, "So I have a bike in the back of my truck and I'll park at an area where there aren't any cameras, and a comfortable distance away from the target house.  What I'm going to do is wear a helmet and lower face wrap.  It's cold out here, wouldn't arouse suspicion, while biking to my designations from my truck, as to avoid license plate

captures."  Roman says, "Aye, of course, that too.  Always keep a distance from target house.  I've already spotted where I can park.  It will be night, but everywhere I will park I will also obscure my license plate."

Q    The next page, 13, what does Krokodil say?

A    Krokodil says, "I may do it during the daytime under the guise of a mail carrier, less suspicious?  Well, evening time...we will see."

Q    What does Roman say?

A    Roman says, "I thought about that.  Saturday nights can be late and slightly busy after the evenings, but I'm too committed to the night-stalker strategy, I suppose.  Laughing out loud.  My targets live 15 minutes from each other, laughing out loud.  Great cover."

Q    Exhibit 108, Page 3.  What does Krokodil tell folks?

A    "Also something we need to talk about urgently, cameras. Most houses now have cameras affixed to their doorbells.  The devices are called Ring.  And your target doesn't even need to have one, necessarily.  If their neighbor or someone down the street has one, it can capture an image of your car that police can use.  Intersection cameras can also pick up your vehicle, and such."

Q    Page 5 of this exhibit, what does Azazel say and how does Lazarus respond?

A    Azazel says, "Be very cautious of the surrounding and use

Google Maps, if possible, to search around."  Lazarus, "We will be sure to be wearing masks and make sure no visible tattoos or marks are showing that could be led back to us."

Q   Next, Page 6 of this exhibit.  What does Lazarus say?

A   "Also, do it at a time where you know they will be asleep, because either way, the flash would have given them away, wrong house or not."

Roman, "I mentioned cameras last time, but a big one would be the Ring-type cameras.  I'm with the idea that this endeavor should have no holes.  I'm not even going to use flash."

Q   Page 8 of this exhibit.  What does Cole say?

A   Cole says, "I think I fixed my issue with my Linux machine.  What did I miss over the past few days, gents?"  Lazarus says, "None, really.  Just the wait for the day of the posters."  Cole asks, "Perhaps in a couple weeks or so?  You guys said Friday would be better, yes?"

Q   Next page.  What's the exchange here?

A   Lazarus says, "I think we said a Saturday.  I think we agreed the 25th."  Cole responds, "Or a Saturday, sorry, I got mixed up over here.  Oh, okay.  That sounds good to me."

Q   Page 11 of Exhibit 108, what does Krokodil say?

A   Krokodil says, "Roger dodger.  I'm considering having this operation's official strategy being that of mailing the posters instead of boots-on-the-grounds.  Thoughts?

Objections?  Seconds to the motion?"  Lazarus responds, "Hmm. Well, it's less threatening if we just mail them."  Azazel, "Honestly, not a bad idea, but I like the dangerous side more."  Lazarus, "But I do see the whole safety thing."

Q   Next, Page 12.

A   Lazarus goes on to say, "I say the night of the posters, before we put up any, we check the house for security, and et cetera.  If the house has too much security, we mail them. But if it doesn't have a lot, and we can get by with our masks, then we put the posters up."  And he's responding to Krokodil.

Krokodil says, "What I don't want happening is one of you boys being caught.  That's my main concern."

Q   Next page, Page 13.

A   Lazarus says, "We know, but you also have to understand we all know what we signed up for.  So I say we go through with the plan, but if a house has too much security, we mail that poster to that house."  Azazel says, "It will look suspicious, especially on me and Laz, driving with a New Jersey plated car and parking somewhere random.  However, we've gotten away with it in the past, too."

Q   Page 15 of Exhibit 108.  And let's see what Lazarus says here.

A   Lazarus says, "Not if we are in and out quickly, without making any mistakes.  Worst case, we mail the poster.  My

point is, if we want to send a message, it would look better if we put that poster up.  Mailing them, yes, seems effective enough, but it doesn't send a bigger and greater message than actually putting up a poster at someone's house."

Q   Page 18 of this exhibit.  What does Roman say?

A   Roman says, "It's not like they're expecting us in person. If they all receive some shit in the mail consecutively, it will draw the same stir.  Maybe not as novel as a physical visit with a poster on their front window, but in the scare range, just the same."

Q   Page 20.  What does Krokodil say?

A   "I'd Google house security camera systems, what they look like.  Look at reviews of the product for potential weaknesses, et cetera.  Most are motion activated."  Lazarus says, "And wear no clothing that you wear all the time."

Q   Page 22.

A   Azazel, "Best idea I got for us, Laz.  We hit up a thrift store beforehand, wear those close, then burn them.  And make sure you wear something big, so they don't know your body shape."

Q   Page 26 of Exhibit 108?

A   Azazel, "There has to be a way for us to check how often cops are out on certain days."  Roman, "Best I could think is just having a police scanner in the vehicle."

Q   Page 29?

A   Krokodil responded, "If we are arrested later in connection to the operation, but they can't prove we specifically did it, Fedwaffen's open sourcing of the AW brand name gives us plausible deniability."

Q   Are you familiar with what Fedwaffen is?

A   Yes.  This was a rogue group that was utilizing the Atomwaffen brand and putting out their propaganda videos.

Q   So with that in mind, read, again, what Krokodil is saying here.

A   "If we are arrested later to the connection to the operation, but they can't prove we specifically did it, Fedwaffen's open sourcing of the AW brand name gives us plausible deniability."

Q   So somebody else that was using the Atomwaffen brand?

A   Yes.

Q   What does Krokodil say?

A   "If there are mass arrests following this operation, the operation is already compromised, and it can't get any worse, right?  Might as well pawn it off on the Ukrainians, while taking personal satisfaction that we got away with it."

Q   Further down this page.  So what you just said, "Personal satisfaction, we got away with it."  What does Azazel say, and then what does Cole say?

A   Azazel says, "Fair point."  Cole says, "The only ones that have anything to worry about, if anyone at all, are marked

men."

Q   Page 32, what is a continuation of this.

A   Krokodil, "I know, but it's good to have a fallback plan for every scenario.  The scenarios we don't plan for are the scenarios that catch us off guard.  And being caught off guard leads to fear-based decisionmaking."  And Cole responded, "But, of course."

Q   Page 33.  What does Cole continue to say here?

A   "All one has to say is, 'I know nothing and have nothing to say,' more or less."  Krokodil says, "To the authorities, yes.  But this would be something to tell your defense lawyer."  Cole responded, "Oh, okay."

Q   Okay.  Exhibit 109, Page 2.  What does Cole say?

A   Cole says, "Don't expect a bunch of media coverage.  This is simply to send a message which will stir whispers."  Krokodil responded, "The question is, do we want media coverage or not?  Personally, I think there will be.  The journos themselves who are targeted will probably broadcast it on their own."

Q   Page 7 of Exhibit 109, what does Cole say?

A   "The point overall is to send a message and stir whispers, and a wee bit of frenzy.  If there isn't any coverage, it's because they don't want to bring more heat upon themselves, or fellow journos, adding to their fear of us."

Q   Let's continue, it cuts off.  Same part of this page, what

does he say?

A   "They don't want to bring more heat upon themselves or fellow journos, adding to their fear of us.  If there is coverage, it would be like the coverage of the Base's little stunt recently, except done correctly.  And, again, sending a message that stirs them up and we intimidate them further."

Q   Exhibit 110.  What does Cole say?

A   "For every individual you attempt to neutralize, there are 50 more of us that are left untouched.  This will be the narrative of another poster I'll make soon.  How is everyone doing today?  Everyone pumped for the op?"  Lazarus says, "Oh, yeah, baby, next weekend."  Roman, "A little bit.  I just can't wait to see what the fallout will be like."

Q   Page 2, what does Roman and Cole say here?

A   Cole responded, "Altogether it's about sending a message.  Whether there is press coverage or not, there will be whispers stirring."

Q   Page 9 of this exhibit.  Is this the end of this chat string?

A   Yes.  So this would have been late January 2020.

Q   What does Krokodil tell the group?

A   "All right, gentlemen.  As a reminder, the operation shall be undertaken on the night of Saturday the 25th, in four days.  Please take the necessary precautions to avoid leaving evidence, both forensic and physical.  If you are caught,

remember, say nothing at all.  Plead the 5th Amendment.  Don't talk to the police about anything.  Let your lawyer do the talking.  Because of Fedwaffen's attempted open sourcing of the AWD brand, we have plausible deniability.  I'm looking forward to seeing all your guys' work.  I have total faith in all of you, which is why you were all selected for this historic operation.  Sieg heil, gentlemen.  Good luck out there."

Q   And the last page of this exhibit, is Krokodil in the chat group?

A   Krokodil is removing all the members in the Erste Saule group out of there.

THE COURT:  Let's break for lunch and start up again at 1 o'clock.  We'll be in recess.

(Recess.)

AFTERNOON SESSION

THE COURT:  Ready for the jury?

MR. WOODS:  Yes.

(The following occurred in the presence of the jury.)

Q   Special Agent Haughton, let's leave the chats and go to 2018.

Did the informant in this case capture a recording of Kaleb Cole addressing Atomwaffen members?

A   Yes.

Q   Is that Exhibit 701?

A   Yes.

Q   Have you listened to it?

A   Yes, I have.

Q   Do you recognize the voice on it?

A   Yes, I do.

Q   Who is the voice?

A   It's Kaleb Cole.

MR. WOODS:  Offer 701.

MR. BLACK:  We object on the basis of lack of personal knowledge.

THE COURT:  It's a statement of the defendant, counsel.

MR. BLACK:  As to the source of the recording, Your Honor.

THE COURT:  Overruled.

MR. WOODS:  May I publish it?

THE COURT:  Yes.

Q   Prior to coming to court today, did you review the transcript that accompanies the recording?

A   Yes, I did.

Q   And is the transcript true and accurate?

A   It is.

(Exhibit 701 played.)

Q   Is A.C. Thompson someone who has reported on Atomwaffen?

A   Yes.  He's a journalist for ProPublica.

Q   Let's switch topics and look at Exhibit 501, which was previously admitted.  Remind us, this is the poster Chris Ingalls got?

A   Right.  This is the poster that Chris Ingalls received by mail.

Q   Do you see the phrase that's written in the top, "Death to pigs"?

A   Yes.

Q   Do you recall the news story that Chris Ingalls did, or one of the news stories that he did on Kaleb Cole, in which Charles Manson came up?

A   Yes.

Q   This phrase, "Death to pigs," is there any connection that you're aware of between that phrase and Charles Manson?

A   Right.  In the late 1960s, the Manson family killed Leno

and Rosemary LaBianca, in their home.  It was a home invasion.  They stabbed the victims to death, then they wrote this on the wall in their blood.

Q   If you are to -- have you Googled this phrase, "Death to pigs," with Charles Manson?

A   Yes.

Q   Is there a common image that comes up from the crime scene?

A   Yes.  The crime scene photo where this was written on the wall is commonly -- is openly available on the Internet.

Q   Is that Exhibit 706?

A   Yes.

Q   And how does the writing on the wall, not just the words, but the writing on the wall compare to the writing in the poster?

A   It looks the same.  It looks like "death" was repositioned next to -- from "to pigs" from the original photo.  But the lettering is the same.

MR. WOODS:  Offer 706.

MR. BLACK:  Objection.  Lack of foundation as to the basis of the photo.

THE COURT:  Sustained.  It's cumulative, counsel. The evidence is in already.  Move on.

MR. WOODS:  Okay.  Your Honor, I have no further questions.

THE COURT:  All right.  Counsel.

CROSS EXAMINATION

BY MR. BLACK:

Q   Good afternoon, Special Agent Haughton.  You've been involved in the investigation into Atomwaffen for some time; is that correct?

A   Yes.  Since approximately September 2018.

Q   And that includes investigation into Kaleb Cole?

A   Yes.

Q   For most of that time?

A   Yes.

Q   Mr. Cole has never been involved in any actual violent actions against anybody during that time; is that correct?

A   I mean, by violent action, do you mean physical violence?

Q   Yes.

A   No.

Q   Do you know if he's planned any physically violent actions?

A   No.

Q   There are a number of electronic chat messages that have been entered into evidence in this case that we just reviewed, correct?

A   Yes.

Q   And those include messages attributed to Mr. Cole, as well as many other members of the organization, correct?

A   That's correct.

Q   And these are from a variety of chats over the years, right?

A   Yes.  I think we focused on strictly for this case.

Q   But from 2019 and '20?

A   Correct.  We've provided those.

Q   And the chats provided include those obviously from the Erste Saule string, which is what we reviewed in the, I believe it's the 100 series that occurred over December 2019 to January 2020, correct?

A   It started late November, and then was late January.  So late November 2019 to late January 2020.

Q   And the string of messages in basically chronological order that we reviewed this morning, all comes from the Erste Saule string, correct?

A   Most of it does.  The initial solicitation was a direct communication between Krokodil and the informant, inviting the informant into the scheme.

Q   Okay.  So there was that one, and then all the other ones were from the Erste Saule string?

A   Right.  Where you see the list of participants, the monikers for all the chat participants, that was taken from the Erste Saule chat.  There's a bubble that they can click and see who the chat participants are.  And so that's what that was.  And then Krokodil announcing that the informant

had been added to the group, he was another ranking

gentleman, I believe is what Krokodil said.

Q   Okay.  So the one from Krokodil to the informant, as well

as the Erste Saule chat string, that's the entire sum of

chats regarding this postering campaign; is that correct?

A   Yes.

Q   That are in the government's possession, I should say.

A   Right.

Q   Are you aware of any chats that weren't provided to the

government?

A   I mean, I can see from the very first solicitation, I

think this one that's on the screen right now, there

obviously was some communications between Krokodil and

Mr. Cole that led up to that, that the informant was not a

party to.  So I know there was -- Mr. Cole was probably

involved in those other chats, but we didn't get to see

those.

Q   Let me rephrase, perhaps.  Are you aware of any chats that

the informant received regarding this postering campaign,

that were not provided to the FBI?

A   No.

Q   The messages, the chat messages included statements about

a lot of things, correct?

A   Yes.

Q   The chats included statements -- the purpose of the

postering campaign, made by numerous people; is that correct?

A    Yes.

Q    One of those people was Krokodil, correct?

A    Yes.

Q    I'd ask you to look, please, at your screen.  That is Exhibit 100, which has been identified.

Krokodil there talks about eroding the media's and state's air of legitimacy, correct?

A    Yes.

Q    And in doing that, by showing people that they have names and addresses?

A    Yes.

Q    Correct?

It does not discuss the intent to do violence; is that correct?

A    Um, I think later on it says that they're going to have threatening messages.

Q    This message here doesn't discuss the intent to do violence, correct?

A    This one, no.

Q    Okay.  Not physical violence, correct?

A    Right, physical violence.

Q    And this chat message also does not discuss the intent to make people believe that physical violence was planned; is that correct?

A    No.

Q    Thank you.

If you could take a look at the exhibit before you, that's what's been marked as 109(2), which has been admitted. That's also one of the chat messages from the string that we discussed this morning, correct?

A    Yes.

Q    And as you've testified, the purple symbol string moniker is attributed to Mr. Cole, correct?

A    Yes.

Q    And what he says here is to -- is that this is to simply send a message which will stir whispers, correct?

A    Yes.

Q    This also doesn't discuss planning physical violence, correct?

A    Not this one statement by itself.

Q    Thank you.

MR. BLACK:  Sorry, Your Honor.  We're pulling up an exhibit.

Q    And here, again, at Exhibit 109, Page 7, again, we have the purple symbol moniker indicating that the point overall is to send a message and stir whispers, and a wee bit of frenzy, correct?

A    Yes.

Q    And, again, doesn't discuss a plan for violence, correct?

A   Not that one by itself, no.

Q   Thank you.

Could we go to Exhibit 110, Page 2, please?

A   I will say on that last one -- I don't know if I can point out something -- this message did go on to say something else.

Q   Go ahead.

A   It says, "Aiding to their fear of us."  If you read the message.

Q   Sure.  It says, "I assume, adding to their fear of us." And, again, then at the bottom, "sending a message," correct?

A   Right.  "And we intimidate them further."

Q   Yes.

A   I'm sorry, go ahead.

Q   I'm sorry.  This does discuss both fear and intimidation, correct?

A   Yes.

Q   But it doesn't discuss a plan for physical violence, correct?

A   No, this does not.

Q   And the discussion of fear and intimidation is in the context of press coverage; is that correct?

A   I think it's in the context of the communications that were sent out.

Q   It says, "If there isn't any coverage," and then continues

from there.

A   That's based on the messages actually being delivered. That's my understanding from this, in the context of it.  So they're talking about what is going to happen when they do this.

Q   But the coverage discussed is press coverage, correct?

A   Right.  They're trying to figure out, are there going to be -- is there going to be fear and intimidation.  This is what they're discussing.

Q   If there's press coverage, correct?

A   I think they're looking at the press coverage as some feedback to them.

Q   Thank you.

Again -- strike that.  You have all the chats that were provided; none of them indicate that Mr. Cole said anywhere that his true intent was to make people believe that AWD was actually going to harm them; is that correct?

A   I guess I don't really agree with that.  I mean, the statements in their context is fear, intimidate, those kind of words.  Intimidation is bodily harm, fear of bodily harm. I guess what maybe you're asking is, was there a plan for them to go operational right then and there and commit an assault, a physical assault?  No, I never saw anything like that.

Q   You never saw a statement where Mr. Cole said:  I want

these people to believe that we are coming for them; is that correct?

A   I don't think he said it that way.

Q   Thank you.

You went through a lot of statements in the chats this morning.  And for many of those it appeared there were long stretches where The Moniker, attributed to Mr. Cole, was not involved in the chats; is that correct?

A   I don't know if I would describe it as a long stretch. There was a period there where he talks about his Linux machine, his computer, being down.  And that was creating some kind of delay.  And he was asking for an update, at one point.

Q   There were stretches where Azazel and Lazarus and Krokodil were having back and forth, and there was no interjection by the symbol string, for pages, correct?

A   I mean, I guess it could have been a few days without -- you know, because the timeframe we're looking at is approximately 60 days, I guess, November through -- late November through late January.

Q   There are no timestamps on those messages, correct?

A   No.

Q   And you're not aware of exactly when any of those messages were sent; is that correct?

A   No.  They're ballpark.  My understanding is that those

were being provided almost, I won't say instantly, but in very close proximity to when they were occurring.  And that was being forwarded to the handling agent, and then they would be available for me to review.

So I was able to see, like, ballpark, like if it was mid-December, late November.  Clearly, January 25th when they sign off of the chat, that's clearly right on the eve of the attack.

Q   Right.  Those messages, many of them were set to self-destruct, or whatever you want to call it, after a time period, correct?

A   Yes.

Q   How long was that time period, do you know?

A   It was 24 hours.

Q   Okay.  So there could easily have been stretches where messages were exchanged that the symbol moniker never received, correct?

A   It's possible.  I noticed at one point, I think he asked for an update, and he was given an update by, I believe, Azazel.

Q   Sure.  But you don't know --

A   Right.

Q   -- when the messages were sent, they self destruct after 24 hours, so you can't say that the symbol string person saw them, unless there are interjecting messages; is that

correct?

A    Correct.

Q    Thank you.

And, again, the chats that were introduced as evidence were just screenshots, correct?

A    Yes.

Q    They weren't associated with a particular IP address?

A    No.  They probably were, but we didn't have access to those records.  Like I mentioned before, because they were using this Swiss-based service, they don't keep those records.

Q    Right.  So you don't have those records?

A    No.

Q    And they didn't come off of a device?

A    No.

Q    Correct?

As the FBI was monitoring this chat conversation, you came to the conclusion that the time of the postering campaign was approaching in late January, correct?

A    That's correct.

Q    Of 2020?

A    Yes.

Q    And you -- the FBI reached out to a number of people who appeared to be the planned recipients of these messages?

A    Yes.

Q    And you informed them about what was happening?

A    Yes.  One of the goals that we had, obviously as part of this investigation, was to find out really what was going on. And so part of that was who the potential victims were, and so we wanted to warn them.

Q    And who did you reach out to?

A    I remember the victims that you spoke to today.  There was one in Florida that you haven't spoke to yet.  I'm sorry, not today -- that previously testified already.  We spoke to those victims.  The ones that we were able to identify.  So part of the challenge was, they were talking about going to the people's doorsteps, and obviously, you know, even though there was no overt plan of physical violence, the concern was that there was a risk of some kind of possible violence, either somebody being spooked that somebody is on their doorstep, or something like that.  So to the extent possible, we wanted to warn the victims that we could identify, but we weren't able to identify all the victims.

Q    And I believe you just indicated that you informed them that there was no overt risk of physical violence?

A    Right.

Q    Thank you.

A    I guess --

        THE COURT:  You've answered the question.

Q    I've asked my partner to pull up an exhibit here.  One

moment.

This is what's been introduced as Exhibit 111.  This is a copy of the e-mail, with posters attached, that the confidential source received on, I believe it was January 11, 2020?

A   No.  It's January 7th.  And, I'm sorry, this was received by the agent, from the informant.

Q   It contains materials from the informant that were sent to the agent though, correct?

A   Yes.

Q   And these are the posters that were sent to the informant in conjunction with this operation, correct?

A   Yes.  These were the blank templates.

Q   I'm just going to ask to page through a few.  If we could go to here.

So this one, at Page 5 of the exhibit, is not one of the posters that were used in the campaign at issue here, correct?

A   That's correct, as far as I know.  These were provided as miscellaneous.  So they could have been used and just not reported to law enforcement, for whatever reason.

Q   Thank you.  Well, do you know where these kind of posters are used?

A   These would be -- by this particular group, they like to go to campuses, periodically, Capitol Hill neighborhood, they

like that area, to put these kind of stickers up.

Q    Put up flyers, just out in the world?

A    Right.

Q    This poster, for example, contains some of the same images that are included in the other posters, correct?

A    Right.  The context is different in this poster, just because this looks like it's a solicitation to join the group.

Q    Right.  But there's the radiation shield, and there's what looks to be Molotov cocktails and a swastika?

A    Right.

Q    All included.

Those are similar to the other posters?

A    I mean, I don't think they're similar, the way they're arranged.  The Molotov, to me, is still indicating violence.  But this is more like an asking.  This is more of a recruitment, versus a statement.

Q    It's the same images, correct?

A    I mean, there are images of Molotovs and swastikas.  The shield is the same.

Q    Which is on the other posters as well, correct?

A    I think the shield is the same.  I'd have to look at the other posters to see if the skull is the same.

On the one poster, the swastika is different.

Q    But there are swastikas on both?

A    Yes.

Q    And Molotov cocktails on both?

A    Yes.

Q    Okay.  Thank you.

Can we go to the next page.  Similarly here, there's somebody carrying what looks like a gun?

A    Yes.

Q    And, again, swastikas and a skull mask?

A    Yes.

Q    And these are also similar images to what was included in the posters involved in the campaign?

A    I mean, similar in that there's neo-Nazi imagery and violent imagery, but it's not arranged the same way.

Q    The skull mask is the same, correct?

A    It's similar.

Q    And the swastika is not the same, though?

A    Some of them probably are.

Q    But they're swastikas?

A    Right.

Q    Thank you.

Again, in this one, the skull mask, which is similar?

A    Yes.

Q    Here somebody in a skull mask carrying a gun?

A    Yes.

MR. BLACK:  Nothing further, Your Honor.

THE COURT:  Redirect?

MR. WOODS:  Briefly.

THE COURT:  That is a word I wish lawyers would ban from their vocabulary.

MR. WOODS:  We don't always live up to it either.

REDIRECT EXAMINATION

BY MR. WOODS:

Q   Special Agent Haughton, you were asked about threats of violence in these chats.  Let's look at the posters we were just looking at.

You see the reporter in the middle of the screen?

A   Yes.

Q   What's pointed at his head?

A   It's a -- it looks like a firearm.  A sniper.

Q   Let's look at the next page.  What's that person in a skull mask holding?

A   That's a Molotov cocktail.

Q   In front of a?

A   In front of a residence.

Q   And what are the lines that are right here on the poster?

A   "We know where you live."

Q   Counsel showed you the series of posters, those first three, and then the remaining ones.  What was different about the first three posters?

A   The first three were designed to communicate a threat.

Q   Well, I'll withdraw that.

MR. BLACK:  Objection, move to strike.

MR. WOODS:  Yeah.

THE COURT:  The answer will be stricken.

Q   If you look at the screen, let's focus on the posters. What's different in the first three posters, versus all the remaining posters in that set?

A   It has this block that says, "You've been visited by your local Nazis," which is where the address of the intended recipients received it.

Q   If we look at Exhibit 104, what does Cole say about -- what does he say here?

A   "So I have three designs ready for doorsteps.  I may make another one as well.  If you're doing spots that are news station, or anything else, our standard selection of posters will work for those."

MR. WOODS:  No further questions.

THE COURT:  All right.  Any recross?

MR. BLACK:  No.  Thank you, Your Honor.

THE COURT:  All right.  You may step down.

MR. WILKINSON:  The United States calls Josh Sutter.

JOSHUA SUTTER

Having been sworn under oath, testified as follows:

DIRECT EXAMINATION

BY MR. WILKINSON:

Q   And you may remove your mask, sir.

Good afternoon.

A   Hello.

Q   Could you tell the jury your name, please?

A   Joshua Sutter.

Q   What city do you currently live in?

A   Lexington.

Q   What state is that in?

A   South Carolina.

Q   Will you just give us a brief pause after I ask a question, so we don't talk over each other?  That will help the court reporter.

So, you live in Lexington, South Carolina?

A   That's correct.

Q   Are you married?

A   Yes.

Q   What do you currently do for a living?

A   Publishing.

Q   Publishing?

A   Correct.

Q   Have you also worked as an FBI informant?

A   That's correct.

Q   Is it true that you have been involved in

Q   white-supremacist groups in the past?

A   That's correct.

Q   And which particular white-supremacist group were you a member of?

A   Several.  But Aryan Nations, Church of the Sons of Yaweh.

Q   And over what time period were you a member of those groups?

A   Late '90s up to 2003.

Q   And what happened in your life in 2003?

A   I was arrested in 2003.

Q   What charges were you arrested on?

A   Possession of a Glock .40 caliber with an obliterated serial number, and possession of a silencer unregistered to me personally.

Q   Were you convicted?

A   I was.

Q   Did you serve time in jail?

A   I did.

Q   How long?

A   Two years.

Q   Two years?

A   Yes, sir.

Q   During that period of time, were you approached by the FBI?

A   I was.

Q   Did they make a proposal to you?

A   Yes.  I was contacted through my lawyer, soon after my arrest.

Q   Okay.  And can you explain what the proposal was?

A   According to my lawyer, after my release I would be -- it was proposed that I could act in a deep-cover capacity.  And I was instructed to continue the relationships that I had in the right wing.

Q   Is that another way of saying that you would work as an informant?

A   Correct.

Q   Okay.  And did you agree to do that?

A   Yes, sir.

Q   Why did you agree to do that?

A   I found it an interesting proposal.  And at that point, since I had talked amicably with the FBI, I no longer had any invested reason not to, really.

Q   Okay.  Can you explain, just very generally, what types of things you did in your work as an informant for the FBI?

A   Certainly.  I've engaged in travel for person-to-person meetings with targeted individuals and target organizations.  Surveillance.  Use of surveillance equipment.  Things of those natures.

Q   Okay.  And did you say you were released from prison in 2004?

A    That's correct.

Q    And so how long after that did you start working as an informant?

A    Immediately thereafter.

Q    Okay.  And did you work more or less continuously as an informant since that time?

A    That's correct.

Q    Okay.  How much money have you been paid over the period 2004 through the present?

A    Over $100,000.

Q    Have you been charged with any other crimes since that 2003 conviction?

A    I have not.

Q    Are you familiar with an organization called Atomwaffen?

A    I am.

Q    And how did you first come into contact with Atomwaffen?

A    I was contacted by one of their members.

Q    And do you know who the member was that contacted you?

A    Yes.  Cameron Denton.

Q    How did he contact you?

A    By social media, a message.

Q    And did you have an understanding of why they were interested in you?

A    I had a reputation in the right wing, and some ties to cultism.  So my name was out there.  I was approachable.

Q    And when you were contacted by Mr. Denton, did you report that to the FBI?

A    I did.

Q    Did they give you any instructions on how you should respond?

A    They did.

Q    What did they tell you to do?

A    Well, I informed them that I had been contacted.  And then soon thereafter, the events in Tampa occurred.  And then I was formally -- I was formally invited to join.  And I shot that to my handler, and then was told to join.

Q    Okay.  And by your "handler," that's the FBI agent who you directly worked with?

A    That's correct.

Q    So he instructed you that you should go ahead and join the Atomwaffen group?

A    That's correct.

Q    Okay.  How did you initially communicate with other members of the Atomwaffen group?

A    The initial -- I was vetted on a phone interview, and then thereafter utilizing Discord, which is an electronic communications means, and also Wire, which is an encrypted messaging service.

Q    And when members of Atomwaffen communicated over Discord or Wire, did they use their real names?

A    No, sir.

Q    Okay.  Did they use nicknames instead --

A    Correct.

Q    -- or an alias?

     Did you have an alias?

A    Correct.

Q    What was your alias?

A    Swissdiscipline.

Q    Swissdiscipline?

A    Correct.

Q    Did you develop an understanding of who the leaders of the group were, through your participation in these communications?

A    Yeah, that's correct.

Q    And what were the nicknames of the primary leaders of the group?

A    Primary leaders were Rape and Khimaere.

Q    And you mentioned Khimaere.  Did he send out regular communications to the Automwaffen group?

A    Yes, that's correct.

Q    Could you describe the nature of the communications he would send out, or what his role seemed to be in this?

A    General nature of communications, propaganda development, recruitment, operational details.

Q    Okay.  Did he post recordings online of himself speaking?

A    Yes, that's correct.

Q    I want to turn to 2018.  Did you participate in an in-person event in Death Valley, California?

A    That's correct.

Q    Was the person that you had come to know as Khimaere present at that event?

A    Yes.

Q    Do you see the person you had understood to be Khimaere in court today?

A    Yes, that's correct.

Q    And can you describe him by what he's wearing?

A    Individual to the right.  White mask.

        MR. WILKINSON:  Could the record reflect he's identified the defendant?

        THE COURT:  Yes.

Q    What was the event in Death Valley, California?

A    Death Valley hate camp.

Q    What is a hate camp?

A    It's usually a meeting in a rural area, consisting of weapons training, ideological discussion, in-person discussions, that wouldn't be held otherwise.  Propaganda development.

Q    Was there, in fact, weapons training at this hate camp?

A    There were weapons, but no weapon training, per se.

Q    Okay.  What was Mr. Cole's role at the hate camp?

A    He was the organizer of the camp.

Q    Did you also travel to an in-person meeting in Washington State?

A    That's correct.

Q    And what event was that?

A    That was an unnamed hate camp.

Q    Another hate camp?

A    Correct.

Q    Where, approximately, did that take place?

A    Greenwater.

Q    Is that near Mount Rainier?

A    That's correct.

Q    Was the defendant present at that hate camp as well?

A    That's correct.

Q    What occurred at that hate camp, just generally?

A    There was some weapons training, firearms, hand-to-hand combat training.  Propaganda videos.  Still shots.

Q    Okay.  And, again, what was the defendant's role at the hate camp in Washington State?

A    Primary organizer.

Q    Did you develop an understanding of where the defendant was from?

A    That's correct.

Q    Where was he from?

A    Washington.

Q    Okay.  As you attended these various events, did you keep the FBI updated on what you were doing?

A    Absolutely.

Q    Would you get permission before you would go?

A    Yes.

Q    Did they pay your expenses?

A    Yes.

Q    And did you provide them reports on what happened?

A    That's correct.

Q    You mentioned a minute ago that you understood, when you met Mr. Cole, that he was living in Washington State.  Did you understand later in time that he moved somewhere else?

A    That's correct.

Q    Where did he move to?

A    Conroe, Texas.

Q    And moving into 2019.  Do you remember being contacted by a member of the group named Krokodil?

A    That's correct.

Q    Who is Krokodil?  And by that I mean, what was his role in the organization?

A    He was a recruiter.

Q    Okay.  And did he make a proposal to you?

A    That's correct.

Q    What did he propose?

A    He informed me that there was an operation called

Operation Erste Saule.  The gist of it was to send threatening communications to journalists, ADL personnel, civil rights type personnel, in retaliation for media coverage.

Q   How did he contact you?

A   Wire.

Q   Okay.  Now, the jury has already seen these chats and we're not going to go back through them.  But I do want to ask you just a couple questions about how you captured them.  I'm showing you Exhibit 100.  Is this the communication where Krokodil reached out to you?

A   That's correct.

Q   And did you do anything to preserve this communication?

A   That's correct.

Q   What did you do?

A   Photocopied -- not photocopied.  Photographed.

Q   And did that involve literally just using another phone to take a picture --

A   Yes.

Q   -- of this?

     And did you attempt to capture each message that you received in this chain of communications?

A   That's correct.

Q   And how frequently did you capture them?

A   In this particular conversation?

Q   Yeah.

A   I mean, it would be ongoing.

Q   As they came in?

A   That's correct.

Q   Then what would you do with them after you captured them?

A   Forward them to the FBI.

Q   So I think you mentioned this is a chat just between you and Krokodil?

A   That's correct.

Q   And were you then added to a chat group that was used to plan the operation?

A   That's correct.

Q   I'm showing you Exhibit 101 now, the second page.  Is this image the picture of you being added to that group?

A   That's correct.

Q   And it says, "Another ranking gentleman added to the mix." Do you have an understanding of what that meant?

A   At that point I was a trusted upper-echelon member.

Q   That was referring to you?

A   Correct.

Q   And as you received these chat messages, under the Operation Erste Saule group, did you also capture those in the same way that you captured Exhibit 100?

A   Correct.

Q   Did you regularly capture them as they came in?

A    That's correct.

Q    What did you do with those once you received them?

A    Forwarded them to the FBI.

Q    I want to show you exhibit -- actually, let me just ask you.  Did you review, before coming to court today, Exhibits 102 through 110?

A    Yes, sir.

Q    And are those accurate copies of the chats that you collected and sent on to the FBI?

A    Yes, sir.

Q    Is the same also true of Exhibits 602, 603, 605 and 700?

A    Correct.

Q    And those all accurately depict the chats that you received?

A    Correct.

Q    Showing you Exhibit 111.  This is an e-mail -- and we've redacted the sender and recipient information -- but is this an e-mail that you sent to your handler at the FBI?

A    Correct.

Q    And there's a file there.  Can you tell us what that file is?

A    The name of the file?

Q    Yeah.

A    Attachments-prop-stuff.zip.

Q    Where did you get that zip file?

A   That was sent to me by Khimaere.

Q   And before Khimaere sent it to you, had you asked Khimaere for anything?  Had you asked him to send you any literature?

A   That's correct.

Q   What did you ask him to send you?

A   I asked him to send me the propaganda posters that were designed for the operation.

Q   Okay.  And after you asked him to send them, what happened?  What kind of notification did you receive?

A   They were forwarded to me.

Q   And just scrolling through Exhibit 111, are these the posters that were contained in the file?

A   Correct.

Q   After you got them, did you forward them on to the FBI?

A   That's correct.

Q   We mentioned -- you mentioned earlier that sometimes Khimaere would post recordings online in which he gave speeches or instructions to other members of Atomwaffen.

A   Correct.

Q   And did you review, before coming to court today, Exhibit 701, which is a recording of one of those?

A   Yes, sir.

Q   Was that an authentic recording that you received online?

A   Yes, sir.

Q   Did you recognize the voice on that recording?

A    Yes, sir.

Q    And who was it?

A    Khimaere.

MR. WILKINSON:  No further questions.

MR. BLACK:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. BLACK:

Q    Good afternoon, Mr. Sutter, I'm Chris Black.  I'm one of the lawyers representing Mr. Cole in this case.  You testified that you joined Atomwaffen at Cameron Denton's invitation; is that correct?

A    That's correct.

Q    That was in 2017?

A    That's correct.

Q    Do you know how old Mr. Denton was at the time?

A    I'm not aware.

Q    Approximately?

A    Early twenties.

Q    And you did all of that under FBI supervision, correct?

A    That's correct.

Q    You were reporting back to the FBI the whole time, from then on, everything that you did in regard to Atomwaffen?

A    That's correct.

Q    Do you remember when you first met Mr. Cole?

A    Yes.

Q    When was that?

A    It would have been in Las Vegas, in early 2018.

Q    Do you know how old Mr. Cole was at the time?

A    Early-to-mid twenties.

Q    And during the course of your participation in the investigation into Atomwaffen, you provided all the information that you got about Atomwaffen to the FBI, correct?

A    That's correct.

Q    And who was your supervising agent?

A    My handler, or my --

Q    Your handler?

A    Bill Moser.

Q    Was that the entire time?  The entire time that you were working for the FBI in the Atomwaffen --

A    There's been various special agents involved.

Q    Did you have a handler during the investigation into Atomwaffen, starting in 2017?

A    Correct.

Q    Was it one person, or more than one person?

A    There were multiple people.

Q    Who were they?

A    In the context of the Atomwaffen investigation specifically?

Q    Correct.

A   Bill Moser is my primary handler.  Steve -- I don't know his last name.

Q   Okay.  But to those two, then, you provided all the information that you got?

A   That's correct.

Q   So you were involved with Atomwaffen over the next several years, correct?

A   That's correct.

Q   Until at least the arrest of Mr. Cole in this case, correct?

A   Correct.

Q   In 2020?

A   Correct.

Q   And your participation in Atomwaffen included things like online chats, correct?

A   That's correct.

Q   In-person meetings, some of which you've discussed?

A   Correct.

Q   Anything else?

A   Say again.

Q   Anything else?

A   I think that's an appropriate summary.

Q   In the online chats and the meetings, the members of Atomwaffen discussed their philosophy, correct?

A   Correct.

Q    And their ideologies?

A    Correct.

Q    They discussed plans that they had?

A    Correct.

Q    If they had been planning a violent operation, you would have certainly reported that to the FBI, correct?

A    Certainly.

Q    You indicated that Mr. Cole's role in Atomwaffen was to create propaganda; is that correct?

A    Correct.

Q    And he was involved in planning what's been described as hate camps?

A    Correct.

Q    And at these camps -- well, these camps took place in the wilderness, basically, right?

A    Correct.

Q    Over the course of a few days?

A    Correct.

Q    And there were people shooting guns there?

A    Correct.

Q    These were people who were legally permitted to possess firearms, to your knowledge?

A    I would assume.

Q    Except for you, correct?

A    Correct.

Q    And there were ideological discussions at these camps?

A    That's right.

Q    And filmed -- propaganda videos were filmed there?

A    Correct.

Q    Were any plans for any violent attacks discussed at these camps?

A    If they were, I would have forwarded them to the FBI.

Q    So, no?

A    Not specifically, no.

Q    Briefly, you provided all of the chats that you were engaged in, in relation to Atomwaffen, to the FBI?

A    That's correct.

Q    That you ever received, correct?

A    That's correct.

Q    There were none that you kept to yourself and didn't provide?

A    Not to my knowledge.

Q    You were present at a meeting on January 9, 2020, at the home in Conroe, Texas, correct?

A    Yes, sir.

Q    And Mr. Cole and Mr. Denton were there, correct?

A    That's correct.

Q    You were there in an undercover capacity, correct?

A    Correct.

Q    And you're aware that the meeting that you had at that

house that day was recorded?

A   Yes, sir.

Q   Have you ever reviewed those recordings?

A   I have.

Q   Do they appear to be an accurate representation of the conversation that was had that day?

A   Correct.

Q   To your knowledge, are there any statements that Mr. Cole made that day that weren't recorded?

A   Not to my knowledge.

Q   And if he would have said something relating to planning a violent action, even if it weren't recorded, you would have reported that, correct?

A   That's correct.

Q   And that didn't happen?

A   Well, there was a discussion regarding the operation, which involved threatening actions against certain targets, so that's --

Q   The one that was recorded, correct?

A   Correct.

Q   And that was the discussion about sending the posters, correct?

A   That's correct.

Q   Do you remember being involved in a discussion with Mr. Cole that day, during that meeting, where you were

talking with him about not wanting to overshoot or undershoot anything?

A    Sure.

Q    And that was about not wanting to take it too far, correct?

A    Well, I -- there were statements by me.  I was asking them to see -- to gain a litmus of what they were doing.  In other words, I was saying:  I don't want to undershoot or overshoot, so explain to me what you're doing.

Q    And Mr. Cole did do that, correct?

A    I believe so, yes.

Q    And he said you don't want to overshoot it, correct?

A    I think he said that we shouldn't overshoot it or undershoot it.

Q    Okay.  Thank you, sir.

     There was no indication to you, during that meeting that day, that Mr. Cole had any idea that you were working with the FBI; is that correct?

A    Correct.

Q    He had no indication -- there was no indication to you that he was aware that an FBI agent was present?

A    No, sir.

Q    No reason that you know of that he would have been careful with his true thoughts; is that correct?

A    Correct.

Q    He thought that he was among friends?

A    Sure.

Q    And that you were all involved in planning this thing?

A    Sure.

Q    He didn't appear to be choosing his words carefully; is that correct?

A    Say again.

Q    He didn't appear to be choosing his words carefully?

A    I mean, it was a serious conversation.  So not any more than usual, I would assume.

Q    He was drinking alcohol, correct?

A    Sure.

Q    You and the FBI agent brought that, correct?

A    We brought some beer.

Q    And you shared that with Mr. Cole?

A    Sure.

Q    You indicated that you've been paid over $100,000 working with the FBI; is that correct?

A    Correct.

Q    Have you paid taxes on that?

A    No.

Q    Did you tell the FBI that?

A    No.

Q    You didn't tell the FBI that you weren't paying taxes?

A    No.

Q   Did you tell them, at some point prior to this trial, in the last few weeks, perhaps?

A   Correct.

Q   Sir, is that a "yes"?

A   Correct.

Q   Is there any indication that you're likely to be charged with tax evasion for that?

A   I --

MR. WILKINSON:  Objection, relevance.

THE COURT:  Sustained.

MR. BLACK:  Nothing further, Your Honor.

THE COURT:  Redirect?

MR. WILKINSON:  No redirect, Your Honor.

THE COURT:  You can step down.  Put your mask back on.

MR. WILKINSON:  United States calls Special Agent Jayme Poteet.

JAYME POTEET

Having been sworn under oath, testified as follows:

DIRECT EXAMINATION

BY MR. WILKINSON:

Q   Good afternoon.  And you can remove your mask.

A   Okay.

Q   Could you tell the jury your name, and what you do for a living?

A    My name is Jayme Poteet, and I'm a Special Agent with the FBI in Houston, Texas.

Q    How long have you been with the FBI?

A    Or over 21 years.

Q    And do you have any particular specific assignment with the FBI?

A    Yes.  I'm the evidence response team coordinator.

Q    What does that mean?

A    The evidence response team is a group of agents in the division that are specially trained to collect forensic evidence and conduct complex searches.  And I'm the coordinator for that.  So other times we're called the senior team leaders.  So I do all the administrative duties, the training, the purchasing, and I go to crime scenes and searches as a leader, whenever I'm available.

Q    So is it common for you, when a search warrant is executed, for you to go out and participate in the collection of evidence?

A    Yes.

Q    And have you received training in the collection and inventorying of evidence?

A    Yes, I have.

Q    Does that include the collection of forensic evidence, like computers?

A    Yes, it does.

Q   I want to turn to February 26th of 2020.  Did you participate in the execution of a search warrant that day?

A   Yes, I did.

Q   And where, generally, was the site of the warrant?

A   It was at a residence at 1218 OxOn Run, in Montgomery Texas.

Q   I'm going to show you Exhibit 2.  Was that the residence where you participated in the search warrant execution?

A   Yes, it is.

Q   And what was your role in that search?

A   I was the search team leader.

Q   What time of day, roughly, was the search warrant executed?

A   When I arrived on scene, it was approximately 5:40 a.m. in the morning.

Q   Did the FBI also have arrest warrants that day?

A   Yes, they did.

Q   Did that include one for the defendant, Kaleb Cole?

A   Yes, it did.

Q   And was Mr. Cole present in the house when the warrant was executed, when the search warrants were executed?

A   I don't believe so, no.

Q   Was he arrested that day?

A   Yes, he was.

Q   I'm going to show you Exhibit 1.  Do you recognize

Exhibit 1?

A    Yes, I do.

Q    Is that a diagram of the house and the items that were found in the house?

A    Yes, it is.

Q    Does it accurately depict them?

A    Yes, it does.

MR. WILKINSON:  United States offers Exhibit 1.

MR. BLACK:  No objection.

THE COURT:  Admitted.

(Exhibit 1 was admitted.)

Q    Okay.  Actually, let me back out of this a little bit.

So is this a floor plan of the house?

A    It's a sketch that I made that would resemble a floor plan.

Q    And it looks like there are blue boxes.  Can you tell us what those blue boxes are?

A    Right.  It's our procedure, when we conduct a search of a residence or business where they have multiple rooms, we designate a room label to each room that we're searching.

Q    Is that used in part of the inventorying process for those search items?

A    Yes.

Q    What are the yellow bubbles?

A    The yellow bubbles are the approximate location of where

the items we recovered were found.

Q   Okay.  And I'm drawing an arrow on the exhibit.  Is that the front door there?

A   Yes, it is.

Q   And what do you see, what do you enter into when you cross through the front door?

A   When you enter into the front door, you enter into what we labeled Room A, which was a living room.  And then kind of an adjoining dining area.

Q   Have you reviewed Exhibits 2 through 23?  And there's a notebook there if you just want to double-check.  Did you review those before coming to court today?

A   Yes, I believe I did.

Q   And are those photographs that were taken during the search?

A   Yes, they are.

Q   And do the pictures adequately -- accurately depict the house and the items in the house at the time of the search?

A   Yes, they do.

        MR. WILKINSON:  The United States offers 2 through 23.

        MR. BLACK:  Your Honor, we maintain our objection to some of these prior exhibits, as per the written motion.  But I have no additional objection.

        THE COURT:  The objection will be overruled.

(Exhibits 2 - 23 were admitted.)

Q   So we just looked at the entrance of the front door of the house.  I'm now showing you Exhibit 3.  Can you tell us what that is?

A   So that is a photograph from the front entrance looking into Room A.

Q   Okay.  So is this like just as you're walking through the front door?

A   Yes.

Q   And I want to ask you now, in particular, about the items in the room that's circled on the screen on Exhibit 1 here. What was that room labeled?

A   It was labeled Room N, as in November.

Q   Then there's also a Room O, that looks like it's part of that room.  What is Room O?

A   Room O was a closet that was part of Room N.

Q   Can you describe generally what Room N was?

A   It was a bedroom.

Q   Showing you Exhibit 21.  Is this a picture of that bedroom?

A   Yes, it is.

Q   Can you just describe the orientation here, what we're looking at?

A   So you're looking at the door that's the entrance to the room.  There was a table set up as sort of a desk with a

computer. And the picture has kind of been taken from standing in center of the room looking back towards the entrance to that room.

Q   That's how it looked when you all arrived?

A   Yes.

Q   And it looks like there's a closet off here on the left. Is that what you described as Room 0 a minute ago?

A   Yes, I did.

Q   Now I'm circling an item on the desk here. Can you tell us what that is?

A   It appears to be a wallet.

Q   And how is a wallet significant to you in executing a search warrant?

A   Well, a lot of times it indicates who has dominion and control of that area.

Q   Is dominion and control just another way of saying who is living there?

A   Exactly.

Q   Showing you Exhibit 14. Is that a picture of the contents of the wallet?

A   Yes, it is.

Q   And those were laid out, taken out of the wallet and laid out to be photographed?

A   Yes.

Q   And I'm zooming in a little bit now, actually it's

Exhibit 15, which is a closer picture.  What are we seeing?
What are the items in there?

A    You see a couple of cards, debit cards, credit cards that
are issued in the name of Kaleb Cole.  And there's also a few
prepaid cards that don't have a name associated with them.

Q    So, for example, I'm showing you -- I'm putting an arrow
to an item in the top middle.  What is that?

A    It's a card that says, "State of Washington address
confidentiality program."

Q    And the name underneath?

A    It's Kaleb James Cole.

Q    What's the item I'm pointing to now?

A    It's a AAA card.

Q    In what name?

A    Kaleb Cole.

Q    What about the credit or debit card that I'm drawing an
arrow to?

A    It's a MasterCard in the name of Kaleb Cole.

Q    And the next place I'm drawing an arrow to?

A    Visa card with the name Kaleb Cole.

Q    Showing you Exhibit 16.  Are these more items that were in
the wallet?

A    Yes.

Q    And working from left to right, starting with the driver's
license, can you tell us what they are?

A   There is a Washington driver's license issued in the name of Kaleb James Cole.  There's a card that says, "I'm a Texas patriot," and some other words on it.  Then a Social Security card in the name of Kaleb James Cole.

Q   Some item I'm circling here on the windowsill, maybe I'll blow that up a little bit, on Exhibit 12.  Can you tell us what that is?

A   Appears to be a passport.

Q   And I'm showing you Exhibit 17.  Is that the cover of the passport?

A   Yes, it is.

Q   And what is Exhibit 18?

A   It's the interior of the passport.

Q   And in whose name is the passport issued?

A   Kaleb James Cole.

Q   Looking now at Exhibit 111, is there a computer on the desk there?

A   Yes.

         THE COURT:  You said 111.  Did you mean 11?

         MR. WILKINSON:  Excuse me, Your Honor.  Yes, 11.

Q   Was the computer on, when it was executed?

A   Yes.

Q   Was that a Dell desktop computer?

A   Yes, it was.

Q   How was the computer handled?

A    We had another search team member who was a, what you call a member of the regional computer forensic lab that's based in the Houston division.  He came out to the search, and I believe he's the one who shut down the computer.

Q    And was that taken into evidence?

A    Yes, it was.

Q    Showing you Exhibit 12.  Can you tell us what the item is on the chair?

A    Yes.  It's an HP laptop.

Q    And going back to Exhibit 1, can you tell us where that HP laptop was located?

A    When I came into the room, it was located on the chair.

Q    Okay.  And where was it marked as being located?

A    On the chair, 241.

Q    241, okay.

Let me ask you one more question about that computer.  Was that computer taken into evidence in a similar way as the Dell desktop computer we talked about a minute ago?

A    Yes, it was.

Q    I'm showing you Exhibit 6 now.  Is that another picture that was taken in the room?

A    Yes, it was Room N.

Q    Okay.  And Exhibit 22.  Can you tell us what that is?

A    Yes.  That's part of Room N, looking into the closet, which we designated as Room O.

Q   Okay.   And is Exhibit 23 a close-up of some of the items in the closet?

A   Yes, it is.

Q   Did you also execute a search warrant on a car that day?

A   Yes.

Q   Showing you Exhibit 24.   Is that the car?

A   Yes, it is.

        MR. WILKINSON:   The United States offers 24.

        MR. BLACK:   No objection.

        THE COURT:   Admitted.

                (Exhibit 24 was admitted.)

Q   And so you conducted a search of the car?

A   Yes, we did.

Q   And I'm going to show you Exhibit 25.   Is that a piece of paper you found in the car?

A   Yes, it was.

        MR. WILKINSON:   United States offers 25.

        MR. BLACK:   No objection.

        THE COURT:   Admitted.

                (Exhibit 25 was admitted.)

Q   What is 25?

A   It's a registration certificate for a vehicle.

Q   So what does the certificate tell us about who owned the car?

A   It says the registered owner is Kaleb J. Cole.

Q    Is Exhibit 26 a photograph of two of the items that were found in the car?

A    Yes, it is.

        MR. WILKINSON:  The United States offers 26.

        MR. BLACK:  No objection.

        THE COURT:  Admitted.

                (Exhibit 26 was admitted.)

Q    And do those appear to be two masks?

A    Yes.

Q    I asked you earlier whether Mr. Cole was in the house at the time that the warrant was executed in the morning.  And you said you didn't think he was.  Are you sure one way or the other about that?

A    Well, there were other members of the Houston division that effected the arrest warrant before I got on scene to conduct the search.  So I'm not sure if he was still in the house or just outside.  My recollection, he might have been outside, being interviewed in a vehicle, at the time that we started the search warrant.

Q    Okay.  Understood.  No further questions.

        THE COURT:  Cross.

        MR. BLACK:  Thank you, Your Honor.

                    CROSS EXAMINATION

BY MR. BLACK:

Q    Good afternoon, Agent Poteet.

A    Good afternoon.

Q    Your role in this case was basically just to perform the search, and log all the evidence on the day of the search and the few days thereafter; is that correct?

A    That's correct.

Q    You didn't have any role in the investigation otherwise?

A    That is correct, I did not.

Q    And you're obviously not aware if the materials that you seized on -- at the end of February of 2020, were in the same place that they were in January of 2020; is that correct?

A    So you're asking me if the items we seized on February 26, 2020, if I could know if they were in the same location as in -- as they were in January?

Q    Correct.

A    There's no way I could know that.

Q    Thank you.  Nothing further.

        MR. WILKINSON:  No redirect, Your Honor.

        THE COURT:  You may step down.  I'm sorry you have to go back to Texas.

        THE WITNESS:  It is a lot cooler here.

        MR. WOODS:  Can I confer with Mr. Black for just one minute?

        THE COURT:  Sure.

MALA BLOMQUIST

Having been sworn under oath, testified as follows:

DIRECT EXAMINATION

BY MR. WILKINSON:

Q   Good afternoon.  Could you begin by telling the jury your name and what you do for a living?

A   My name is Mala Blomquist, and I'm the editor for Oregon Jewish Life magazine and Arizona Jewish Life magazine.

Q   Where do you live?

A   Phoenix, Arizona.

Q   What types of things do Oregon Jewish Life magazine and Arizona Jewish Life magazine cover?

A   We're a lifestyle publication.  So we have columns for seniors, and kids and teens, and food, things like that.

Q   And what do you, yourself, do for them?

A   I'm the editor-in-chief of both of the publications.

Q   So what responsibilities does that include?

A   I write.  I edit freelance articles.  I compile.  I work with the art director to create the magazine each month.

Q   Are you, yourself, Jewish?

A   No, I am not.

Q   Does the magazine, itself, the two magazines have a brick-and-mortar location?

A   No, we don't.

Q   Why is that?

A    For basically for safety reasons.  Most of our staff, we have a small staff of people who are full time, and they're female.  And so we worked in an office, but the security wasn't -- we didn't feel as safe as we could with things.  So we were going to go into the Jewish Community Center to have our office.  But those plans fell through, so we just don't have a location at this time.

Q    Okay.  And can you tell us, just generally, what type of neighborhood you live in?

A    It's an older neighborhood.  Most of the people are original owners.  The houses were built in 1978.

Q    Okay.  I'm showing you Exhibit 300.  Is that a picture of your home?

A    Yes it is.

          MR. WILKINSON:  The United States offers 300.

          MR. ASKEROV:  No objection, Your Honor.

          THE COURT:  Admitted.

                    (Exhibit 300 was admitted.)

Q    How long have you lived in this home?

A    21 years.

Q    And who else lives there?

A    My husband.

Q    Do you have children?

A    I do.  I have two grown daughters.

Q    Okay.  They no longer live in the home?

A    No.  At the time, I had one who was in college.  And sometimes she would come home for a weekend, or spring break.  But, no, right now they are not.

Q    I would like to turn to February 5th of 2020.  Were you visited by federal agents that day?

A    Yes.

Q    Can you describe that experience, what was the conversation?

A    Well, originally they came to the door and rang the doorbell.  So I was home alone.  And when I looked out and saw two gentlemen at the door, I didn't answer it, because I didn't know who it was.  So I saw them, like, looking through the window and other things.  So it made me kind of nervous.

So when they left, I looked out the bedroom window, and that's when I saw the back of the poster that had been glued on my home.  So I went outside to the front to see what was on it.  And when I realized what it was, I tried to remove it.  And it was actually adhesed -- it was adhesive sprayed on and glued to my window, so I couldn't take it off.  So then I went back inside.

Q    Let me just stop you right there, because I just want to unpack a little bit of what you're saying.

A    Oh, okay.

Q    Thank you.

So you said that the first thing was you looked out a

bedroom window?

A   Right.

Q   And you saw the back of the poster?

A   Right.

Q   Was that your bedroom window?

A   No, it was one of my daughters'.

Q   So I want to show you now Exhibit 307.  Is that a picture of the bedroom?

A   Yes.

MR. WILKINSON:  The United States offers 307.

MR. ASKEROV:  No objection, Your Honor.

THE COURT:  Admitted.

(Exhibit 307 was admitted.)

Q   So this is your daughter's bedroom?

A   Yes.

Q   And I take it that's her bedroom window?

A   Right.  Yes.

Q   And what is the item that I'm circling here in the picture?

A   That's the poster.

Q   Okay.  So you looked out, you saw the back of the poster?

A   Right.

Q   Then it sounds like you went outside of the house and walked around and looked at it?

A   Right.  I went out to the front of the house and I saw

what it said, and I tried to take it off.

Q   So I want to show you Exhibit 305 now.  Is that a picture of the poster --

A   Yes, it is.

Q   -- glued to the window?

MR. WILKINSON:  The United States offers 305.

MR. ASKEROV:  No objection.

THE COURT:  Admitted.

(Exhibit 305 was admitted.)

Q   What was your reaction when you saw this picture?

A   Um, I was petrified, because the main thing I focused on was, "You have been visited by your local Nazis."  So -- and then, besides the other, "Your actions have consequences.  Our patience has its limits."  I couldn't figure out what I had done to deserve this poster being put on my home.

Q   Is that your name on the bottom of the poster?

A   Yeah.  It was my name and my address, that's been blocked out.

Q   And is that the correct address?

A   Yes, it was.

Q   Okay.  And so you said you were petrified.  Can you describe what you were feeling in your body when that happened?

A   Well, I was just -- I saw it, and I ran in the house.  And actually I immediately called the police, because I didn't

know if the gentlemen that had been to the door before were affiliated with what happened with the poster or not.

Q   And what happened next?

A   The FBI agents came back.  And so they rang the doorbell again.  And I wasn't sure, again, if it was something to do with this or not, so I didn't answer the door.  And so I actually called my neighbor across the street, who is a very large man, and I asked him to come across the street and talk to the gentlemen who were at my door.  Then he told me it was okay to come out, that they were FBI agents.

Q   Okay.  Did you discuss this poster with your husband?

A   Yes.

Q   What did you tell him?

A   Well, actually he was on his way home, he was working and on his way home.  So he hadn't answered his phone.  So he didn't know about it until he came home.

Q   What did you say?

A   I told him, I said, "We've been the victim of a hate crime."  And I had him, "Come and look at the poster."  Because at that time they hadn't removed it yet.

Q   How did he react?

A   He was stunned.

Q   Did you, at some point, learn what group was behind this?

A   Yeah.  Actually, I didn't recognize the symbol on the poster, but my daughter's boyfriend had looked it up.  And he

discovered who it was.  And I had never heard of them prior to that.

Q    Did you learn anything about them?

A    Yeah, that --

MR. ASKEROV:  Objection, hearsay.

THE COURT:  Sustained.

Q    How did what you learned about the group affect your feelings about receiving the poster?

A    Um, well, with the past history of violence, it was --

MR. ASKEROV:  Objection, Your Honor.  Ask to strike.

THE COURT:  Overruled.  It's not being accepted for the truth of the contents.

Q    I'm sorry, I think I had asked you how what you learned affected your feelings about receiving the poster, and you said, "With the history of violence..."

A    Right.  It made us more cautious.  And, you know, I was just always looking over my shoulder whenever I went out of the house.  And my husband wouldn't let me leave alone.

Q    Did you purchase anything, or do anything to your house to ensure your security?

A    Yeah.  The very next day we bought a whole security system and installed it, with cameras that go directly to your phone, and everything like that.

Q    Did it have -- did going through this experience have any effect on the way that you checked your mail?

A   Yeah.  We have a box at the end of our driveway.  So I wasn't sure if there was going to be -- I've heard of mail bombs, and things like that.  So I opened my mailbox with a stick for -- and then also my daughter had left her car at our home, because she was traveling.  And before she came home, I drove her car first to make sure that it hadn't been tampered with.

Q   And by "tampered with," what did you mean?

A   I didn't know if they could do something to the brakes, or put an explosive device -- I just didn't know what anybody would do.

MR. WILKINSON:  No further questions for this witness.

THE COURT:  Cross.

CROSS EXAMINATION

BY MR. ASKEROV:

Q   Good afternoon, Ms. Blomquist.  I'm Tim Askerov.  I represent Mr. Cole.

You just testified that you actually noticed the poster at the time that you were contacted by the FBI.  Was that the same day?

A   Yeah.

Q   So before the FBI came, you didn't even know -- well, I guess you only learned that the poster was there on the same day that the FBI came to your house?

A   Right.  Right.

Q   And it's possible that the poster had been there for days, and you've just didn't notice it?

A   Right.  Because the way we leave our house, we go out the garage.  So we don't often go where the poster was.  And there's shrubbery there, too.  So it's kind of hard to see the windows from the street.

Q   And you testified that your daughters are adults now and out of the house?

A   Um-hum.

Q   And so when this happened, your daughters weren't actually physically in the house at that time?

A   No.

Q   Do you recall, during your conversation with the FBI, did they tell you whether there was a threat of, or any evidence of a plan to do violence to you or to your family?

A   Well, they were warning me about something happening.  And then this was -- you know, they couldn't reassure me that nothing more would happen.  But they said that this was -- they believed this was what they were intercepting, the chatter online, and things like that.

Q   So they told you what they suspected would happen is that a poster would be delivered by mail or in person, is that generally what you were informed?

A   Yeah.

Q   Okay.  And so they didn't tell you about evidence of any violent threats on your family, or property, or anything like that?

A   They couldn't confirm or deny that.  Because I had told them I was concerned with the image of the Molotov cocktail, that a Molotov cocktail was a threat being thrown into our home, or something like that.  And they couldn't say anything about it one way or the other.

Q   But all they told you was that they knew that a poster was -- that you were going -- you were targeted to receive a poster?

A   Yeah.  They said I was on a target list, and they -- that was -- I'm assuming what the target was.

Q   So the poster that was delivered to your house, that's on the screen now?

A   Um-hum.

Q   And you'll note that your address and your name are on the bottom there?

A   Yeah.

Q   Did you notice that when you first saw the poster?

A   Absolutely, yes.

Q   And when looking at this, did you have concerns that somebody had your information and they could publicly disseminate it?

A   That wasn't on my mind.  It was mostly just they had my

name there to say, "We know where you live," for the threat.

Q   And so you didn't have concerns about your information being distributed?

A   In this day and age, I think you can pretty much Google anybody's name and find their name and address very easily. So, no.  So I didn't think about that.

Q   And you continued living at the same residence, since?

A   Yes.

Q   You never received any materials from Atomwaffen or AWD before?

A   No.

Q   And you haven't received anything since?

A   No.

        MR. ASKEROV:  No further questions.  Thank you.

                    REDIRECT EXAMINATION

BY MR. WILKINSON:

Q   Just one point of clarification.  You just described some conversations you had with the FBI about what to expect in terms of a poster.  When did you have those conversations, compared to when you discovered the poster?

A   Well, when we were talking out in my -- you know, the FBI agents, we went outside, after I realized who they were.  And we talked about the poster and things like that.  And they said there had been chatter online, and different journalists were being targeted across the country.  But they didn't get

into a lot of details about things.  But they were under the impression that this was the threat.

Q   Okay.  And so this happened after -- this conversation with the FBI happened after you discovered the poster?

A   Yeah.  Because I think they were coming to warn me before, but I never answered the door, when I saw them before.

Q   I see.  No further questions.

MR. ASKEROV:  No redirect, Your Honor -- or recross.

MR. WILKINSON:  United States calls Veronica Rudie.

VERONICA RUDIE

Having been sworn under oath, testified as follows:

DIRECT EXAMINATION

BY MR. WILKINSON:

Q   Good afternoon.

A   Good afternoon.

Q   And you can remove your mask.

A   Thank you.

Q   Could you please tell the jury your name?

A   Veronica Rudie.

Q   And can you tell us where you were born?

A   San Juan, Puerto Rico.

Q   Where do you live now?  In what city do you live now?

A   Tampa, Florida.

Q   When did you move from Puerto Rico to Florida?

A   I moved to Tampa actually to go to college at the

University of South Florida.  So soon after graduating high school.

Q   What made you make the decision to move to the mainland, to Florida?

A   I always dreamed of being a broadcast journalist, and I knew I wanted to do it in the United States.

Q   And did you, in fact, become a broadcast journalist?

A   I did.

Q   And I want to turn to January of 2020.  Were you a broadcast journalist at that time?

A   Yes.  I was an evening news anchor at Bay News 9.

Q   Bay News 9?

A   (Nods head.)

Q   What kind of station is that?

A   Bay News 9 is owned by Spectrum Networks Charter Communication.  It's a 24-hour station in Tampa Bay.

Q   What kind of things do they cover?

A   We cover everything.  The big timely news of the day, just like any other local stations you watch at home.  Your 5 o'clock, 10 o'clock newscasts.  Tragedies, fires, crimes. The cost of living, health, anything.

Q   Over time, has your network covered acts of anti-Semitism or hate crimes?

A   Yes.

Q   Can you give us some examples?

A    So there have been many over the ten years I've worked at Bay News 9.  We have cases like the synagog shooting in Philadelphia, the shooting at the Orlando nightclub.  We, of course, have Charlottesville.  I mean, there are so many, unfortunately.

Q    Are those things the network covered while you were serving as the anchor?

A    Absolutely.  Any time there would be a big development in a story like that.  And, of course, being a 24-hour news station, we have the ability of updating content on the hour, all day.  So if there would be a big development in a case, an arrest, victims sharing their experiences, you name it, we would cover it.

Q    I want to turn to January of 2020.  Did you become aware at some point of a threat against you?

A    Yes.

Q    How did you become aware of it?

A    I was reporting to my shift, I was a night anchor, so I start typically at about 2:30 in the afternoon.  And I was in the makeup room getting ready to start my shift that day.  So I get a called from Homeland Security.  At the time, I was participating in the U.S. Homeland Security Investigations citizens academy.  And one of the individuals in that office, the Tampa office for HSI called me to say that I would be getting a call from the FBI, and they were working a case

where my name came up, and I was a victim.  And they couldn't state too much beyond that, but to stay tuned for that call.

Q   How did you feel when you learned that first information from HSI?

A   I mean, I was stunned.  And it's a mix of emotions. Because there is that moment, I'm thinking in a matter of an hour or so I need to go in and start doing these broadcasts. Why am I getting a call from HSI about a situation, a crime involving my name?  Is it against me?  Is it against my family?  Should I call the FBI and not wait for this call? It was terrifying.  And, honestly, like, you just -- very, very concerned.  I was freaking out.

Q   Did you end up speaking with the FBI?

A   So soon after, I did get that call from the FBI.  And it was, what I recall, not a long call at all.  In fact, I remember my frustration at not getting enough information, because I was so terrified.  The FBI said that for them to give me any more details about this threat that has been made against me, that I would have to give testimony, some victim statement, and they would have to take it in person.  And so you can imagine, I was at work in a makeup room, now having to process this.  And not really understanding what the scope of that threat was.

Q   Did you end up meeting with the FBI?

A   I did.  They came to my house.

Q   Was that the same day, or the next day?

A   It was within the 48 hours following that call, I believe. So they came that morning, either the following morning or the day after.  I knew that I shared with them I wanted to do this as soon as possible.  And, in fact, I even invited them to the station that night.  And they couldn't make that happen.  I just wanted to know what was going on.

Q   And when you were finally able to meet with them, did they tell you what was going on?

A   Yes.

Q   What did you learn?

A   My husband and I were in the living room, and the agents came in and they had a flyer with them.  And they shared that this flyer has my name on it.  They showed me the flyer.  And they asked me, do I recognize the address on that flyer.

Q   Let me just stop you right there.  I'm showing you Exhibit 402.  Is that the flyer they showed you?

A   Yes.

        MR. WILKINSON:  United States offers 402.

        MR. ASKEROV:  No objection, Your Honor.

        THE COURT:  Admitted.

                (Exhibit 402 was admitted.)

Q   How did you feel when you first saw this flyer?

A   It was horrific.  And I've seen a lot of stuff, being a news anchor.  This was horrific, that somebody would go as

far to create this content, have it printed, drop it off where they did, thinking that was my house, to terrorize me and my family. It's something I'll never forget. It's something that marked me forever. And even seeing this flyer again is just awful.

Q   Can you tell us what about the flyer was most terrifying to you?

A   Well, the swastikas all over the place, is one thing. The fact that it says here, somebody is watching me. I have a little daughter. I have a husband. I work -- at the time, I worked late at night. I wasn't getting home until after midnight. That was part of my shift. So driving alone to my house 40 minutes, not knowing if somebody would be waiting for me in the parking lot. Where would they show up? They went as far as putting this thing together. They made the conscious decision to spread it out. And to me, that is a major horrific way. It's an invasion of my privacy. It's an attack on me. They don't know me. It's evidently racist. "We know where you live." Okay. So what's next, are you going to show up to my house and do what? "Do not fuck with us." What did I ever do?

MR. ASKEROV: Objection, Your Honor. The witness is testifying in a narrative.

THE COURT: Overruled.

Q   You can continue.

A   This is a threat, that could have taken all kinds of forms and shapes.  So what do you do with that?  Do I pack up and leave, disappear?  Go find somewhere else to live, so these people actually don't know where I live?  Why do they hate me so much to do this?  It's awful.

Q   Did you come to learn, following this, what group was behind this?

A   I did.  The moment I learned from the FBI the name of the group, I immediately started researching.

Q   And without going into what exactly you found, how did you feel when you found out who was behind this?

A   Even more terrified than before, when I learned that this is a group that has killed people in other places.

MR. ASKEROV:  Objection, Your Honor.  Hearsay.

THE COURT:  Overruled.  It's not being accepted for the truth of the contents.  It's being accepted for the witness's state of mind.

Q   Now, that's -- there's an address on the bottom of the flyer.  Is that -- it's been redacted here, but was that your real address?

A   Thank God it wasn't.

Q   Do you know anything about that address, or why that address was connected with you somehow?

A   I have no idea.  It was part of what the FBI was asking me in my house, do I know this address?  Have I ever been there?

It happened to be a district that I have frequented, just as a visitor.  Go to a restaurant, or go, you know, shop, you know, like anybody else.  But I have never lived there.  I don't know anybody on that street.  No.

Q   Did it make it less scary to you that they got the wrong address?

A   No.

Q   Now, it says, "Veronica Cintron" on there.  I think you originally introduced yourself as Veronica Rudie.  What is Veronica Cintron?

A   That's my maiden name.

Q   Is that the name that you use in your reporting on television?

A   Yes.

Q   Did this incident have any effect on your professional career?

A   Yes.  It's one of the reasons I ended up changing careers.

Q   So you no longer work in journalism?

A   No.  I left television news soon after these arrests.

Q   Thank you.  No further questions.

        THE COURT:  Cross.

                    CROSS EXAMINATION

BY MR. ASKEROV:

Q   Good afternoon, Ms. Rudie.

A   Good afternoon.

Q    My name is Tim Askerov.  I represent Mr. Cole.

You testified that at the time of these events, you were employed as a news anchor?

A    Yes.

Q    And you also testified that you had reported on issues regarding white supremacy and neo-Nazis in your area; is that accurate?

A    Yes, generally.  And usually national news.  But also some local cases.

Q    The poster that was intended for you, was not delivered to your actual residence?

A    No.

Q    You said that after -- well, the FBI notified you by phone first, correct?

A    HSI called me first.  Then I got the call from the FBI, correct.

Q    And then you went to meet with them in person?

A    They came to my house, the FBI agents did.

Q    And when they met with you, did they tell you anything along the lines of, there was no evidence to suggest that there was an actual plot to do violence against you?

A    They mentioned this was a threat, and they showed me the flyer.

Q    They showed you the flyer, and said the flyer itself was a threat?

A    Yeah.   In fact, the calls that I had with HSI and the FBI, both indicated there was a threat against me.

Q    Did they tell you that there was any evidence of anything else happening, other than the delivery of the flyer?

A    No.   They said they were investigating.

Q    After receiving this poster, did you have concerns about your information being publicly leaked, your personal information?

A    What kind of information?

Q    Your address, your personal telephone number, did you have concerns about that being disseminated on the Internet, or in other media?

A    I did have concerns, because at the time, even though it wasn't my address, the fact that they were putting it on a piece of paper, indicated to me, or at least implied that they were going to continue to search.

Q    Just a couple follow-ups.   You have never received -- you had never received anything from AWD before, anything from Atomwaffen before?

A    Before this?   No.

Q    You haven't received anything after?

A    No, thank God.

Q    You have no personal knowledge of anything Atomwaffen or AWD has done?

A    To me?

Q    Generally.

A    Generally, I know what a researcher would know.

          MR. ASKEROV:  Objection.

Q    You have not seen personally -- you have not been there to witness anything that Atomwaffen has done.  So you don't -- let me rephrase that.  I apologize.

          Other than what you've read in the media, you have no personal knowledge of Atomwaffen's activities; is that correct?

A    Beyond what I have read, eventually also reported in a case with Tampa Tides --

Q    That's the only question.

          Other than what you've read in the media and on the Internet, that's all you know about them, correct?

A    I hear where you're going, but I'm just saying it's not just what I've read, I've reported on even an Atomwaffen member who killed a person in Tampa.

          MR. ASKEROV:  Objection.  Objection.

          THE COURT:  No.  You asked the question, counsel.

A    There was a case in Tampa Bay.  So you asked about what do I know about Atomwaffen.  There was a member in Tampa Bay who killed his roommates.  And so that is not something I read, that is something that, as part of my work, I had to work and tell the story.

Q    Okay.  And isn't it true that that individual had actually

converted to Islam?

A   Correct.

Q   Is that correct?

A   Yes.

Q   And he killed his roommates because they were -- or professed neo-Nazi beliefs; is that correct?

A   I don't remember exactly at this point, it's been a number of years, if that was part of the case.  But I know that he had converted to Islam, correct.

Q   And he espoused jihadist ideology?

A   I don't recall exactly.  But, sure, if you know this, I trust that you remember it correctly.

        MR. ASKEROV:  Nothing further.

        MR. WILKINSON:  No redirect, Your Honor.

        THE COURT:  You may step down.  Please put your mask back on.  We'll take a 15-minute recess, folks.

                    (Recess.)

        THE COURT:  Ready for the jury?

        MR. WILKINSON:  Yes.

    (The following occurred in the presence of the jury.)

        MR. WILKINSON:  United States calls John Powers.

JOHN POWERS

Having been sworn under oath, testified as follows:

DIRECT EXAMINATION

BY MR. WILKINSON:

Q   You can be seated and take your mask off.  Could you begin by telling the jury your name and what you do for a living?

A   My name is John Powers.  I'm a forensic examiner for the FBI.

Q   And how long have you been with the FBI?

A   Almost ten years.

Q   Can you tell us about your educational background?

A   I have a bachelor's of science in computer and information technology from Purdue University.  After joining the Bureau, I went through their computer forensics training program. I'm certified to examine Windows, Macintosh, Linux, and mobile devices.

I've taken various other training classes from the Bureau and outside vendors on general forensics and specific tools. And I'm also a certified senior forensic examiner.

Q   Okay.  Have you taught or lectured on computer forensics?

A   I have.  Just last week, in fact, I was teaching a beginning course on computer forensics to FBI personnel.

Q   Can you describe, just very generally, what your job responsibilities are?

A   In general terms, my responsibilities are to collect,

preserve, analyze and explain the results of digital evidence.

Q   And you say "digital evidence," does that include computers?

A   It does.

Q   And can you explain for the jury what it means to image a computer?

A   I can.  First, I want to apologize, here in Seattle, for all I know, half of you have worked for Microsoft for decades and you know the technology more than I do.  But I have to assume some of you don't even like technology.  So my answers are going to be geared more for that.  I'm not trying to insult or belittle anybody's technical expertise or not respect that you know what you're doing in your jobs.

So by imaging, we don't like to work on original evidence, we want the original evidence to be as untouched as possible. So whenever we can, we make a copy of that evidence.  So, for instance, with a computer, we'll take the hard drive out of the computer, we'll attach it to something called a right blocker.  The right blocker will allow the hard drive to talk to something else, but will only let data come out.  It will not let the command "write to the hard drive" go through.  So we hook that up to try to keep the original evidence as pristine as possible, and when we pull the data out of the hard drive, in this example.

This data is then collected into what we call an image file, which is basically a file like any other computer file. But this file contains the contents of, in this case, the hard drive, or whatever other device we're imaging. That image file is then what we do our exam on, because it has all the original evidence, but doesn't touch the original evidence.

Q   And is that imaging process designed to create an exact replica of the evidence on the original computer?

A   It is.

Q   And do you have measures in place to make sure that once you create the new, image that the material on the new image, is not altered?

A   We do. There's something called a "hash," which has many uses in computer science. But this hash you can think of as a fingerprint. And if you change anything on the original evidence, it will totally change the hash. So if I hash my original evidence, and I hash the image I made, and those two hashes are the same, I can be confident that all the data transferred correctly.

Q   Okay. So now, say, we've taken a computer, we've created an exact image of it that can't be altered, can you describe, very generally, how you or the FBI then goes about searching that image?

A   Right. So we have various forensic software programs.

And what they typically do is they go through that image and they just look to see what's there.  And they'll say, okay, here's a Word document, and here's a picture.  And some of them will create an index like you see in the back of a book, so you can look stuff up.

And once the forensic software figures out what's what, then you can go through and say, I want to look at all the Excel spreadsheets, or I want to look for the word Oreo, because I like cookies, whatever you're looking for.  The forensic software is there to make it easier to find it.  As opposed to manually looking through the entire computer.

Q   I think you touched on this a minute ago when you mentioned the word "Oreo."  But this software allows you to search for terms on the computer?

A   It does.

Q   And in the case where a file has been deleted or removed from the computer, are you sometimes able to find fragments or traces of the file?

A   Yes.

Q   And can you explain, generally, what portions of the computer or the names of the portions of the computer you can find those on?

A   So, the hard drive is basically there to store things, right?  You can think of it as a box or file cabinet.  And the parts of your box or your file cabinet that have things

you care about, files, is called allocated space, because we have allocated it to these files we care about.

Then the rest of it is called unallocated space. The reason we can see deleted files is because the computer is -- you can call them lazy, but they don't do work they don't have to do. So, imagine we've got this file cabinet that's our hard drive, we also have a clipboard that says what's in each drawer. So when I delete a file, what really is happening with the computer is, I just cross out that name on the clipboard. But the actual file is still physically sitting in the file cabinet, until I actually need the space. Only then do I actually physically pull the file out and toss it out.

Q   So is this unallocated space a place where you can sometimes find fragments of old files?

A   It is.

Q   Can you explain what the term "slack space" is and how that relates to unallocated space?

A   It's a similar concept, works a little bit differently. The computer writes in certain size chunks. It won't write exactly 13 characters. It will -- or whatever. There's certain size chunks it will write to. And so say you have a big file, that means eight chunks. And then you delete it, so it's gone. Or it's deleted on our clipboard, but still physically sitting in our file cabinet.

And then eventually the computer wants to put something else there, but it doesn't need all eight chunks, it just needs six chunks.  So it writes to those six chunks.  But the last two chunks still have the old data on them.  Those two chunks that were part of some old file, but are not part of the new one, that's really sitting in that area is called slack space.

Q    Can you sometimes, if you're running one of these term searches, let's say the word "Oreo" was sitting in that two-chunk space, would your term search find the word "Oreo," even though it had been deleted from the computer?

A    Yes.

Q    I'm going to show you -- let me ask you, first, did you perform forensic imaging in connection with this case?

A    I did.

Q    And I'm showing you Exhibit 11.  Do you recognize the Dell laptop there?

A    I do.

Q    Is that one of the computers that you imaged in this case?

A    It was.

Q    And did you apply the imaging procedures that you talked about a minute ago?

A    I did.

Q    And then did you put it into a software that would allow it to be searched?

A    I did.

Q    And can we just refer to that document or that computer as the Dell laptop as we go forward?

A    As a Dell laptop.

Q    Excuse me, Dell desktop, as we go forward?

A    Yes.  We can call that the Dell desktop.

Q    Then I'm showing you Exhibit 12.  And there is a laptop sitting on a chair there?  What kind of computer is that?

A    I believe it's an HP laptop computer.  I don't remember the exact model number.

Q    Did you apply the imaging techniques to that computer as well?

A    I did.

Q    And did you apply the search software that you -- of the type you described earlier?

A    I did.

Q    And we'll call that the "HP laptop."  Can we call that computer the "HP laptop"?

A    Sure.

Q    Okay.  All right.  I want to show you -- excuse me, that was unpublished the whole time, wasn't it?

       So why don't we go back.  So we're looking at Exhibit 12, that's the HP laptop we just referenced.

A    Yes.

Q    And Exhibit 11 was the desktop?

A    Yes.

Q    Okay.  So I'm going to show you Exhibit 802.  That's one of the -- do you recognize that image?

A    I do.

Q    Is it one of the files that was found on the HP laptop?

A    It was.

        MR. WILKINSON:  United States offers 802.

        MR. ASKEROV:  No objection.

        THE COURT:  Admitted.

                (Exhibit 802 was admitted.)

Q    Does that appear to be a photograph of a person?

A    It does.

Q    Or two people.  Okay.

        I'm showing you 803.  Is that another file that you found on the HP laptop?

A    It was, or it is.

        MR. WILKINSON:  I'm offering 803.

        MR. ASKEROV:  No objection.

        THE COURT:  Admitted.

                (Exhibit 803 was admitted.)

Q    Now, how does that picture compare to the Exhibit 802 we just looked at a minute ago?

A    It looks like it's probably a cropped version of the previous one.

Q    Okay.

And did you review the file name of that picture?

A   I did.

Q   And is the file name of the photo copied onto this exhibit here?

A   It is.

Q   What was the file name?

A   "Myself," and I'm suspecting this is a misspelling of and "Kan."

Q   And there's a dot PNG.  What does that mean?

A   PNG is a type of picture file.

Q   Showing you Exhibit 804.  Is that another image file that you found on the HP laptop?

A   It is.

        MR. WILKINSON:  United States offers 804.

        MR. ASKEROV:  No objection.

        THE COURT:  Admitted.

                (Exhibit 804 was admitted.)

Q   So just to be clear, this image was found on the same computer as the picture we just looked at a minute ago, that the man -- that was titled, "Myself" and "Kan"; is that right?

A   That is correct.

Q   And I want to put this picture, Exhibit 804, next to Exhibit 602.  Do those two pictures appear to resemble one another?

A    The one on the right appears to have a little circular part cut out of the one on the left.

Q    So the item on the left, the picture on the left, is that Exhibit 804?

A    Yes.

Q    Okay.  And that's the one that you found on the HP laptop?

A    Correct.

Q    And how does -- and just because the jury couldn't see 24 when I asked this question a minute ago, how does the picture that you found on the HP laptop compare to Exhibit 602, the picture on the right?

A    The picture on the right seems to be a portion of the picture on the left.  Looks like they took a circular part out of the middle.

Q    I want to show you some of the posters that are at issue in this case.

     I'm showing you Exhibit 305.  To your knowledge, was an image of this actual poster found on either of the computers that we talked about today?

A    Not to my knowledge.

Q    What about the name "Mala Blomquist," was the name Mala Blomquist found anywhere on those computers?

A    It was.

Q    Where was it found?

A    It was in that space we were talking about earlier.  It's

not part of an allocated file, it's just sitting on the drive.

Q   Slack space?

A   Yep.

Q   And I'm showing you Exhibit 501.  Was that poster itself or an image of it found anywhere on either of those computers?

A   Not to my knowledge.

Q   What about the name "Veronica Cintron," did you find that on one of the computers?

A   It was found there, yes.

Q   And, again, was that in the slack space or unallocated space?

A   It was.

Q   And I'm showing you Exhibit 501.  Was an image of this actual poster found on either of the computers?

A   Not to my knowledge.

Q   What about the name "Chris Ingalls."  Did you find that on the computers?

A   It was.

Q   What about there's two phone numbers at the bottom, an office number and a cell number.  Were those found on the slack space as well?

A   They were.

Q   Okay.  I'm showing you Exhibit 807, or at least the first

page of it.  Have you reviewed -- this is a several-page

exhibit.  Have you reviewed all the pages of it?

A    I have.

Q    And is it a summary of some of the data that was found in

the slack space?

A    It is.

Q    Now, if you were to take all the slack space on both those

computers, is it fair to say that would be a voluminous

amount of data?

A    Yes, fair to say.

Q    It would be difficult to examine here in court?

A    We'd be sitting here for quite a while.

Q    Would it be easier to examine the summary of the data that

you've created here?

A    Much easier.

Q    And does the summary of the data here accurately summarize

some of the data that you found in the slack space on the

computers?

A    It does.

        MR. WILKINSON:  The United States offers 807.

        MR. ASKEROV:  No objection.

        THE COURT:  Admitted.

               (Exhibit 807 was admitted.)

Q    We're looking now at the first page of 807.  So what do we

see here?  What are those three items listed there?

A   We have three names:  Chris Ingalls, Veronica Cintron and Mala Blomquist.

Q   All three of those found in the slack space?

A   They were.

Q   And we're going now to the third page.  Yes, the third page -- second page of Exhibit 807.  What are we looking at here?

A   This is some of the data, the text readable data that was in that space.  We have the phone numbers from the poster, and we have Chris Ingalls' name, and this data.

Q   Is this what slack space data looks like when you look at it through your search tool?

A   This is reasonably representative.

Q   And it says "Dell desktop," in the lower right-hand corner.  Is that because this was found in the slack space for the Dell desktop?

A   That is correct.

Q   So I'm putting 807, Page 2 next to 501.  Are the two phone numbers that are highlighted on the top, the same phone numbers that are on the bottom of Exhibit 501?

A   They are.

Q   Turning to Page 4.  What are we looking at here?

A   This is some more slack space from the Dell desktop computer.  This has Veronica Cintron's name in it.

Q   It says, "Veronica Cintron dot LNK."  What do you make of

the dot LNK as a forensic examiner?

A   Dot LNK usually is referring to a link file.

Q   What is a link file?

A   A link file has a number of uses.  The one you're probably most familiar with is when you create a shortcut on your desktop, or whatever, that points to something deep in your file structure, that magic is accomplished with a link file.

Q   So we've got Page 4 of 807 on the left, then 402 on the right.  Is it the same name, Veronica Cintron?

A   It is.

Q   Then what is the highlighted language at the bottom of Exhibit 804, Page 4?

A   "We are everywhere" dot LNK dot L.

Q   And did that appear within the slack space just right below that, many lines below the words "Veronica Cintron"?

A   Yes.

Q   And also a link file?

A   Yes.

Q   We're looking at Page 5 of 807.  What do we see here?

A   We have more slack space data.  This one contained Mala Blomquist's name.

Q   This is actual data from the slack space, again?

A   Yes.

Q   Is this from the HP laptop?

A   It is.

Q    So now we're putting that next to Page 305.  Is the name in the slack space the same as the name, minus the middle name --

A    It is.

Q    -- on 305?

And then what's the second highlighted portion on the left, what's that word?

A    "Consequences."

Q    What's the dot PSD indicate to you?

A    Dot PSD is the file extension for a Photoshop, actually stands for a Photoshop document.  So it's a file that Photoshop uses to do its stuff.

Q    Does that suggest there was a Photoshop file with the name "consequences"?

A    It does.

Q    And does the poster on the right, Exhibit 305, have the word "consequences" in it?

A    It does.

Q    And what about the next set of highlighted data?  Can you tell us, generally, what that is discussing, or what word repeats there?

A    The word "mask" comes up numerous times, and with the dot PNG, which is suggestive of a graphics file.

Q    The dot PNG suggests a graphics file?

A    Correct.

Q   Would that be consistent with having a graphics picture of the mask?

A   Assuming you're naming your file after what's in the picture, yes.

Q   And I'm drawing a circle on Exhibit 305.  Does that appear to be a mask of some type?

A   It could be.  It's more of an illustration.

Q   Showing you Exhibit 26.  Does that appear to be a mask with a skeleton on it?

A   It does.

Q   I want to show you one more exhibit.  Is that another selection of data from one of the -- from the slack space of one of the computers?

A   This is actually unallocated space.  But it is.

Q   Okay.

        MR. WILKINSON:  The United States offers 805.

        MR. ASKEROV:  No objection.

        THE COURT:  Admitted.

            (Exhibit 805 was admitted.)

Q   And so what are we looking at here?  Can you just explain what this exhibit is, because it's a little funny looking?

A   So there is a ton of data in any given chunk of unallocated space that we just don't care about.  So what's happened here is we've snipped out some, and there are certain terms that were of interest.

Q   Okay.  And so can you read for us the highlighted language that I'm pointing to?

A   HTTPS://app.Wire.com/pound/conversation.

Q   Do you know what Wire is?

A   It's a communications app.  It comes out of Switzerland. It advertises end-to-end encryption.

Q   And what does the fact that this text appears in the slack space -- excuse me, unallocated space, tell you as a forensic examiner about whether this computer was used to access Wire?

A   It's very difficult to come up with any kind of firm conclusion with anything in slack or unallocated space.  But what we have here is a web address for the app.Wire.com so that would be consistent with it.

Q   And can you tell us what word we see or what series of words is in the next highlighted language?

A   Krokodil Wire MOC dot ERIW dot PPA.

Q   Does the fact that the word "Krokodil" appears one line down from the app.Wire suggest that there may be a relationship between the computer accessing Wire and the name Krokodil?

A   It's certainly within the realm of possibility, especially when you keep on going to the left of Krokodil, we have another reference to the app.Wire.com.  And then this could all be part of a term that was sent over the Internet. Again, it's hard to know exactly what's going on in the

context of unallocated space.  But what's now highlighted could all be -- could all be one thing.

MR. WILKINSON:  Thank you.  No further questions.

THE COURT:  Cross.

CROSS EXAMINATION

BY MR. ASKEROV:

Q    Good afternoon, Mr. Powers.

A    Good afternoon.

Q    My name is Tim Askerov.  I represent Mr. Cole.

If several different people are using the same machine, is it possible to determine who created the materials that you found in the unallocated space, or the slack space?

A    The IT answer number one is, it depends.  But it could be very difficult, depending on our circumstances.

Q    In this particular case, were you able to determine who the specific individual was who created those materials?

A    I do not have enough information at my disposal to tell you that.

Q    So we don't know exactly who searched for the terms that we were just looking at on the screen, like the names Veronica Cintron, Chris Ingalls?

A    I don't know.

MR. ASKEROV:  I have nothing further.  Thank you.

MR. WILKINSON:  No redirect.

THE COURT:  All right.  Thank you.  You may step

down.  Put your mask back on, please.

THE WITNESS:  Yes, sir.

MR. WILKINSON:  The United States calls Hilary Bernstein.

HILARY BERNSTEIN

Having been sworn under oath, testified as follows:

THE COURT:  Go ahead and be seated.

DIRECT EXAMINATION

BY MR. WILKINSON:

Q   Good afternoon.

A   Hello.

Q   Could you begin by telling the jury your name?

A   My name is Hilary Bernstein.

Q   What city do you live in?

A   I live in Seattle, Washington.

Q   What's your current occupation?

A   I'm semi-retired.  But I work as an education consultant and I create and lead workshops to help people overcome bias, and learn how to be allies for each other in the workplace, and in their communities.

Q   You said that you're semi-retired.  How long have you been semi-retired?

A   Since June of -- July of 2019.

Q   And what did you do for a career, prior to July of 2019?

A   Well, for 14 years I was working with the Anti-Defamation

League in the Pacific Northwest.

Q   What was your final position with the Anti-Defamation League?

A   For over ten years, of those 14 years, I was regional director.  Then the last year and a half, I served as education director.

Q   And the jury heard from Miri Cypers yesterday.  How does your -- did your position relate to hers?

A   She was my successor.

Q   Okay.  So she took over after you retired?

A   Well, when I stepped back to be education director.

Q   Understood.  What kind of things did you do as regional director for the Anti-Defamation League?

A   I'm smiling, because I wore a lot of hats.  I served as representative.  As you know, the Anti-Defamation League is a national organization.  And so this regional office covers five states.  I worked to help respond to bias incidents and hate crimes.  I worked with law enforcement to keep them apprised of information in that regard.  I worked with the legislature to help strengthen civil rights laws, particularly against hate crimes.

And last, but not least, I worked in schools to help young people recognize the pitfalls of stereotypes and prejudice, and learn to respect people.

Q   Can you tell us what your faith is?

A    I'm Jewish.

Q    Are you currently married?

A    My husband passed away several years ago, so I am a widow.

Q    Okay.  Do you live with others, or on your own?

A    I live by myself.

Q    I'd like to turn to February 4th of 2020.  Had you been away from your house for a period of time?

A    I had.  I had been gone for a couple of weeks.  I traveled to Chicago to celebrate the first birthday of my grandson.

Q    And did you then return on February 4th?

A    I did.  I flew back kind of late at night.  I think I landed in Sea-Tac probably around 10 o'clock or 10:30, something like that, at night.

Q    So did you arrive home late at night?

A    Yes.  It was close to midnight.

Q    Did you get your mail when you came home?

A    I did.  I have a mail slot in my home, so I didn't have to stop the mail, it was -- there was a big pile waiting for me, of course.

Q    And among that big pile of mail, was there anything that got your attention?

A    Yes.  After I had separated out the catalogs and junk mail, and looked for bills, there was an envelope that caught my attention, a business-sized envelope.  And it was addressed to me, but my name was misspelled.  And there was

another thing that caught my attention, and that was that in the "from" section of the envelope, it had my name also; misspelled. So it looked like it was to me and had come from me. And I hadn't created anything like that.

Q   I'm showing you Exhibit 504. Is that the envelope that you received that night?

A   It is.

MR. WILKINSON: The United States offers 504.

MR. ASKEROV: No objection.

THE COURT: Admitted.

(Exhibit 504 was admitted.)

Q   So when you say that your name was misspelled, in what way was it misspelled?

A   My first name, Hilary, is spelled with one L.

Q   And what did you notice about how the address, name and address were affixed to the envelope?

A   Oh, it was covered with clear tape. And so was the "from" section was covered with clear tape.

Q   Did you open the envelope?

A   I did.

Q   I'm going to show you Exhibit 505. Do you recognize Exhibit 505?

A   Yes. That is what was inside the envelope.

MR. WILKINSON: The United States offers 505.

MR. ASKEROV: No objection.

THE COURT:  Admitted.

(Exhibit 505 was admitted.)

Q   What did you notice about this message, when you opened it?

A   Well, um, a lot of things.  I noticed what was written, of course.  I noticed the font.  It was like kind of -- kind of an ugly font, and kind of angry looking.  There were swastikas.  And my name and address were part of the flyer.  It wasn't, like, taped on, or anything, it was part of the flyer.  And I also noticed the language, of course.

Q   Was it significant to you that your name and address were typed onto that flyer?

A   Yes.

Q   Why?

A   Well, I had seen ugly flyers before, you know, as part of the work that I did for a long time.  But I had never seen one where someone's name and address, their personal information was part of the flyer.  It was sent specifically to me.  It was directed to me.  And I felt that -- I felt really violated, actually.

Q   Can you please read the words that were written under your name and address?

A   "You have been visited by your local Nazis."

Q   How does it feel, as a Jewish person, to receive a message saying that you've been visited by your local Nazis?

A   I'm not sure I can really describe all of the emotions.  I mean, just looking at it now, it's a specific message.  It's a specific threat, is how it feels.  It would maybe be similar if a person of color was shown a noose, you know, an image of a noose, or the image of a burning cross or something.  Those images are not just random, they mean something.  And those words mean something.  Being visited by your local Nazi means something to a person who is Jewish.

Q   What did you do after you read this message?

A   Um, I tried not to cry, actually.  And I -- it was really late at night, it was past midnight at this point.  And I -- I think I was probably just feeling, you know, some sort of shock or something.  It was totally unexpected.  I was really exhausted.  I put it down and I thought, you know, I've got to call law enforcement, I've got to -- I knew this was serious.  But it was 12:30, whatever time, 1 o'clock, or something.  I thought, I'll try to go to sleep and I'll call them in the morning.

I didn't sleep.  But, yeah.

Q   Did receiving this envelope and message cause you to worry that you could be in physical danger?

A   Absolutely.  This says, "We know where you are."  And, "We're watching you.  We know where you live."  And, "Don't mess with us."

Q   Did you take any steps after that to ensure your security?

A    Um, do you mean that night?

Q    No, in the following weeks or months.

A    Yes.  I contracted with a company to have security cameras, a pretty extensive system installed around my home. Cameras.  Yeah.  You know, not like you get at Home Depot or something, but a serious, sophisticated system.  I was really scared.

Q    And how did living with this, having received this message affect you in the weeks and months after this?

A    Well, we didn't know, on February 4th when I got this, but we were about to be ordered to stay at home, stay safe, stay home, because COVID hit.  And I had to stay home.  And I didn't go anywhere except my backyard to garden, or something.  But I was home all the time.

Q    How did this affect your feeling of safety in your home?

A    It really shattered that feeling of safety.

          MR. WILKINSON:  No further questions.

          THE COURT:  Cross.

                    CROSS EXAMINATION

BY MR. ASKEROV:

Q    Good afternoon, Ms. Bernstein.

A    Hello.

Q    My name is Tim Askerov.  I represent Kaleb Cole.

          Isn't it true that when you talked to the FBI about receiving this poster, you indicated that based on your

professional experience and training, you felt like you were not in immediate danger at the moment?

A   Yes.  At midnight on February 4th, that's correct.

Q   And you testified that you previously were employed as the regional director of ADL?

A   Yes.

Q   And ADL had previously published information on Atomwaffen or AWD; is that correct?

A   That's correct.

Q   Your home address and your name are listed at the bottom of the poster?

A   Correct.

Q   After seeing that, did you have concerns about your private information being disseminated online by AWD?

A   It certainly was a possibility.

Q   Prior to receiving this mailing, had you ever received anything else from AWD?

A   No.

Q   Have you received anything after from AWD?

A   No.

        MR. ASKEROV:  Nothing further.  Thank you.

        MR. WILKINSON:  No redirect, Your Honor.

        THE COURT:  All right.  You may step down.

        THE WITNESS:  Thank you, Your Honor.

        THE COURT:  Please put your mask back on.

MR. WILKINSON:  United States rests.

MR. BLACK:  Your Honor, we'd make a Rule 29 motion.

THE COURT:  We'll do that tomorrow morning.  But other than that?

MR. BLACK:  Rest.

THE COURT:  All right.  Ladies and gentlemen, I'm going to release you, then, for the evening.  Please remember the court's admonitions.  They still remain in effect.  You still must not discuss the case with anyone, not even among yourselves.  Don't read, listen or watch anything about the case.  Don't attempt to do any investigation on your own.  Don't permit anybody to talk to you about the case.  We'll see you tomorrow morning.  I'm going to ask you, would it be inconvenient for you to be here by 9 o'clock tomorrow?  Is that a problem for anybody?  Okay.  We'll do it at 9:30, then.

A MEMBER OF THE JURY PANEL:  9:00 is good.

THE COURT:  Is 9 o'clock okay for everybody?  All right.  We'll start at 9 o'clock, then.  All right, we'll be in recess.

(Adjourned.)