UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

UNITED STATES OF AMERICA,      ) CR20-032-JCC
                               )
                 Plaintiff,    ) SEATTLE, WASHINGTON
                               )
v.                             ) September 29, 2021
                               )
KALEB COLE,                    ) 8:45 a.m.
                               )
                 Defendant.    ) Trial - Day 3
_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE JOHN C. COUGHENOUR
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:


 For the Plaintiff:       Thomas Woods
                          Seth Wilkinson
                          Assistant United States Attorneys
                          700 Stewart Street
                          Suite 5220
                          Seattle, WA  98101


 For the Defendant:       Christopher Black
                          Teymur Askerov
                          Black & Askerov PLLC
                          705 2nd Avenue
                          No. 1111
                          Seattle, WA 98104

THE COURT:  Counsel, take a look at Instruction No. 14, which Richard tagged for you.  Neither he nor I could remember whether there were charts or summaries that were shown to the jury, but were not admitted into evidence.

MR. WILKINSON:  There were not.  The only summary was admitted, Your Honor.

THE COURT:  Do you agree with that?

MR. BLACK:  Yes, Your Honor.

THE COURT:  All right.  We'll pull No. 14.

So does the government have any other problems with the instructions?

MR. WILKINSON:  We have no exceptions, Your Honor.

THE COURT:  Mr. Black?

MR. BLACK:  Thank you, Your Honor.  We take exception to the court's failure to include defense supplemental Instruction No. 1.  And we take exception to currently Final Instruction No. 20, for which we proposed an alternate instruction.

THE COURT:  All right.  I understand the exceptions.  Anything else?

MR. BLACK:  Yes, one final, which is Final Instruction No. 26.  We objected to that earlier, on the basis that we believe it's not necessary.  So we take exception to that as well.

THE COURT:  No.  I think it's necessary.  I'm going

to leave it in.  All right.  Well, it's a few minutes before 9:00, so we'll instruct at 9:00.  How long is the government going to take to argue?

MR. WOODS:  I would say it's between 30 and 35 minutes, Your Honor.

THE COURT:  How about you folks?

MR. BLACK:  Your Honor, I would say probably between 20 and 30 minutes.

THE COURT:  I'm not going to limit you, I just wanted to get a feel for how long it's going to take.  All right. We'll take a recess.

(Recess.)

MR. WOODS:  One quick thing.  I wondered if I might go and change out the posters during my closing.

MR. BLACK:  One thing from the defense, we raise a Rule 29 motion.

THE COURT:  Oh, yes, right.  The motion is denied. Bring in the jury.

(The following occurred in the presence of the jury.)

THE COURT:  So, folks, at this time, I'm going to read the court's instructions on the law.  Copies of these instructions will be available for each of you in the jury room, so you don't need to take notes.  But do pay careful attention to what I say.

Members of the jury, now that you've heard all the

evidence, it is my duty to instruct you on the law that applies to this case.  Copies of these instructions will be available in the jury room for you to consult.

It is your duty to weigh and to evaluate all the evidence received in the case, and in that process to decide the facts.  It is also your duty to apply the law as I give it to you, to the facts as you find them, whether you agree with the law or not.

You must decide the case solely on the evidence and the law.  Do not allow personal likes or dislikes, sympathy, prejudice, fear or public opinion to influence you.  You should also not be influenced by any person's race, color religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.

Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion or biases, including unconscious biases.  Unconscious biases are stereotypes, attitudes or preferences that people may consciously reject, but may be expressed without conscious awareness, control or intention.  You will recall that you took an oath promising to do so at the beginning of the case.

You must follow all of these instructions and not single out some and ignore others.  They are all important.  Please do not read into these instructions, or anything I may have said or done, any suggestion as to what verdict you should

return.  That is a matter entirely up to you.

The superseding indictment in the case is not evidence. The defendant has pleaded not guilty to the charges.  The defendant is presumed to be innocent, unless and until the government proves the defendant guilty, beyond a reasonable doubt.  In addition, the defendant does not have to testify or present any evidence.  The defendant does not have to prove innocence.  The government has the burden of proving every element of the charges, beyond a reasonable doubt.

A defendant in a criminal case has a constitutional right not to testify.  In arrival at your verdict, the law prohibits you from considering, in any manner, that the defendant did not testify.  Proof beyond a reasonable doubt is proof that leaves you firmly convinced the defendant is guilty.  It is not required that the government prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense, and is not based purely on speculation.  It may arise from a careful and impartial consideration of all the evidence, or from lack of evidence.  If, after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty.

On the other hand, if after a careful and impartial consideration of all the evidence you are convinced beyond a

reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty.

The evidence you are to consider in deciding what the facts are, consists of the sworn testimony of any witness, the exhibits received into evidence, and any facts to which the parties have agreed.  In reaching your verdict, you may consider only the testimony and exhibits received in evidence.  The following things are not evidence, and you may not consider them in deciding what the facts are.

Questions, statements, objections and arguments by the lawyers are not evidence.  The lawyers are not witnesses. Although you must consider a lawyer's questions to understand the answers of a witness, the lawyers' questions are not evidence.

Similarly, what the lawyers have said in their opening statements, will say in their closing arguments, and at other times, is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.  Any testimony that I excluded or struck or instructed you to disregard, is not evidence.  In addition, some evidence may have been received only for a limited purpose.  When I have instructed you to consider certain evidence in a limited way, you must do so.  Anything you may have seen or heard when the court was not in session, is not

evidence.  You are to decide the case solely on the evidence received at the trial.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw, or heard, or did. Circumstantial evidence is indirect evidence.  That is, it is proof of one or more facts from which you can find another fact.  You are to consider both direct and circumstantial evidence.  Either can be used to prove any fact.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

In deciding the facts in this case, you may have to decide which testimony to believe, and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.  In considering the testimony of any witness, you may take into account the opportunity and ability of the witness to see, or hear, or know the things testified to; the witness's memory; the witness's manner while testifying; the witness's interest in the outcome of the case, if any; the witness's bias or prejudice, if any; whether other evidence contradicted the witness's testimony; the reasonableness of the witness's testimony, in light of all the evidence; and any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide that the testimony is untrue, just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things, but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.  What is important is how believable the witnesses were and how much weight you think their testimony deserves.

You are here only to determine whether the defendant is guilty or not guilty of the charges in the indictment.  The defendant is not on trial for any conduct or offense not charged in the indictment.

A separate crime is charged against the defendant in each count.  You must decide each count separately.  Your verdict on one count should not control your verdict on any other

count.

The superseding indictment charges the offenses charged in Counts 1 through 5 were committed on or about a certain date. Although it is necessary for the government to prove, beyond a reasonable doubt, that the offense was committed on a date reasonably near the date alleged in the superseding indictment, it is not necessary for the government to prove that the offense was committed precisely on the date charged.

You have heard testimony from an informant who received compensation from the government in connection with this case. For this reason, in evaluating the testimony of the informant, you should consider the extent to which his testimony may have been influenced by this factor. In addition, you should examine the testimony of the informant with greater caution than that of other witnesses.

You have heard testimony from an undercover agent and an informant who were involved in the government's investigation in this case. Law enforcement officials may engage in stealth and deception, such as the use of informants and undercover agents, in order to investigate criminal activities. Undercover agents and informants may use false names and appearances, and assume the roles of members in criminal organizations.

Certain charts and summaries have been admitted into evidence. Charts and summaries are only as good as the

underlying supporting material.  You should therefore give them only such weight as you think the underlying material deserves.

The defendant is charged in Count 1 of the superseding indictment with conspiracy to commit stalking, to mailing threatening communications, and to interfere with federally protected activities, in violation of Section 371 of Title 18 of the United States Code.

In order for the defendant to be found guilty of conspiracy, the government must prove each of the following elements beyond a reasonable doubt:  First, beginning no later than November 2019 and ending on or about February 26, 2020, there was an agreement between two or more persons to commit one or more of the following crimes:  Stalking, mailing threatening communications, or interference with federally protected activities.

Second, the defendant became a member of the conspiracy, knowing of at least one of its objects and intending to help accomplish it.

And third, one of the members of the conspiracy performed at least one overt act, for the purpose of carrying out the conspiracy.

A conspiracy is a kind of criminal partnership, an agreement of two or more persons to commit one or more crimes.  The crime of conspiracy is the agreement to do

something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement, or that they agreed on every detail of the conspiracy.  It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another.  You must find that there was a plan to commit at least one of the crimes alleged in the indictment, as an object of the conspiracy, with all of you agreeing as to the particular crime which the conspirators agreed to commit.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy.  Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators.  On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator.

Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

An overt act does not, itself, have to be unlawful.  A

lawful act may be an element of a conspiracy, if it was done for the purpose of carrying out the conspiracy.  The government is not required to prove that the defendant personally did one of the overt acts.

A conspiracy may continue for a long period of time, and may include the performance of many transactions.  It is not necessary that all members of the conspiracy join it at the same time.  And one may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme, or the names, identities or locations of all of the other members.

Even though a defendant did not directly conspire with other conspirators in the overall scheme, the defendant has, in effect, agreed to participate in the conspiracy if the government proves each of the following beyond a reasonable doubt:

First, that the defendant directly conspired with one or more conspirators to carry out at least one of the objects of the conspiracy.

Second, that the defendant knew or had reason to know that other conspirators were involved with those with whom the defendant directly conspired.

And third, that the defendant had reason to believe that whatever benefits the defendant might get from the conspiracy, were probably dependent upon the success of the

entire venture.

It is not a defense that a person's participation in a conspiracy was minor, or for a short period of time.

Before being convicted of a conspiracy, an individual must conspire with at least one co-conspirator.  There can be no conspiracy when the only person with whom the defendant allegedly conspired was a government agent or informant, who secretly intended to frustrate the conspiracy.

Count 1 of the superseding indictment alleges that the defendant conspired to commit the crime of stalking, in violation of Section 2261(a) of Title 18 of the United States Code, in addition to other crimes.

The elements of stalking are as follows:  First, the defendant used the mail, any interactive computer service, or electronic communication system of interstate or foreign commerce, or any other facility of interstate or foreign commerce.

Second, the defendant used the mail, interactive computer service, or electronic communication system, or other facility of interstate or foreign commerce, to engage in a course of conduct undertaken with intent to kill, injure, harass, or intimidate another person, by means of a threat, as defined below in these instructions.

Third, the defendant's course of conduct placed another person in reasonable fear of death or serious bodily injury,

or caused, or attempted to cause, or would reasonably be expected to cause, substantial emotional distress to the other person.

Course of conduct is an element of the crime of stalking under 2261A(a)of Title 18.  The phrase "course of conduct" is defined as a pattern of conduct composed of two or more acts, evidencing a continuity of purpose.

A threat, as used throughout these instructions, is a serious statement expressing an intention to injure any person, which when considered -- considering all the circumstances, the reasonable observer would interpret as a serious expression of an intention to inflict bodily harm on any person, as distinguished from hyperbole, idle or careless talk, exaggeration, or something said in a joking manner.  A threat can be conditioned on whether the threatened person does or does not take a certain action.  The speaker must make the statement with the intent to communicate a threat.

In determining whether the defendant's statement was made with the intent to communicate a threat, you may consider all the circumstances surrounding the making of the statement.

The defendant is charged in Counts 2 through 4 of the superseding indictment with mailing threatening communications, in violation of Section 876(c) of Title 18 of the United States Code.

In order for the defendant to be found guilty of that

charge, the government must prove each of the following elements beyond a reasonable doubt:  First, the defendant knowingly mailed or arranged to have mailed by the United States Postal Service, a letter or other communication, addressed to a natural person containing a threat, as defined in these instructions, to injure any person.  And second, such letter or other communication was transmitted with the intent to issue a threat, as defined in these instructions. The government need not prove that the defendant intended to carry out the threat.

The defendant is charged in Count 5 of the superseding indictment with interference with federally protected activity, in violation of Section 245(b) of Title 18 of the United States Code.  In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt.

First, the defendant acted by force, or made a threat, as defined in these instructions of force.

Second, the defendant willfully injured, intimidated, or interfered, or attempted to injure, intimidate or interfere with M.C. -- and, counsel, in your final argument, you will identify the initials -- with M.C., a Jewish person associated with the Anti-Defamation League.

Third the defendant acted because of the religion of M.C.; that is, because M.C. was Jewish.

Fourth, the defendant intended to interfere with M.C.'s enjoyment of employment, or any prerequisite thereof by a private employer.

And fifth, the defendant threatened to use a dangerous weapon, explosive, or fire, in connection with the offense.

An act is done knowingly if the defendant is aware of the act, and does not act through ignorance, mistake, or accident. The government is not required to prove that the defendant knew that his acts were unlawful. You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly.

A defendant may be found guilty of the crime of mailing threatening communications, or interference with a federally protected activity, even if the defendant personally did not commit the act or acts constituting the crime, but aided and abetted in its commission. To aid and abet means to intentionally to help someone else commit a crime.

To prove a defendant guilty of mailing threatening communications or interference with a federally protected activity by aiding and abetting, the government must prove each of the following beyond a reasonable doubt: First, someone else committed the crime of mailing threatening communications, or interference with a federally protected activity.

Second, the defendant aided, counseled, commanded, induced or procured that person with respect to at least one element of the crime of mailing threatening communications, or interference with a federally protected activity.

Third, the defendant acted with intent to facilitate the crime of mailing threatening communications, or interference with a federally protected activity.

And fourth, the defendant acted before the crime was completed.

It is not enough that the defendant merely associated with the person committing the crime or unknowingly or unintentionally did things that were helpful to that person, or was present at the scene of the crime.  The evidence must show, beyond a reasonable doubt, that the defendant acted with the knowledge and intention of helping that person commit mailing threatening communications, or interference with a federally protected activity.

A defendant acts with intent to facilitate the crime when the defendant actively participates in a criminal venture, with advance knowledge of the crime, and having acquired that knowledge when the defendant still had a realistic opportunity to withdraw from the crime.

The government is not required to prove precisely which defendant actually committed the crime and which defendant aided and abetted.  A defendant may be found guilty of the

crimes charged, even if the defendant did not personally commit the acts constituting the crime, if the defendant willfully caused an act to be done that, if directly performed by him, would be an offense against the United States.

A defendant who puts in motion or causes the commission of an indispensable element of the offense, may be found guilty as if he had committed this element himself.

Each member of a conspiracy is responsible for the actions of the other conspirators, performed during the course and in furtherance of the conspiracy.  If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.

Therefore, you may find the defendant guilty of mailing threatening communications as charged in Counts 2 through 4 of the superseding indictment, or interfering with federally protected activity, as charged in Count 5 of the superseding indictment, if the government has proved each of the following elements beyond a reasonable doubt:

First, a person committed the crime of mailing threatening communications as charged in Counts 2 through 4 of the superseding indictment, or interfering with federally protected activity as charged in Count 5 of the superseding indictment.

Second, and there's a typo right there --

THE LAW CLERK:  Okay.

THE COURT:  Second, the person who committed the crime was a member of the conspiracy charged in Count 1 of the superseding indictment.

Third, the person committed the crime in furtherance of the conspiracy.

Fourth, the defendant was a member of the same conspiracy at the time the offense charged in Counts 2, 3, 4 or 5 was committed.

And fifth, the offense fell within the scope of the unlawful agreement, and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

When you begin your deliberations, elect one member of the jury as your foreperson, who will preside over the deliberations and speak for you here in court.  You will then discuss the case with your fellow jurors to reach agreement, if you can do so.  Your verdict, whether guilty or not guilty, must be unanimous.  Each of you must decide the case for yourself.  But you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.  Do not be afraid to change your opinion, if the discussion persuades you that you should.  But do not come to a decision, simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict, but, of course, only if each of you can do so after having made your conscientious decision.

Do not change an honest belief about the weight and effect of the evidence, simply to reach a verdict.  Perform these duties faithfully, fairly, and impartially.

Do not allow personal likes, dislikes, sympathy, prejudice, fear or public opinion to influence you.  You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.

Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases.  Unconscious biases are stereotypes, attitudes or preferences that people may consciously reject, but may be expressed without conscious awareness, control or intention.

It is your duty, as jurors, to consult with one another and to deliberate with one another with a view towards reaching agreement, if you can do so.

During your deliberations, you should not hesitate to reexamine your own views and change your opinion, if you become persuaded that it is wrong.

Because you must base your verdict only on the evidence received in the case and these instructions, I remind you,

you must not be exposed to any other information about the case, or to the issues it involves.  Except for discussing the case with your fellow jurors during your deliberations, do not communicate with anyone, in any way, and do not let anyone else communicate with you in any way about the merits of the case, or anything to do with it.

This instruction includes discussing the case in person, in writing, by phone, tablet, computer, or any other means, via e-mail, text messaging, or Internet chat room, blog, website, or any other forms of social media.  This restriction applies to communicating with your family members, your employer, the media or press, and the people involved in the trial.  If you are asked or approached in any way about your jury service, or anything about this case, you must respond that you have been ordered not to discuss the matter, and to report the contact to the court.

Do not read, watch, or listen to any news or media accounts or commentary about the case, or anything to do with it.  Do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials. And do not make any investigation, or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial, based on the same evidence that each party has had an opportunity to address.  A juror who violates

these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result, that would require the entire trial process to start over.  If any juror is exposed to any outside information, please notify the court immediately.

Some of you have taken notes during the trial.  Whether or not you took notes, you should rely on your own memory of what was said.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of your fellow jurors.

The punishment provided by law for this crime is for the court to decide.  You may not consider punishment in deciding whether the government has proved its case against the defendant beyond a reasonable doubt.  A verdict form has been prepared for you.  After you have reached a unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the clerk that you are ready to return to the courtroom.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the clerk, signed by any one or more of you.  No member of the jury should ever attempt to communicate with me, except by a signed writing.  And I will respond to the jury concerning the case, only in writing, or here in open court.

If you send out a question, I will need to consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question.  Remember that you're not to tell anyone, including me, how the jury stands, numerically or otherwise, on any question submitted to you, including the question of the guilt of the defendant, until after you have reached a unanimous verdict or have been discharged.

All right.  The government's final argument.

MR. WOODS:  Thank you, Your Honor.

Ladies and gentlemen of the jury, in January of 2020, the defendant sat safe in his home, plotting to make others feel unsafe in theirs, to make them feel terror.  And the sad thing about this case, the tragic thing, the thing that is difficult to acknowledge, is that the defendant succeeded. His plot worked.

You heard from the victims in this case, Miri Cypers, pulling her stroller from outside the house to hide that a child was living there.  Dave Rosenbaum, clutching his daughter while making pancakes when that man appeared at the front door.  Chris Ingalls, buying a gun.  Mala Blomquist, using a stick to open her mailbox, because she was worried about what was inside.  Veronica Cintron, leaving the profession of a journalist.  And Hilary Bernstein, the widow, alone in her house, feeling fear and terror.  Those stories,

those accounts, they were hard to hear.

But if that is the tragedy of this case, the silver lining, if we can call it that, is that this man was caught red-handed.  And in his own words, in the words he used on one of the posters, "Actions have consequences."  Actions have consequences.  And the consequences of what Kaleb Cole did, is that he is guilty of five crimes.

And let's start by talking about the law surrounding those five crimes.  The first count, Count 1 charges conspiracy. And conspiracy has three elements.

First, there was an agreement between two or more people to commit a crime.  We'll talk about that crime in a minute. And here, it's not in dispute, that there were multiple members of this conspiracy.  You saw the chats.

Second, the defendant joined this conspiracy knowing of its object and helping to attend to accomplish it.  And we'll talk about that in a minute.

And third, that at least one of the members of the conspiracy committed an overt act, some action, something to put the conspiracy into effect.  And here, that's also not seriously in dispute.  You saw that the conspiracy happened. The victims got their posters.

Now, the conspiracy in this case was to commit three separate crimes.  You only need to agree as to one of the crimes.  But, in fact, the defendant, and this conspiracy,

involved three crimes.

First, mailing threatening communications.  And that has two elements.

First, the defendant knowingly mailed, or arranged to have mailed by the postal service, a communication addressed to a person containing a threat.

And second, this was done for the purpose of transmitting a threat.

And here you heard that the Seattle-based victims got their posters in the mail, the United States Postal Service.  That's not in dispute.  And we're going to talk in a minute about why these posters were threats.  So that's crime one.

Crime two, interference with federally protected activity.  First, the defendant acted by force, or in this case made a threat.  Second, the defendant either injured or in this case intimidated, interfered, or attempted to do that, with respect to Miri Cypers, the first witness you heard from in this trial, a Jewish person associated with the Anti-Defamation League.

Third, the defendant acted, because of the religion of Ms. Cypers, and that's because she is Jewish.  And that's not seriously in dispute.  You heard the fact that she is Jewish, working for a Jewish organization.

Fourth, the defendant intended to interfere with her employment.  And here, if you remember, the poster for Miri

Cypers, it's right there, doesn't just have her name, it's got her organization.  And you saw the chats where he was intending to target the ADL, that Jewish organization.  That's not seriously in dispute.

And fifth, the defendant threatened to use, in this case explosives or fire.  That's a picture of a Molotov cocktail.  An explosive or fire.  That's not seriously in dispute either.

That third object of the conspiracy, stalking.  First, the defendant used the mail.  Any interactive computer service.  The Wire chats that you saw.

Second, the defendant used these services to engage in a course of conduct undertaken with the intent to kill, injure, harass or intimidate another person by means of a threat.  And we'll talk about those threats in a minute.

And third, that course of conduct placed another person in reasonable fear of death or serious bodily injury.  And you saw and heard from each of those victims that that is precisely what they felt.  So that's Count 1, conspiracy.

Counts 2, 3, and 4 charge the substantive crimes.  So not simply the conspiracy, the agreement to do the crime, but the actual crimes of mailing threatening communications.  Count 2, the poster that was sent to Chris Ingalls.  Count 3, the poster that was sent to Miri Cypers.  And Count 4, the poster that was sent to Hilary Bernstein.

And, finally, Count 5 charges a substantive crime, not simply the conspiracy, the substantive crime of interfering with federally protected activity; the poster that was sent to Miri Cypers.

Now, some of you, as we heard the instructions, may have wondered, well, does it matter whether the defendant himself stuffed those envelopes?  Does that make a difference?  It doesn't.  It doesn't.  For two reasons.  What the law says in this aiding and abetting instruction the court gave you, is that if you aid, counsel, command, with respect to someone else committing the crime, you are guilty of that crime.

So look at the elements.  First, someone else committed the crime.  Second, the defendant aided, counseled, commanded, induced or procured that person, with respect to at least one element of that crime.  Third, the defendant acted with the intent to facilitate, to make that crime happen.  And fourth, the defendant acted before the crime was completed.

Here, you saw the defendant created those posters, the posters that went to each of the victims that were charged in Counts 2, 3, 4 and 5.

And second, for the totally independent reason, it does not matter whether the defendant stuffed those envelopes. Because what the law says is that -- and we're going to go over the elements -- but when you commit a crime, when a

crime is committed as part of a conspiracy, the other co-conspirators who directly do that action, they're responsible as long as the conduct was a consequence -- could reasonably have been foreseen to be a necessary or natural consequence of the conspiracy.  So here, first a person committed a crime.  Second, the person who committed the crime was a member of the conspiracy.  Third, that was in furtherance of the conspiracy.  Fourth, the defendant, the defendant was a member of the same conspiracy at the time the offense was committed.  And this offense fell within the scope of the unlawful agreement, one could reasonably have been foreseen to be a necessary or natural consequence of the agreement.

So if you have a conspiracy, as we had here, whether the defendant himself stuffed the envelope or one of the co-conspirators did that, he is responsible.

Now, ladies and gentlemen, I want to be perfectly clear about something.  The government bears the burden of proving each of the elements of these crimes, beyond a reasonable doubt.  But I submit to you that after listening to the opening statements, and the questions that were asked in this case, there really are two questions you're going to have to answer in that jury room.

First, was the defendant part of this conspiracy?  Second, did this conspiracy involve a threat?  And the answer to both

of those questions is a resounding, yes.

So Question 1.  Was the defendant part of this conspiracy? And ladies and gentlemen, let us count the ways.  His own words.

(Audio played.)

MR. WOODS:  His own words.

(Audio resumed.)

MR. WOODS:  And what was found on Kaleb Cole's computer, in his house down in Houston, Texas?  Chris Ingalls.  Not just his name, his office number, his cell number, the very things that appeared on the poster that he received.  Veronica Cintron, a Tampa reporter.  Her name found all the way across the country on his computer, in his room in Houston.  And Mala Blomquist, an Arizona reporter, her name on his computer.  The masks found in his car used as a model for one of the posters.

And, ladies and gentlemen, let's make sure we're on the same page.  You saw all of those chats during the course of this trial, that moniker, the string of characters, that's Kaleb Cole.  All right?  And let's just briefly review the many reasons you know that to be the case.  Here's an article tagging The Moniker and The Moniker replies, "I" -- first person, "I."  And what's that article about?  Kaleb Cole. Another example, The Moniker, sending an article about Kaleb Cole.  And what does The Moniker say?  "I" -- first person --

"I."  That's him.

Remember his discussion about trials in Canada?  There's The Moniker.  And this blood eagle for every bureaucrat poster.  Well, you heard the recording, Kaleb Cole was in trial in Canada, and presented with, "Blood eagle for bureaucrat poster" as evidence.  That's him.

And what was hidden in Kaleb Cole's jail cell?  What was underneath his mattress?  The same characters that appear in this moniker.  This moniker is Kaleb Cole.

And so what do we see in the chats?  Kaleb Cole circulating one of the posters.  It's right there.  He's talking about the three designs for doorsteps.  Three posters.  Three designs in this case.  Right there in the chats.  Talking about gathering the addresses for the victims.  Applauding the efforts to identify Jewish victims.  Ladies and gentlemen, the answer to that first question, Kaleb Cole was part of this conspiracy.  The answer to that question is yes.

So that leaves the second question.  Did this conspiracy involve a threat?  And let's look at the court's instruction of what a threat is.  A threat is a serious statement expressing an intention to injure any person, which, when considering all the circumstances, a reasonable observer would interpret as a serious expression of an intent to inflict bodily harm on any person.  That's distinguished from

hyperbole or idle or careless talk, exaggeration, something that's a joke, in a joking manner.  And a threat can be conditioned.  "I will hurt you unless you stop."  Whether the threatened person does or does not take a certain action.  And the speaker must make the statement with the intent to communicate a threat.  And you can consider all of the circumstances in making this determination.

Now, ladies and gentlemen, in order to answer that question, was a threat made in this conspiracy, you need only do one thing.  Apply your common sense and look at these posters.  That's all you need to do.  And let's start with the poster that was sent to Chris Ingalls.  Okay?

There was a picture of a reporter, who's got the press badge on.  There's a man pointing a gun at the reporter's head.  There are men in skull masks in the back, holding guns.  And what is the statement?  What is the statement that Kaleb Cole chose for this poster?  "Death.  Death to pigs." And did Kaleb Cole just come up with this?  Did he pull it out of thin air?  He didn't.  He chose that message for a reason.  He chose it because he knew Chris Ingalls would get the message.  Because Chris Ingalls had just done a news story in which he linked Atomwaffen to Charles Manson. "Death to pigs" was the statement that was written in blood when a family was murdered, slaughtered in their home.  And what is on that address?  Chris Ingalls' home address.  That

poster is a threat.

Then there's the poster that is sent to Miri Cypers and Mala Blomquist.  A man with a Molotov cocktail standing in front of a house, with the victim's home address at the bottom of the poster.  What is the message Kaleb Cole wanted to send to his victims?  It's obvious.  The message is:  Is tonight the night?  Is tonight the night that somebody shows up at my house?  Is tonight the night that I hear glass breaking?  Is tonight the night that my house fills with smoke and fire?  Is tonight the night that I hear my children screaming?  Is tonight the night we die?  That is the message of this poster.  That poster is a threat.

And then there's the poster that was also sent to Veronica Cintron, Veronica Rudie, and Hilary Bernstein.  "We are watching.  We know where you live."  And their home address at the bottom.  And who is one of the two victims in this case?  Hilary Bernstein, a Jewish woman.  A Jewish woman. When you send a poster with a swastika and it says, "We know where you live.  Don't fuck with us."  And when you include a swastika and a statement, "You have been visited by your local Nazis," and you send that to a Jewish woman, you are not simply sending a statement of hate, you are sending a statement of terror.

Ladies and gentlemen, all you need to do is apply your common sense.  But, of course, because of the recordings in

this case, because of the chats that were captured, you also had a front-row image, a view into the defendant's threatening and hatred.  You saw it.  You saw how he planned and executed this operation.

Right there.  "Wanting to create frenzy.  Adding to their fear of us, so we can intimidate them further.  Targeting home addresses."  It's not enough to send a poster to Chris Ingalls at King 5's corporate headquarters, or to the ADL's general office.  No, to send that message of fear and terror, you send it to their home.  And his words.

(Audio played.)

MR. WOODS:  That's exactly what he suggested to his followers.  Take a knife and stab it through a doll right outside their homes.  His words again.

(Video resumed.)

MR. WOODS:  But we can, right?

And one thing I want to make clear, when you look at the instructions, there's no requirement to prove that Kaleb Cole knew he was violating the law.  If we had some crazy scenario where Kaleb Cole honestly thought he was complying with the law, but nonetheless intended to make a threat, he is still guilty.  But that isn't our scenario, because he knew exactly what he was doing.  He knew precisely that what he was doing was wrong.

That's why he said:  Hey, don't use the library, because

of surveillance.  You do that because you're plotting a crime.  Watch out for metadata, the electronic fingerprints associated with a printer.  You say that because you're committing a crime.  I know nothing.  Discuss about what to tell your defense attorney.  When you start talking about what to tell your defense attorney when the cops show up, you're probably engaged in a crime.  And that's exactly what happened here.

You know, ladies and gentlemen, I said at the outset that the great tragedy here is that these victims were terrified and that the silver lining was that this defendant was caught red-handed.  But there's a second silver lining as well.  The defendant set about to terrorize these victims, to silence them, to keep them quiet.  And although he instilled terror, he did not keep them quiet.  He failed.

Miri Cypers, Dave Rosenbaum, Chris Ingalls, Mala Blomquist, Veronica Cintron, Hilary Bernstein, they came into this court and they told you their story.  And because of that, Kaleb Cole's day of judgment is here.  Actions have consequences.  And ladies and gentlemen, I ask you to please hold the defendant responsible for his crimes and find him guilty on all five counts.

Thank you.

THE COURT:  All right, folks, if you'd like to stand up and stretch while counsel is getting set up.

MR. BLACK:  Your Honor?

THE COURT:  Yes.

MR. BLACK:  May it please the court, ladies and gentlemen of the jury, as my co-counsel indicated at the outset of this case, what this case comes down to is really one question, which is what was Mr. Cole's intent in sending those posters?  And more particularly, did the government prove beyond a reasonable doubt that his intent, his purpose in sending the posters was to communicate a serious expression of intent to inflict bodily harm on some person; in other words, to send a true threat?

It is not enough for the government to prove that people felt threatened.  It is not enough for the government to prove that Mr. Cole should have known that they would feel threatened.  It's not enough for the government to prove that he actually knew they would feel threatened.  The government has to prove that his purpose in sending the posters was to make people believe that he or his alleged co-conspirators actually intended to physically harm these people.

This is a high burden.  It's a high burden for a reason, which is that the First Amendment protects speech in this country.  This is one of the most important rights guaranteed to us all by the Bill of Rights.  Speech is protected and can only be criminalized in very narrow circumstances.  The reason for this protection is to check the government's

ability to bring down its massive power on people with unpopular ideas, or even people with ideas that you may find abhorrent.  This is one of the bedrock principles of American law.  And it's one of the prices we pay for the freedoms we have.

We discussed these issues during the voir dire process, and all of you agreed that you would follow the law as presented to you by the court, regardless of personal feelings that you may have about the subject matter of this case.  And under the law, the government has failed to establish that Mr. Cole communicated a true threat in this case.

And to explain why that's the case, I first want to clarify why Mr. Cole's intent is the relevant question here. The answer comes from the instructions that the court read to you, copies of which you'll have, and I encourage you to read them very carefully, because they set forth the precise standards that you must judge this case under.

The first instruction that I want to touch on is a general concept that is part of every criminal case, which is that the government has the burden to prove every element of every charge beyond a reasonable doubt.  All the charges in this case have multiple elements, as the court read, as the government reviewed in their argument.  But in order to convict Mr. Cole, the government must prove each element of

every charge beyond a reasonable doubt.

And what a reasonable doubt is, is something that leaves you firmly convinced that the government has met its burden as to that element.  It's not enough to just think that the defendant probably took actions he's charged with, or that he probably had the intent to commit a crime.  The standard is higher.  You must be firmly convinced that he had that intent.  And, again, that standard applies to every element of the crimes, including particularly intent here, which as I've said is the relevant issue in this case.

The first charge is conspiracy.  There are a number of instructions to finding a conspiracy and setting forth the elements of a conspiracy and how a person can become part of a conspiracy.  It can sound pretty broad, and it can sound like the kind of thing it might be easy to become a part of, but there are some crucial things that the government needs to prove in order to establish that Mr. Cole was part of a conspiracy.

A primary component is that he agreed to commit a crime. And you would all have to agree on the same crime that he agreed to commit.  In this case, all of the charged crimes involved threats.  And threats have a very particular meaning, which the government discussed, which I'll get into more in a minute.  But what this means is that in order to convict Mr. Cole of any of these charges, the government must

prove that he made true threats.

The instructions also discuss aiding and abetting as a basis to find Mr. Cole guilty. Finding Mr. Cole guilty under that theory would also require that he intended the posters as true threats. This is laid out in the jury instructions as well. So what this all means is that to convict Mr. Cole of conspiracy, to convict him of the substantive counts, to convict him of aiding and abetting, you have to find that he intended the posters to be true threats.

The definition of a true threat is set forth in the court's instructions. It's in front of you now. There's a few parts that we've highlighted here. The first is that a true threat must be a serious statement expressing an intention to injure any person. It's not an intent to scare them, it's an intent to injure them. It cannot be hyperbole. And at the bottom, the most important element of this definition, in our view, is that the speaker must make the statement with the intent to communicate a threat.

Again, it's not enough for the government to prove that people felt threatened, or that Mr. Cole should have known that they would feel threatened, or that Mr. Cole actually knew that they would feel threatened. The government has to prove that that was Mr. Cole's intent in sending the posters was to make people believe that he or his co-conspirators actually intended to communicate a true threat, which, again,

is defined as a serious expression of intent to inflict bodily harm on any person.

And not only has the government failed to meet that burden, the available evidence clearly shows that this was not Mr. Cole's purpose. And how do we know this? Because of Mr. Cole's and his alleged co-conspirators' own statements. These statements included things that appeared on the chats between the people involved in the postering campaign.

This is the first one. It's sent by Krokodil to the confidential informant, to announce the plan to him and to tell him what the whole idea is behind it. And the purpose is set forth right there. It's to dox people. It's not to make people think that AWD is actually going to harm them.

And Mr. Cole himself also sent messages in the chat room that communicated his personal intent about the campaign. "The point of the campaign is to send a message, stir whispers." There's nothing about making people think that they are actually in danger. And he reiterated this a number of times. "The point overall is to send a message and stir whispers and a wee bit of frenzy." It's about sending a message, getting press coverage. Again, "stirring whispers."

And Mr. Cole also made statements that were secretly recorded during the meeting on January 9th at his home. He talks about doing to ADL what they did to him. And what that is, is expose him and expose his information.

He talked about sending a message.  Again, he's talking about whispers and trying to enhance their reputation, getting media attention.  He says it's a symbolic gesture.  And he specifically talks about not wanting to overshoot the mark, not wanting actually to go to somebody's doorstep and say, "We're going to kill you."  That's what he says he does not want to do.  He never, in any of these chats or recorded statements, indicated that he had an actual plan to hurt anyone, let alone saying that he actually did want to hurt anybody, which he never did.

And these statements are reliable expressions of Mr. Cole's true thoughts.  They were made in a context where he thought he was among friends and colleagues.  It was on the chat string, and in the secretly recorded meeting.  He had no idea that the FBI was part of it, that an undercover -- that a confidential informant was part of it.  He had every reason in the world to be completely candid, in that context.  And he was.  He said exactly what his intent was, on numerous occasions.  He was consistent about it.  He never said that his intent was to communicate a serious expression of an intent to inflict bodily harm.  In fact, he said explicitly:  You don't want to do that.

There was some talk at one point about pinning a rag doll to a tree with a knife, in the context of discussing actions taken by another group.  But nobody ever did that.  And

Mr. Cole never told anybody to do that.

We also know that Mr. Cole did not intend these communications to be true threats, because of the content of the posters, things like, "Two can play at this game," which infers that there's some kind of back and forth happening. "These people have names and addresses." Talking about exposing information. He's talking about doxing people, he's talking about when Mr. Ingalls went to his dad's house and showed it on TV. He's talking about the ADL publishing information about him and his group, and multiple witnesses, including Ms. Cypers and Mr. Ingalls, acknowledged that they understood the messages in the posters to be about doxing.

You've heard that Mr. Cole is young and part of a group of other young men. You've seen and heard him talking, without much perspective on the world. He has grown up in a polarized nation, a nation where even the President of the United States labeled the media as the "enemy of the people." Mr. Cole has been inundated with toxic slogans, that most of you have probably all heard in political and social movements, such as: Lock her up. Beat the bitch. All cops are bastards.

And the memes and the political videos that you've no doubt seen that have inundated our culture, have influenced people. And that's -- that kind of exposure obviously doesn't lead necessarily into white supremacy, or neo-Nazism,

or anything like that.  But it does help explain the sort of "us against them" view that Mr. Cole and his companions clearly had.  And this is what they were acting on.

They believe that they were engaged in a struggle regarding public opinion and doxing.  It was misguided.  It was grandiose.  It was based on views that I strongly suspect that you don't agree with, in the slightest.  But it was the genuine purpose of their campaign.  And this was stated repeatedly and consistently by Mr. Cole.

And this purpose is consistent with what we know about Atomwaffen and Mr. Cole's history.  There have been allusions during this trial that Atomwaffen is a violent organization, and some of its members may have done violent things in the past.  But you heard that in the three years that the FBI has been investigating Mr. Cole, he has never engaged in any violent actions, and that he has never planned any violent actions.  You heard this from the FBI agent who has been investigating him for years.  And the FBI would know, because they have an informant who was embedded in Atomwaffen that entire time.  And he also testified there were no such plans for violence ever made.

Instead, they held conferences, and shot guns in the woods, and -- all legally, talked about their ideas and philosophies.  But they did not plan violent actions.  They did not engage in violent actions.  And any allusions to the

contrary, are simply not supported by the evidence.

In the end, what we have here are a group of disillusioned young men who want to believe that they are engaged in some sort of propaganda war with journalists, and organizations like the ADL.  But they never actually engaged in violence.  They never planned violence.  And most importantly, they never intended to communicate an actual threat to commit violence.  And it is for this reason that we ask you to find that the government has not met its heavy burden to establish, beyond a reasonable doubt, that Mr. Cole's intent was to commit a crime in this case.

And this brings me to one last instruction from the court, which is that it is your duty to return a not guilty verdict, if you do not find that all of the elements of the charges have been proven beyond a reasonable doubt.  This is your duty, even if you disagree with your whole heart about the philosophy underlying Mr. Cole's actions.  This is your duty, even if you find those posters to be despicable.  This is your duty, even if you acknowledge the genuine distress of the people who received those posters.  Because that is not enough for Mr. Cole to be guilty of a crime.  And by returning a not guilty verdict, it would represent no more than a technical finding, under the precise definition of the crimes charged in this case.

This is something that we discussed during voir dire, and

is crucially important in this case. It's something you all agreed to do. And it's something that the evidence in this case supports. For all these reasons, we ask that you find Kaleb Cole not guilty of all the charges against him. And before I sit down, I just want to say one final thing, because this is the last time you'll hear from the defense in this trial, the government will be able to present a rebuttal argument, and I just ask that you keep these principles that I have discussed in mind as you listen to the government's argument. Thank you.

THE COURT: All right. You folks can stand up and stretch while counsel is getting set up.

MR. WILKINSON: Members of the jury, Mr. Black acknowledges that we're to a point, after seeing all this evidence, that there is only one issue in dispute in this case, and that is because the evidence has made crystal clear exactly what happened. And what happened was, the defendant, Kaleb Cole, created these hateful posters, he entered people's names on those posters, so that they would know that he knows who they are. He entered their addresses on those posters, to make clear that he knew where they lived. And he sent those posters out to his cells across the country, to have them mailed to people and glued to people's houses, to terrify them. That happened. There's no dispute about that at this point.

So the only question that you have to decide, when you go back to the jury room, is this:  Did the defendant intend those posters as threats?  How do you answer that question?  Well, I'll suggest to you that the first place you should look is the instructions, what is a threat, in deciding whether he intended to send a threat.

And the instruction tells you that it is a serious statement expressing an intent to injure any person.  And importantly, as Mr. Woods noted, it can be conditional.  It can be, if you continue doing what you're doing, there will be consequences.  And this instruction is particularly important, because -- and useful, because it also tells you what is not a threat.  It's not a threat if it's hyperbole, idle, or careless talk, exaggeration, or something said in a joking manner.

So that is your task when you go back to the jury room.  Ask yourself, did Kaleb Cole intend to send a serious statement about an intent to injure, or was it merely hyperbole, idle or careless talk?  That is the question you need to answer.

And when you're answering that question, keep one other thing in mind.  Don't lose sight of this:  The government does not need to prove that what Cole was doing -- that Cole knew what he was doing was illegal.  Okay?  That's the second sentence there.  The government is not required to prove the

defendant knew his acts were unlawful.  All he had to know was that he was intending to send a serious statement about a risk of injury.

And in making that assessment of what was in his mind, of his intent, I'll offer to you there are three places you should look.  The first is the posters themselves.  A lot has been said about them over these last few days, and I'm not going to go over it all.  But ask yourself, the fundamental question for you.  Are these serious?  Or are these idle or careless talk?  Remember the imagery:  Guns, blood, Molotov cocktails.  Remember the words, "Your actions have consequences.  Don't fuck with us.  You've been visited by your local Nazis."  And please, in particular, consider defendant's decision to put people's names and addresses on those posters.

Remember the testimony of Hilary Bernstein, who spent her career at the ADL.  And she told you she had seen a lot of hateful propaganda in her career.  But what this -- what made this different was not simply that it was something that was personal to her, but it was the fact that this had someone's name and address on it.  It was delivered to their home.  And it told them, "You have been visited by your local Nazis."

Now, what about this argument that these posters weren't threatening injury, that these posters are actually just threatening to put your name on the Internet?  Ask yourself,

if that's what Kaleb Cole intended to threaten, what would these posters look like?  Do these posters have a picture of Miri Cypers' name posted on the Internet?  Does it have an Atomwaffen member sitting at a computer?  No.  These posters have a picture of a man preparing to firebomb her house.

Or the Chris Ingalls' poster, when it says, "Two can play at this game."  Is Kaleb Cole saying:  Oh, I'm going to run a news story about you.  But what would a news story about Chris Ingalls even look like?  No.  The poster has a picture of a blindfolded journalist, with a gun pointed at his head, with the words "Death to pigs," intentionally handpicked by Kaleb Cole, to invoke an incident of a home invasion, where people were slaughtered in their home, and these words were written on their wall in their own blood.  All of this was handpicked, each of these images and words was handpicked by Kaleb Cole to send one message, and that was:  We can get you in your home.

So look at the posters.  You can look at Cole's words that you heard outside of the posters, that he wanted to approach journalists with pure aggression.  You heard that in his own voice.  Pure aggression, not pure hyperbole and idle talk.  Pure aggression.  He wanted to intimidate them, to create a frenzy.  And please, when you're thinking about his intent, remember that moment where he's talking about the rag doll, where he's telling his followers to go out -- at the same

time they stick these posters on people's houses, he says, "At the same time you do that, take a rag doll and stick a knife through its head on their house." And that tells you everything about the defendant's intent. He wanted to terrify them with threats of physical harm.

The third place to look to understand Cole's intent when he was sending these posters, to determine whether they were just a joke, idle words, or whether they were serious, is the words of the people who -- the words that you heard from the people who actually received them, from his targets. How were these things actually interpreted? All six of the people that we know of who received posters like this came into court and told you how they felt when they received this.

How many of them told you they took this as idle or careless talk? Zero. Every single one of them told you that they were terrified, petrified. And that was because Kaleb Cole succeeded in his effort to handpick words and images that would carry people's -- that would prey on people's fear of physical danger. Some of them may have had some concern about their name being posted for other extremists. But every single one told you their primary concern, by far, was for their physical safety.

That's why Mala Blomquist tested her daughter's car, to make sure there wasn't a bomb in it, or the brakes were

tampered with.  That's why they installed security systems in their houses.  Moved out of their houses for a time.

Members of the jury, I want to close by reminding you of one particular instruction that Mr. Woods also mentioned, and it's Instruction 4.  And it's Instruction 4 that says that you are entitled and required to use your common sense in making your determination here.  When you go back to the jury room, use your common sense in looking at these posters, and answer the question:  Did Kaleb Cole intend these as idle.

Talk, careless words, or did he intend them as serious statements of intent to injure people?  And if you apply your common sense, I'm confident you will conclude that these were threats, these were hateful words, done deliberately to terrorize human beings in their homes.  And you will return guilty verdicts on all counts.  Thank you very much for your attention.

THE COURT:  All right, ladies and gentlemen.  If you'll retire to the jury room.  You can commence your deliberations.  Probably start by selecting your foreperson. The court's instructions and the exhibits will be delivered to you in a few minutes.  And your lunch will be brought in around noon.  All right?

(The following occurred outside the presence of the jury.)

THE COURT:  Go ahead and be seated.

All right, counsel, if you will work with Gabe to make

sure he has correctly gathered the exhibits to be sent to the jury room.  If there is no statement otherwise, it will be taken as your concurrence on the current set of exhibits to be sent to the jury room.  Remain in close quarters to the court, no more than 15 minutes away, in case we have questions from the jury, or a verdict.  We'll be in recess.

(Adjourned.)

12:11 p.m.

THE COURT:  Counsel, they indicate they have a verdict.  Are you ready for the jury?

MR. WOODS:  Yes.

MR. BLACK:  Yes, Your Honor.

THE COURT:  All right.  Bring them in.

(The following occurred in the presence of the jury.)

THE COURT:  Will the foreperson of the jury please rise?  Has the jury reached a verdict?

JUROR NO. 1:  Yes, Your Honor.

THE COURT:  Would you give it to the clerk, please?  You can be seated.

The verdict is proper in form.  Will the defendant please rise and face the jury?  And the clerk will read the verdict.

THE CLERK:  United States District Court for the Western District of Washington at Seattle.  United States of America, plaintiff, versus Kaleb Cole, defendant, Case No. CR20-32-JCC.  Verdict form.

Count 1.  Conspiracy.  As to the offense of conspiracy as charged in Count 1, we, the jury, unanimously find the defendant guilty.

Count 2.  Mailing threatening communications.  As to the offense of mailing threatening communications with respect to CI, as charged in Count 2, we, the jury, unanimously find the defendant guilty.

Count 3.  Mailing threatening communications.  As to the offense of mailing threatening communications, with respect to MC, as charged in Count 3, we the jury, unanimously find the defendant guilty.

Count 4.  Mailing threatening communications.  As to the offense of mailing threatening communications with respect to HB, as charged in Count 4, we the jury, unanimously find the defendant guilty.

Count 5.  Interference with federally protected activity.  As to the offense of interference with federally protected activity with respect to MC, as charged in Count 5, we the jury, unanimously find the defendant guilty.

Dated this 29th day of September, 2021.  Signed by the foreperson of the jury.

THE COURT:  Counsel, do either of you wish to have the jury polled?

MR. BLACK:  No, Your Honor.

MR. WOODS:  No, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, first of all, let me ask the clerk to give us a sentencing date and time.

THE CLERK:  Your Honor, this can be set January 11th of 2022 at 9:00 a.m.

THE COURT:  Does that work for you?

MR. BLACK:  Yes, Your Honor.

MR. WOODS:  It does.

THE COURT:  And, folks, if you tell the clerk and want to know what the sentence is, we will mail a copy of the sentencing document to you, if you ask.  If you don't want it, I understand.

And this will conclude your service on this term of federal court.  And you're excused to report to the jury clerk on the first floor.

If you want, I'm happy to invite you back into chambers for a short conversation.  But you're not required to come back.  Okay?  We'll be in recess.

(Adjourned.)


C E R T I F I C A T E


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


*/s/ Debbie Zurn*

DEBBIE ZURN
COURT REPORTER